| | |
|---|---|
| DISTRICT COURT, ADAMS COUNTY, COLORADO<br>1100 JUDICIAL CENTER DR.<br>BRIGHTON, CO 80601<br><br>**PLAINTIFF:** SHEILA JOHNSEN, individually and on behalf of all similarly situated persons,<br><br>**v.**<br><br>**DEFENDANTS:** UNLOCK PARTNERSHIP SOLUTIONS INC.; UNLOCK TECHNOLOGIES, INC.; WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as Trustee for UNLOCK HEA TRUST 2022-1, UNLOCK HEA TRUST 2023-1, UNLOCK HEA TRUST 2024-1, UNLOCK HEA TRUST 2024-2, UNLOCK HEA TRUST 2025-2, and UNLOCK HEA TRUST 2025-3; U.S. BANK TRUST NATIONAL ASSOCIATION, solely in its capacity as Trustee for UNLOCK LEX RESIDENTIAL INVESTMENTS TRUST 2022-1 and UNLOCK LEX RESIDENTIAL INVESTMENTS TRUST 2022-2. | DATE FILED<br>October 1, 2026 10:55 AM<br>FILING ID: E2B197918B36B<br>CASE NUMBER: 2026CV31955<br><br>Δ COURT USE ONLY Δ |
| Attorneys for Plaintiff:<br>Rachel Dempsey, Atty Reg. # 57708<br>Caroline Parker, Atty. Reg. # 60358<br>TOWARDS JUSTICE<br>1580 N Logan Street<br>Ste. 660, PMB 44465<br>Denver, CO 80203-1994<br>Telephone: (720) 441-2236<br>rachel@towardsjustice.org<br>caroline@towardsjustice.org<br><br>Adrienne Warrell (*pro hac vice* forthcoming)<br>Eric Halperin (*pro hac vice* forthcoming)<br>Cara Petersen (*pro hac vice* forthcoming)<br>HALPERIN PETERSEN & MIKKILINENI LLP | Case Number:<br><br>Ctrm/Div: |

1025 Connecticut Ave. NW, Suite 717
Washington, DC 20036
Telephone: (202) 987-3719
adrienne@hpmjustice.com

**CLASS ACTION COMPLAINT**

Plaintiff Sheila Johnsen ("Plaintiff") by and through undersigned counsel, individually and on behalf of all others similarly situated, files this *Class Action Complaint* against Defendants Unlock Partnership Solutions Inc., Unlock Technologies, Inc., Wilmington Savings Fund Society, FSB, solely in its capacity as Trustee for Unlock HEA Trust 2022-1, Unlock HEA Trust 2023-1, Unlock HEA Trust 2024-1, Unlock HEA Trust 2024-2, Unlock HEA Trust 2025-2, and Unlock HEA Trust 2025-3, and U.S. Bank Trust National Association, solely in its capacity as Trustee for Unlock LEX Residential Investments Trust 2022-1 and Unlock LEX Residential Investments Trust 2022-2.

## STATEMENT OF THE CASE

1. Home ownership is the biggest source of savings and stability for many Americans. For that reason, state and federal mortgage lending laws are designed to protect homeowners from confusing products that can destabilize families' finances and the broader economy.

2. Mortgage lending laws require standardized disclosures so that consumers can compare the true cost of different loans. After the 2008 financial crisis, mortgage lending laws were strengthened by requiring lenders to assess a consumer's ability to repay the loan; this was to prevent lenders from making loans that set consumers up for failure. Colorado lending laws similarly seek to protect consumers by capping the rate of interest that a lender can charge and requiring lenders to be licensed to ensure proper oversight and compliance. And, given the enormously high stakes of preventing people from losing their homes and their life savings, mortgage lending laws protect a borrower's right to pursue any legal challenges in court, rather than in mandatory arbitration.

3. Defendants Unlock Partnership Solutions Inc. and Unlock Technologies, Inc. (collectively Unlock or Unlock Defendants) operate a company that claims that it has found a way around each of these laws because it offers consumers a "Home Equity Agreement" (HEA), not a loan. But through its HEA, Unlock provides homeowners with an advance of money, receives security through a deed of trust on their home, and then requires repayment within at least 10 years. That is to say, despite Unlock's efforts to disguise it, the product it offers is a residential mortgage loan. Unlock is taking advantage of consumers by evading the federal and state laws that apply to mortgage lending.

4. Unlock preyed on Coloradans, offering its HEA product through an opaque, nearly 100-page contract filled with confusing terms of art that obscure the true cost of the loan, among other unfavorable terms. Unlock touts its product as not having interest charges or monthly payments, advertising that the cost instead depends on "how much or how little your home appreciates during the length of your HEA term." It provides homeowners with what it calls an "Investment Payment"—in effect, the principal of the loan—based on a percentage of the home's current value. In exchange for the Investment Payment, Unlock's contract entitles it to a payoff of *double* the percentage used to calculate the payment to the homeowner. In other words, if the homeowner receives 10% of the home's current value, Unlock is entitled to 20% of the home's value at the end of the HEA term, basically guaranteeing Unlock a massive return regardless of any changes in the housing market. In fact, it would likely take a catastrophic market crash more than five times more severe than the worst crash in modern history for Unlock to be at risk of not being fully repaid. The payoff amount is in addition to thousands of dollars in fees.

5. Unlock also misleads consumers about its true cost by presenting its "Annualized Cost Limit"—another one of its confusing contract terms—as a means of comparing the cost of the HEA to an interest rate for a comparable loan. But Unlock's Annualized Cost Limit uses a formula that is not, in fact, comparable to an interest rate calculation, leaving homeowners who try to do this comparison with a false impression about the relative costs of an Unlock HEA and a traditional mortgage. And Unlock's Annualized Cost Limit of 19.9%, which understates the actual effective interest rate a homeowner is paying, is still far above market mortgage rates and the Colorado usury cap for unsupervised loans.

6. The high cost of Unlock's HEAs is not to compensate Unlock for higher risk. Unlock has structured its HEA product with highly lopsided terms so that it effectively shifts almost every potential downside risk and cost to consumers to ensure the future payment it receives far exceeds its advance. For example, Unlock requires homeowners to pay for all taxes, insurance, and property maintenance. In the event of any uncured default, Unlock reserves the right to increase the amount the consumer owes it by 10%. In addition, when a consumer seeks to exit the HEA, if Unlock decides the home value is negatively impacted by any repair items, defects, conditions, or damage, it may unilaterally estimate the cost to repair those conditions and increase the amount the consumer owes by that estimate.

7. Plaintiff Sheila Johnsen, and hundreds of other Coloradans, took out a loan from Unlock without understanding either the true cost of the loan or that Unlock did not comply with state and federal mortgage consumer protections. She brings this suit on behalf of herself and other Coloradans to protect the home equity that she worked hard to earn, and which is a source of financial stability for her family.

8. Unlock is not the only company offering home equity investment loans to Colorado homeowners. In recent years, the availability of these new loans has skyrocketed around the country, and Colorado is no exception. As a result of these predatory practices, hundreds of Coloradans are subject to ballooning payments, loss of home equity, and restrictions on their ability

to use their homes as they see fit; and when these contract terms begin to become due in the next few years, hundreds more Coloradans may be subject to forced sales of their homes. Against the backdrop of the state's well-documented housing scarcity, such practices threaten the financial well-being of consumers across the state.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiff Sheila Johnsen is 47 years old and a citizen of Commerce City, in Adams County, Colorado.

10. Defendant Unlock Partnership Solutions Inc. (UP Solutions) is a corporation formed under the laws of Delaware and headquartered at 1230 West Washington Street, Suite 310, Tempe, AZ 85288. UP Solutions is a wholly-owned subsidiary of Defendant Unlock Technologies, Inc. (Unlock Technologies), which is also a Delaware corporation with a principal place of business at 1230 West Washington Street, Suite 310, Tempe, AZ 85288.

11. UP Solutions issued HEAs, also called Unlock Agreements, to Plaintiff Sheila Johnsen and hundreds of other Colorado consumers.

12. Defendants Unlock Technologies and UP Solutions operate together and in conjunction with Unlock Technologies' other wholly-owned subsidiaries: Unlock Partnership Solutions AO1 Inc., Unlock Partnership Solutions AO2 Inc., Unlock Home Equity Solutions Inc., and Unlock Homeownership Solutions Inc. (collectively Unlock Entities).

13. Besides UP Solutions, none of the other Unlock Entities have issued Unlock Agreements in Colorado.

14. Unlock's website does not differentiate among the Unlock Entities. Instead, in fine print, it explains that Unlock Agreements are provided exclusively by UP Solutions, Unlock Partnership Solutions AO1 Inc., Unlock Partnership Solutions AO2 Inc., and Unlock Home Equity Solutions Inc., which it describes as "dba 'Unlock' and/or 'Unlock Technologies'" and Unlock Homeownership Solutions Inc., all of which are wholly-owned subsidiaries of Unlock Technologies, Inc. and are "collectively, 'Unlock'[.]"

15. Unlock's website lists the officers for Unlock and does not differentiate the leadership for the Unlock Entities. The corporate leaders on Unlock's website include Jim Riccitelli (CEO & Co-Founder), Kevin Nerney (CFO & CBO), and Lee Kaplan (General Counsel).

16. Defendants Unlock Technologies and UP Solutions have the same corporate officers listed in their corporate filings in states where they do business: some combination of James Riccitelli (CEO), Kevin Nerney (CFO), and/or Leith Kaplan (Secretary), among others. One or more of these persons direct, control, and manage Defendants Unlock Technologies and UP

Solutions, and at all relevant times, there has existed a unity of interest, ownership, and control between these Defendants.

17. Defendants Unlock Technologies and UP Solutions have the same offices and employees.

18. The Minnesota Attorney General recently entered into a consent judgment with Unlock Technologies, UP Solutions, and Unlock Partnership Solutions A02 Inc., for their collective operations marketing, offering, and entering into Unlock HEAs in Minnesota.

19. Defendants Unlock Technologies and UP Solutions are joined in a joint venture, common enterprise, or integrated enterprise. They have agreed to combine their operations, property, skill, and knowledge for the purpose of carrying out a single business enterprise, namely originating and realizing financial gains from Unlock HEAs. Defendants Unlock Technologies and UP Solutions have centralized operations, common management, unified advertising, and common ownership. Defendants Unlock Technologies and UP Solutions can be held jointly and severally liable for their law violations.

20. Defendants Unlock Technologies and UP Solutions were, and are, the alter egos of one another, such that any liability incurred by one Defendant is chargeable against the other. Because of their agreement and cooperation in the acts set forth herein, Defendants Unlock Technologies and UP Solutions are responsible for the acts of one another.

21. Defendant Wilmington Savings Fund Society, FSB, solely in its capacity as Trustee (HEA Trustee), serves as the Owner Trustee and/or Indenture Trustee for Unlock HEA Trust 2022-1, Unlock HEA Trust 2023-1, Unlock HEA Trust 2024-1, Unlock HEA Trust 2024-2, Unlock HEA Trust 2025-2, and Unlock HEA Trust 2025-3 (collectively the Unlock HEA Trust Defendants). The Unlock HEA Trust Defendants are statutory trusts formed under the laws of Delaware. The HEA Trustee has a principal place of business at 500 Delaware Avenue, 11th Floor, Wilmington, DE 19801.

22. The Unlock HEA Trust Defendants are issuers of securitization transactions for which the collateral includes Unlock HEAs secured by deeds of trust recorded in Colorado.

23. Defendant U.S. Bank Trust National Association, solely in its capacity as Trustee (LEX Trustee), serves as the Owner Trustee and/or Indenture Trustee for Unlock LEX Residential Investments Trust 2022-1 and Unlock LEX Residential Investments Trust 2022-2 (collectively Unlock LEX Trust Defendants). The Unlock LEX Trust Defendants are statutory trusts formed under the laws of Delaware. The LEX Trustee has a principal place of business at 1011 Centre Road, Suite 203, Wilmington, DE 19805.

24. Upon information and belief, the Unlock LEX Trust Defendants are the only entities for which assignments of deeds of trust of Unlock HEAs have been recorded in Colorado.

25. Upon information and belief, the Unlock HEA Trust Defendants and the Unlock LEX Trust Defendants (collectively Unlock Trust Defendants) are the only assignees of Unlock Agreements in Colorado.

26. Unlock Asset Management, Inc. (UAM) is another wholly-owned subsidiary of Defendant Unlock Technologies. UAM is the servicer for Unlock Agreements. UAM services the Unlock Agreements on behalf of the Unlock Trust Defendants.

27. Venue in this Court is proper pursuant to C.R.C.P. 98 because Plaintiff resides in this county; Plaintiff executed Unlock's contract at her home in this county; and the performance deed of trust that is the subject of this action was recorded on Plaintiff's home in this county.

28. This Court has jurisdiction over the parties and subject matter of this action pursuant to C.R.S. § 13-1-124 and the Colorado Constitution.

## FACTUAL BACKGROUND

### *State and Federal Laws Protect Homeowners from Predatory Home Equity Loans.*

29. Home equity is the single largest asset for many lower and middle-income families and plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons are commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages (a special type of loan designed for seniors to convert equity into cash without periodic mortgage payments).

30. Congress and the Colorado legislature have passed laws to protect homeowners like Plaintiff from these complex financial products that can put their homes at risk.

31. The federal Truth in Lending Act (TILA) protects all borrowers, but residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

32. In the wake of the financial crisis of 2008, these protections were strengthened to prevent the recurrence of a surge of predatory home lending. For example, mortgage lenders now must ensure that homeowners have the ability to repay a loan. *Id.* § 1639c(a)(1).

33. Mortgage lenders must also provide specific standardized disclosures to help consumers understand the cost of credit, including the finance charge, the total of payments, and

the annual percentage rate (APR), which is calculated as the finance charge applied to the unpaid balances of the amount financed. *Id.* §§ 1638(a), 1606.

34. How to correctly make these standardized mortgage disclosures varies depending on the type of mortgage product. *Id.* § 1638(b). For example, variable rate mortgages require additional disclosures regarding any limitations on rate increases, the effect of a rate increase, and an example of the payment terms that would result from a rate increase. 12 C.F.R. § 1026.18(f)(1).

35. For loans against a borrower's primary residence, TILA guarantees borrowers the right to rescind the transaction until the later of either three days after consummation of the transaction, or the delivery of notice of the right to rescind and the material mortgage disclosures. 15 U.S.C. § 1635(a). This right expires three years after the transaction or upon sale of the property, whichever occurs first. *Id.* § 1635(f).

36. Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* § 1639b(b)(1)(A).

37. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* § 1639c(e)(1).

38. In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." *Id.* § 1602(bb). These include pre-loan counseling, prohibitions on predatory terms such as balloon payments and financing points or fees, and additional disclosures. *Id.* § 1639(a), (e), (h), (m), (u).

39. "Reverse mortgages" likewise have unique protections under TILA and additional disclosure requirements, including of total annual loan cost rates. *Id.* § 1648; 12 C.F.R. § 1026.33(b). Reverse mortgages under TILA are prohibited from having a time-limited maturity date; absent default, they are only due and payable if the homeowner dies, moves out of their primary residence, or sells their home. 15 U.S.C. § 1602(cc).

40. Colorado state law also protects consumers from usurious consumer credit transactions, unconscionable loan contracts, predatory home equity loans, and unlicensed lending.

41. Colorado limits the amount of interest lenders may charge on consumer loans. Supervised lenders—which are either licensed or a supervised financial organization—may generally charge up to 21% interest per year on supervised loans. *See* C.R.S. §§ 5-1-301(46), (47), 5-2-201(2)(b). For consumer loans other than supervised loans, the finance charge may not exceed 12% interest per year on the unpaid balance of the amount financed. C.R.S. § 5-2-201(1).

42. Colorado requires lenders of consumer loans to comply with the federal TILA disclosures and right of rescission. *Id.* §§ 5-3-101, 5-5-203.

43. Colorado's Consumer Equity Protection Act provides additional protections for TILA's "high-cost mortgages," including cautionary notices and assessment of ability to repay. *Id.* §§ 5-3.5-101(2), 5-3.5-103(1).

44. Colorado requires mortgage lenders to be licensed by the state and prohibits unlicensed entities from originating mortgage loans. *Id.* § 12-10-704(1)(a).

45. In a Position Statement issued in January 2026, the Colorado Division of Real Estate made clear that "home equity [investment] contracts" such as Unlock's "can qualify as . . . residential mortgage loan[s], requiring licensure to originate. The expectation of homeowner repayment signals that a home equity contract is a loan[.]" Colo. Div. of Real Est., *Position Statement – MLO 2.0 – License Requirements for Originating Home Equity Contracts* (2026).

***Unlock Markets its Product as Home Equity Agreements, but They Are Mortgage Loans.***

46. Unlock began operations in 2020 and is a rapidly growing company. It touts that it has originated over 20,000 Home Equity Agreements nationwide, worth $2 billion, and currently funds originations in 26 states.

47. Unlock began operating in Colorado in 2021. UP Solutions is the Unlock Entity that made HEAs in Colorado.

48. UP Solutions is not, nor ever has been, licensed to originate mortgage loans in Colorado.

49. Unlock's website advertises its HEAs as a means for a homeowner to "receive a lump sum of cash today in exchange for a share of your home's future value." Unlock describes the cost of its HEA as "based on how much or how little your home appreciates during the length of your HEA term, which can last up to 10 years."

50. Unlock's product guide, which is available on its website, advertises that homeowners can "use the money for up to 10 years without interest charges or monthly payments." The product guide also advertises that, "the Unlock HEA is not a traditional loan. It has no interest rate."

51. Unlock advertises that it has "no income requirements" for its borrowers. Instead, among other underwriting criteria, Unlock requires all borrowers to have a property value of at least $175,000; home equity of at least 30%; a 500 minimum credit score; no bankruptcies or foreclosures in the last five years; and no more than one 90-day late mortgage payment in the last two years.

52. To secure its up-front advance of money to a borrower, Unlock records a lien on the borrower's property, which gives it a right to foreclose according to the HEA contract terms.

53. In short, Unlock extends residential mortgage loans: It provides homeowners with an advance of money that is secured by a mortgage or deed of trust on their property and requires repayment within 10 years or less.

54. Unlock then bundles and securitizes these residential mortgage contracts and sells them to investors.

55. Despite Unlock's assertion that the company is not engaged in mortgage lending, its 2023 security offering was awarded the Residential Mortgage Backed Security Deal of the Year by GlobalCapital, a news and data service covering capital markets.

56. Unlock has been able to securitize virtually all of its HEA portfolio. There have been at least eight rounds of securitizations of Unlock's HEAs, including at least one in 2026, totaling at least $1.7 billion. The Unlock HEA Trust Defendants are issuers of six of these rounds of securitizations.

57. Unlock's business model relies on securitizing its HEAs, which it routinely does with the Unlock Trust Defendants. The Unlock Trust Defendants were in a continuing business relationship with Unlock at the time of origination and assignment of the Unlock Agreements to each of the trusts.

***Unlock's Contracts Use Opaque and Misleading Terms and Require Repayment of Far More than the Amount Received.***

58. Unlock requires consumers to sign a standard approximately 59-page Forward Sale and Exchange Agreement. Unlock also requires Colorado homeowners to simultaneously sign a Performance Deed of Trust, which is a security instrument on their property. Together, these nearly 100 pages of documents are the "Unlock Agreement."

59. The Unlock Agreement is prepared by a sophisticated corporate entity that specializes in home-based financing. Unlock is significantly more sophisticated than Plaintiff and the other homeowners that signed the Unlock Agreement, and substantially more informed about the rights and responsibilities of mortgage lenders under federal and Colorado law. Unlock had the assistance of counsel in preparing and reviewing its Unlock Agreement before presenting it to Plaintiff or other homeowners.

60. Homeowners do not have an opportunity to negotiate the terms of the Unlock Agreement.

61. At the very top of the Forward Sale and Exchange Agreement is a bold and capitalized statement: THIS EXCHANGE AGREEMENT IS NOT A LOAN. Compl. Ex. 1 at 1. The Unlock Agreement further states that it is "not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any

other requirements, restrictions, limitations or prohibitions set forth in such laws." *Id.* at 37 § 21.5.

62. The Forward Sale and Exchange Agreement contains a glossary of approximately 50 defined, proprietary terms, which appears as an exhibit near the end of the document. *Id.* at 55, Ex. F Glossary of Terms. Some of these defined terms, such as "Ending Home Value," are vague terms of art that Unlock created and are contradicted by the more specific provisions of the agreement. *Compare id.* at 55, Ex. F Glossary of Terms ("Ending Home Value," which does not mention Unlock's option pursuant to Section 8.4(c)), *with id.* at 18 § 8.4(c) (which describes Unlock's unilateral option to instruct appraisal of Ending Home Value on a "non-distressed" basis in the event of default).

63. Unlock provides homeowners who sign its agreement with an advance of money it calls the "Investment Payment." This is, in effect, the principal balance of the loan.

64. Unlock does not actually pay the homeowner the full amount of the Investment Payment, however, as it subtracts thousands of dollars in fees, including its own "Origination Fee," which is typically 4.9% of the Investment Payment, and fees for appraisal, settlement, and recording costs. The "Origination Fee" is not itemized and is not commensurate to any actual cost Unlock incurs in originating its loans.

65. In exchange for providing the remaining portion of the Investment Payment to the borrower up front, Unlock receives a future payment obligation from the borrower. That payment obligation is secured by a deed of trust on the borrower's property.

66. Unlock is guaranteed to receive its payment from the borrower, called the "Settlement Payment," when one of the Agreement's "Settlement Events" occurs. *Id.* at 5–6 §§ 1.8.1(e), 1.8.2. The Settlement Events include:

a. Permitted Sale. The homeowner may sell the property—only with advance notice to Unlock and according to Unlock's terms—and pay Unlock the Settlement Payment from escrowed sale proceeds, or Unlock may require the homeowner to deed Unlock its percentage share of the property prior to sale (a process it calls Conversion). *Id.* at 9 §§ 2.3, 2.4.

b. Buyout. The homeowner may elect to pay Unlock's determined Settlement Payment in exchange for Unlock's release of the lien. *Id.* at 10 § 3.1.

c. Death. Upon the last surviving signatory's death, the homeowner's estate must pay Unlock or Unlock may require the homeowner's estate to deed Unlock its percentage interest in the property (Conversion); then Unlock will market and sell the property and require the estate's "necessary cooperation" to complete the sale. *Id.* at 11–12 § 4.7.

d. 10-year Term Maturity. If the 10-year loan term expires, Unlock claims it can require the homeowner to deed Unlock its percentage interest in the property (Conversion); then Unlock will market and sell the property and require the homeowner's "necessary cooperation" to complete the sale. *Id.* at 13 § 5.5.

e. Default. To further ensure that it will be paid back in practice, if homeowners default on any of their obligations under the contract—which include failing to maintain insurance, pay taxes, or make repairs, or filing bankruptcy, among others—Unlock can require the homeowner to deed Unlock its percentage interest in the property (Conversion), and then sell the property to receive its payment, or exercise foreclosure rights. *Id.* at 27–28 § 16.1, 28–29 § 17.2.

67. Pursuant to the Unlock Agreement, if Unlock elects Conversion, Unlock can select an escrow agent, which will execute a deed, the form of which is determined by Unlock, to convey an undivided fee simple ownership percentage in the property to Unlock, at the homeowner's expense and with the homeowner's necessary cooperation and documentation. *Id.* at 12 § 4.7(b), 13 § 5.5(b), 47, Ex. B Unlock Conversion Agreement. Unlock therefore asserts that after it elects Conversion, Unlock and the homeowner can "promptly market and sell the Property" as "co-owners[.]" *Id.* at 12 § 4.7(c), 13 § 5.5(c). Unlock further clarifies that when it exercises Conversion it may "solicit and sell the entire Property, including Owner's interest therein, to one or more third parties[.]" *Id.* at 29 § 17.2(f).

68. Unlock's Conversion procedure is not enforceable under Colorado's equitable mortgage law. In Colorado, security instruments for a payment obligation "shall not be deemed a conveyance, regardless of its terms," and the owner of the security instrument must go through the process of foreclosure and sale to enforce its lien. C.R.S. § 38-35-117.

69. Unlock structures its product so that the value of the share it takes in the home is far greater than the "Investment Payment" the homeowner receives. To ensure that the future payment it receives is far greater than its advance, Unlock imposes what it calls the "Exchange Rate," which it describes as "the price of your Unlock Agreement." Compl. Ex. 1 at 2, Table of Key Terms.

70. The Exchange Rate is the ratio of the percentage of the home value Unlock pays up front and the percentage of the home value that Unlock will ultimately receive. Unlock's typical "Exchange Rate" is 2.0—meaning if Unlock pays 10% of the home value up front it will receive 20% of the home value when a Settlement Event occurs, which is the "Unlock Percentage." *Id.* at 2, Table of Key Terms.

71. Using this fixed "Exchange Rate" means that Unlock will get repaid with interest even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Unlock requires at the outset and may charge throughout the course

of the agreement.

72. For example, in order for Unlock to ever lose money on Plaintiff Ms. Johnsen's transaction, the Johnsens' home value would need to fall by approximately 51%. Only if the Johnsens' home lost more than half its value would the Unlock Percentage of the home value no longer exceed the Investment Payment.

73. Home values in the Denver area have never fallen by anywhere close to 51% in the past half-century. The worst sustained decline was around the 2008 financial crisis, where from peak to trough average home prices in the Denver area still only fell by around 9%.

74. Unlock only risks not being fully repaid in the event of a catastrophic housing market crash that is more than five times as bad as the worst crash in modern history.

75. Unlock's total return is capped by an "Annualized Cost Limit" of typically 19.9%. While Unlock claims there is no interest rate on its product, the formula for calculating the Annualized Cost Limit is the same as a formula for compound interest. Compl. Ex. 1 at 20–21 § 10.1.

76. But, unlike a normal APR, Unlock does not apply its Annualized Cost formula to the actual amount financed to the consumer; instead, it applies this formula to the full "Investment Payment" amount, without subtracting Unlock's 4.9% Origination Fee. As a result, the Annualized Cost Limit of 19.9% does not actually cap the loan at a 19.9% annual interest rate; the true APR for the first year of an Unlock loan is substantially higher.

77. Unlock's product guide falsely claims that its Annualized Cost is comparable to the interest rate on a traditional loan, when, in fact, its formula for Annualized Cost understates the interest rate.

***Unlock's Contracts Exploit Homeowners with Lopsided Terms.***

78. The high cost of Unlock's product is not to compensate Unlock for higher risk associated with repayment. In fact, Unlock has structured its HEA product so that consumers bear effectively all the risk of loss regardless of the housing market conditions.

79. To ensure that nothing will decrease the value of the home or jeopardize its future payment, Unlock requires homeowners to pay for all taxes, insurance, and repairs on the home. Compl. Ex. 1 at 6–7 § 1.9. If a homeowner defaults on these requirements, Unlock can foreclose to get its repayment, or it can make "Protective Advances," which the homeowner then must pay back with interest. *Id.* at 28–29 § 17.2(a), (g), 30–31 §§ 17.12, 17.13.

80. If a homeowner does not cure any default, Unlock may also increase the amount the homeowner owes Unlock as the Settlement Payment by an amount equal to 10% of the original

Investment Payment. *Id.* at 29–30 § 17.6.

81. Moreover, when a Settlement Event occurs, if Unlock determines that a homeowner has not sufficiently maintained and repaired the property, or that the home's value is negatively affected as a result of "any repair items," including those which may have existed at the Effective Date of the Unlock Agreement, Unlock can hire professionals to estimate the cost required to perform such repairs and charge its estimated maintenance costs to the homeowner as a Maintenance Adjustment to the Ending Home Value. *Id.* at 16–17 § 7.2. Unlock can unilaterally charge a homeowner its selected professionals' estimates of repair costs regardless of any lower estimates that the homeowner may have obtained. *Id.* But Unlock typically will not apply a Maintenance Adjustment unless the property value is decreased by at least $10,000. *Id.*

82. Unlock allows homeowners to seek an Improvement Adjustment decrease to the Ending Home Value to avoid Unlock sharing in any increase in value based on home improvements the homeowner has made. But the Improvement Adjustment applies only to improvements that have added more than $10,000 in property value at the time of settlement, based on an appraisal and as documented with photographic evidence, regardless of how much a homeowner has invested in the improvements. Improvement Adjustments also do not include ordinary and necessary maintenance and repairs such as replacing a roof or HVAC even when these would increase the home's value. *Id.* at 14–16 § 7.1.

83. Another way in which Unlock ensures that it will extract the maximum value from the sale of the home is by giving itself significant power over the sale. If Unlock determines that the sale price is too low, Unlock can "in its sole discretion" calculate the Ending Home Value based on a property appraisal instead of the actual sale price. *Id.* at 8 § 2.1(i). Unlock can also effectively delay the sale by requiring sworn documentation from both the owner and buyer. *Id.*

84. Unlock also has unilateral power over appraisals. Whenever Unlock requires a property appraisal, Unlock selects the appraiser. *Id.* at 17 § 8.1. Where there is a pre-existing appraisal—such as one from a third-party buyer—Unlock may accept or reject that appraisal for purposes of establishing the Ending Home Value. *Id.* at 18–19 § 8.7.

85. Unlock requires homeowners to pay for the first appraisal in connection with every instance where one could be needed: (1) initial valuation before closing to establish a Starting Home Value; (2) any Settlement Event; (3) any Partial Buyout; (4) any Event of Default; (5) any allocation of insurance or condemnation proceeds; (6) any other determination of Ending Home Value; (7) any Maintenance Adjustment or Improvement Adjustment; or (8) any Approved Subsequent Loan. *Id.* at 19 § 8.8(a).

86. In any Event of Default, Unlock may unilaterally instruct that the property be appraised on a "non-distressed" basis—which will almost certainly increase the appraisal value—and use that inflated valuation as the Ending Home Value, from which Unlock calculates its

repayment. *Id.* at 18 § 8.4(c).

87. Unlock has similar unilateral power over property inspections. Unlock selects the inspection company and requires homeowners to pay for Property Inspections in connection with all the same circumstances as appraisals. *Id.* at 19 § 9.1; 20 § 9.4.

88. Unlock further protects its ability to maximize its return on investment by imposing rules on a homeowner's ability to access potential sources of cash from the property and its equity. Unlock imposes limits on the total amount of financing that can be secured by the property and requires Unlock's prior written consent to receive any subsequent loan secured by the property. *Id.* at 24–25 §§ 12.1, 12.4.

89. Unlock also restricts a homeowner's right to rent the property. *Id.* at 26 §§ 14.3, 14.4.

90. In the event of a Settlement Event where Unlock determines any tenant "is having a negative impact on the Unlock Share," the homeowner must compensate Unlock for that loss in the payment value. *Id.* at 26 § 14.7.

91. Unlock may also charge a homeowner "reasonable Administration Fees" in connection with handling events that may occur such as a Settlement Event or event of default. *Id.* at 27 § 15.1. If not paid right away, these fees and others are considered Unpaid Owner Obligations, which are charged to a homeowner in addition to the Unlock Percentage to determine the final Settlement Payment the homeowner owes Unlock. *See id.* at 5 § 1.8.1(d), 7 § 2.1(c), 27 § 15.2, 36–37 § 21.4.

92. The Unlock Agreement purports to require disputes to be resolved in arbitration—even though TILA prohibits arbitration clauses in residential mortgage loans. 15 U.S.C. §§ 1639c(e)(1), (3).

93. The Unlock Agreement also provides that in certain circumstances where a party pursues injunctive relief with a court, the prevailing party can seek reasonable costs and attorneys' fees. Compl. Ex. 1 at 35 § 20.5. The arbitration provision further purports to waive a homeowner's rights to punitive or consequential damages and class action relief. *Id.* at 35 §§ 20.4, 20.7.

94. Unlock also ensures its repayment in the event of a property loss by shifting all aspects of this risk to the homeowner. Unlock requires the homeowner to maintain liability and hazard insurance and requires that Unlock be named as a loss payee under all insurance policies the homeowner obtains for the property. *Id.* at 31–32 § 18.1. After a loss, if insurance coverage is insufficient to restore the property and the insufficient insurance funds are caused by underinsurance, Unlock can require the property owner to pay for restoration out of pocket. *Id.* at 32–33 § 18.2.4. If restoration is not feasible despite sufficient insurance coverage, Unlock can take from the insurance proceeds "an amount equivalent to the Settlement Payment as it would have

been calculated had the Unlock Agreement been settled immediately before the destruction or damage occurred" before the homeowner receives the balance of the proceeds. *Id.* at 33 § 18.2.5.

95. Unlock further ensures its repayment by shifting the risk of any legal claims or attorneys' fees relating to the property to the homeowner: The Unlock Agreement requires that homeowners indemnify Unlock from any and all claims, damages, liabilities, actions, and expenses, including attorneys' fees, relating to the property or breach or acts or omissions by the homeowners or their agents, including any defect or condition affecting the property, whether known or unknown. *Id.* at 38 § 21.12, 25–26 § 13.2. The Performance Deed of Trust further obligates a homeowner to pay all fees and expenses, including attorneys' and experts' fees and costs, incurred "in any way related to this Performance Deed of Trust, to the interpretation or enforcement of the parties' rights under this Performance Deed of Trust, or to the Property." *Id.* at 65 § 2(b)(6).

96. Finally, to further ensure that the future payment it receives is far greater than its advance, when Unlock securitizes its loans after closing, the securitization Asset Management Agreement requires that at year 10, contracts in the Unlock HEA Trusts will be automatically extended for two years if the home's value is 20% below the value at origination.

97. In sum, Unlock has structured its product to ensure it will receive repayment of its advance plus interest regardless of changes in the housing market. Unlock touts this to investors on its website, stating: "Embedded downside protection in [the home equity agreement] product structure allows for stable returns across various housing cycles." Unlock's website also tells investors that its "investment returns are uncorrelated with broader markets and inflation-protected."

***The Colorado Attorney General Took Action to Stop Unlock's Unlawful Lending.***

98. On November 1, 2024, the Attorney General for the State of Colorado (Attorney General) directed UP Solutions to cease and desist from further origination activities in Colorado. Unlock stopped new originations in Colorado shortly thereafter.

99. Defendant Unlock Technologies' wholly-owned subsidiary Unlock Home Equity Solutions Inc. registered as a mortgage company in Colorado in December 2024, but, upon information and belief, has not yet originated loans in Colorado.

100. On June 24, 2026, the Attorney General's office announced that it had entered into a settlement agreement with UP Solutions.

101. The Attorney General's office determined that Unlock's HEA products are loans and UP Solutions violated the Colorado Uniform Consumer Credit Code (UCCC) by failing to make required loan disclosures, including the cost of credit as an annual percentage rate.

102. The Attorney General's settlement asserts that Unlock's HEAs are consumer credit transactions under Colorado law. The settlement requires UP Solutions to comply with the UCCC, including Colorado's Consumer Equity Protection Act (CEPA), and the accompanying rate caps, required disclosures, and licensing obligations, including by applying for a supervised lender license before resuming operations in Colorado.

103. The Attorney General's settlement further requires UP Solutions to provide some restitution to homeowners who have already experienced a Settlement Event and exited their Unlock loans—but not the full amount they are entitled to under the law. The settlement requires UP Solutions to repay consumers only 62.5% of the unlawful interest it collected in excess of the Colorado lending rate cap. While the settlement does not specify what rate cap applies, UP Solutions appears to have completed its refund calculations using the interest rate cap for supervised lenders, which is up to 21%, rather than the maximum 12% interest it could have charged as an unsupervised lender. In other words, UP Solutions is keeping: (1) a portion of the finance charge consumers paid above Colorado's 21% maximum interest rate for supervised loans, and (2) the entire finance charge between 12% and 21%, which was illegal for an unlicensed lender to charge. The settlement estimates UP Solutions will return only $390,783 to 167 consumers who had already repaid their loans as of June 2026.

104. If a creditor has violated the provisions of the UCCC concerning the authority to make supervised loans, Colorado consumers are not obligated to repay *any* finance charge and have a right to recover a penalty of up to three times the finance charge, as determined by a court. C.R.S. § 5-5-201. Nevertheless, the Attorney General's settlement will not reimburse consumers for the remaining unlawful interest they paid, nor does it provide consumers any penalties or damages for Unlock's unlawful conduct or allow them to enforce their rights to rescind the loans.

105. Consumers, like Plaintiff, who have not yet experienced a Settlement Event will not receive any relief from the Attorney General's settlement until they are required to repay Unlock. Even though these loans were illegal when originated, consumers will have to pay Unlock a finance charge of up to 21%, the maximum allowed for supervised lenders by the Colorado consumer credit rate cap. Consumers will not receive any penalties or damages for Unlock's unlawful conduct, nor does the settlement enumerate their right to rescind the loans.

### *The Johnsens' Transaction*

106. Sheila and Adam Johnsen are a married couple who have lived in their home in Commerce City, Colorado since 2013. Sheila is the sole owner of their home.

107. Sheila and Adam each have a high school education. Sheila is an office worker who began her career in accounts payable and now works as an environmental coordinator. Adam completed trade school and worked as a welder until he was injured in 2009 and became disabled.

108. Adam was in a serious car accident in 2022. Following the accident, Adam and

Sheila got into credit card debt and spent funds available from their pre-existing home equity line of credit (HELOC) to cover Adam's medical expenses.

109. In the fall of 2023, Sheila and Adam found Unlock while searching online for options to help with their debt.

110. Sheila and Adam had phone calls with two different representatives from Unlock who led them to believe that they would be taking cash out of the equity of their home and paying it back with some interest but without monthly payments.

111. Sheila provided some financial documentation to Unlock by e-mail. Then an appraiser came to their home, and shortly thereafter Sheila learned she was approved.

112. Unlock emailed Sheila a 100-page document package to review and sign electronically. No one from Unlock explained the documents to Sheila or Adam over the phone.

113. Three days after Sheila signed the documents electronically, a notary came to the Johnsens' home with closing papers. The notary did not work for Unlock and could not answer questions about the documents.

114. Sheila and Adam signed the Unlock closing documents at their home on October 8, 2023.

115. The notary left Sheila and Adam what she described as a copy of the documents they signed. Those documents are attached as Complaint Exhibit 1.

116. At the time Sheila signed the closing documents, she did not understand she would be unable to refinance or get another mortgage against their home until the Unlock loan was paid off.

117. At the time Sheila signed the closing documents, she was not aware what the interest rate was on the Unlock loan because it was never presented to her.

118. Sheila's Investment Payment was $65,400—12.58% of her estimated home value of $520,000.

119. Of that $65,400, Unlock kept 4.9%, or $3,205, as an Origination Fee. An additional $1,743 went to Unlock's chosen title company and appraisers as follows: $715 for Appraisal Cost; $895 for Settlement Cost; and $133 for Recording Fees.

120. Sheila was required to pay off her HELOC with $25,253 of the proceeds. The remaining $35,200 went to Sheila.

121. At the end of the 10-year Unlock Agreement, or when a Settlement Event occurs,

Unlock will receive 25.78% of the Johnsens' home's value—an Exchange Rate of 2.05. This means Sheila will owe Unlock more than twice the percentage of her home's value that she received from the loan, unless that amount is capped by the Annualized Cost Limit.

122. If Sheila had understood the true terms of the Unlock Agreement, including that it was a loan that carried an interest rate of more than 19.9% in the first three years, she would not have gone through with this transaction.

123. In December 2025, the Johnsens asked Unlock what it would cost to pay off the loan early. Unlock told Adam that he could roughly calculate what they owed by multiplying the Investment Percentage by the Exchange Rate by the home's value on Zillow or Redfin, which at the time would have resulted in a payment of approximately $139,000. The Johnsens could not afford to pay this amount so they did not take any further steps toward payoff.

124. Even if that payoff had been capped by the Annualized Cost Limit, at the end of 2025 the Johnsens would still have owed at least approximately $98,078—which is $37,547 more than they had received after fees just 2.25 years earlier.

125. Sheila and Adam only discovered that their Unlock HEA loan terms and disclosures may have been inaccurate and illegal when they saw a local news segment in spring 2026 about a lawsuit that had been filed against a different home equity investment company.

## CLASS ACTION ALLEGATIONS

126. Plaintiff brings this action on behalf of herself and as a class action pursuant to C.R.C.P. 23, including, without limitation, Sections (b)(2), (b)(3), and (c)(4) of Rule 23.

127. Plaintiff brings this action on behalf of the proposed classes defined as follows:

a. **Colorado Class**: All persons who have entered into an Unlock Agreement secured by a property located in Colorado and extending through the date of class certification.

b. **Rescission Subclass**: All persons who have entered into an Unlock Agreement secured by a property located in Colorado, within the time period commencing three (3) years prior to the filing of this action and extending through the date of class certification, who have not sold their properties since obtaining the Unlock Agreement as of the date of the filing of this action.

128. Plaintiff reserves the right to amend the definitions of the classes above based on discovery or legal developments.

129. Numerosity. The putative class members are so numerous that joinder of all is impractical. Unlock has entered into at least 532 Agreements in the State of Colorado.

130. Predominance of Common Questions of Law and Fact. Common questions of law and fact exist and predominate over any questions affecting only individual putative class members. Common questions include, without limitation:

a. Whether Unlock Agreements or portions thereof are unconscionable;

b. Whether Unlock's HEAs and/or their marketing and advertising violate the Colorado Consumer Protection Act;

c. Whether Unlock's HEAs are residential mortgage loans under the Truth in Lending Act;

d. Whether Unlock's HEAs are residential mortgage loans under Colorado law;

e. Whether Unlock's HEAs are consumer loans under the Colorado UCCC;

f. Whether Unlock's HEAs are reverse mortgages as defined by C.R.S. § 11-38-102(4); and

g. Whether Unlock acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

131. Typicality. Plaintiff's claims arise from Defendants' practices that are applicable to the entire Class and thus are typical of the claims of each putative class member. Plaintiff entered into substantially similar form contracts with Unlock as each class member and is entitled to relief under the same causes of action as the other putative class members.

132. Adequacy. Plaintiff is an adequate representative of the Class because her interests coincide with and are not agnostic to the interests of the members of the class she seeks to represent. Plaintiff has retained counsel competent and experienced in consumer protection and class action litigation; she intends to prosecute this action vigorously; Plaintiff will fairly and adequately protect the interests of the Class; and she has no interests that are adverse to the Class.

133. Superiority. Questions of law and fact common to the putative class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By

contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

**FIRST CLAIM FOR RELIEF**
**(Unconscionability, UCCC, C.R.S. § 5-5-109 and/or Colorado Common Law)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

134. Plaintiff incorporates by reference all paragraphs above.

135. Under the Colorado Uniform Consumer Credit Code (UCCC), a court may refuse to enforce any consumer credit transaction that was unconscionable when made, or induced by unconscionable conduct, or may refuse to enforce any unconscionable term or part of a consumer credit transaction agreement. C.R.S. § 5-5-109(1).

136. The Unlock transaction is a "consumer credit transaction" under the Colorado Uniform Consumer Credit Code (UCCC) because it meets all the requirements of a "consumer loan" as defined in C.R.S. § 5-1-301(15)(a):

a. Unlock is regularly engaged in the business of making loans;

b. Plaintiff and the Class are natural persons;

c. Plaintiff and the Class incurred the debts primarily for personal, family, or household purposes;

d. The debt was by written agreement in which a finance charge was made; and

e. The debt was secured by an interest in land.

137. Unlock is a "creditor" as defined under the UCCC because Unlock "arranges . . . consumer credit transaction[s]" (i.e., the Unlock Agreement) and is "initially payable" under that Agreement. C.R.S. § 5-1-301(17).

138. The Unlock Trust Defendants are also "creditors" because they are "the assignee of the creditor's right to payment[.]" *Id.*

139. The Unlock transaction is "credit" under the UCCC because Unlock grants homeowners the right to defer their payment of debt. C.R.S. § 5-1-301(16).

140. The Unlock Agreement creates a debt because Unlock advances funds and homeowners are obligated to repay Unlock at the conclusion of the Agreement, including upon expiration of the term or a Settlement Event. The Unlock product is designed to ensure that, absent

an unprecedented drop in home values, the homeowner will have to make a payment to Unlock at the conclusion of the Agreement that exceeds their amount received.

141. Like the UCCC, Colorado common law prohibits unconscionable agreements.

142. The Unlock Agreements are substantively and procedurally unconscionable, based on the following, non-exhaustive factors:

a. Plaintiff and the members of the Class are ordinary consumers without sophistication in complex financial transactions;

b. Unlock is a large financial company engaged in the business of soliciting homeowners and placing them in an Unlock Agreement like the one entered into by Plaintiff and the Class;

c. Plaintiff and the Class occupy significantly unequal bargaining strength relative to Unlock, including that Unlock drafted all documents, amounting to approximately 100 pages, and presented them as contracts of adhesion;

d. Unlock drafted the documents such that they are extremely difficult to understand due to their use of cross-references, approximately 50 different defined terms (most of which are proprietary and do not translate to traditional mortgage terms), multiple different formulas for calculating repayment, and use of small print;

e. Unlock misrepresented that its Annualized Cost formula was comparable to a traditional interest rate;

f. Unlock provided no meaningful explanation of the documents to Plaintiff or the similarly situated Class prior to or at signing;

g. There is no Unlock representative available at the closing if the homeowner has questions;

h. Unlock drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that Plaintiff and the Class would not and could not understand the full nature and consequences of the Agreement, including, but not limited to, failing to provide accurate disclosures related to the transaction and cost of credit as required by law and instead providing purported disclosures that were misleading; and

i. Unlock deploys a variety of mechanisms that tilt the transaction in their favor, including requiring an “Exchange Rate” of approximately double the original Investment Percentage; having unilateral influence over the sale, appraisal, and property inspection processes; having unilateral influence over the Ending Home

Value, including through Maintenance Adjustments, Improvement Adjustments, and assessing the impact of tenants; having the ability to add a 10% increase to the Investment Payment in the event of default; restricting subsequent liens and owner-occupancy; including provisions in the agreement that require arbitration and purport to waive punitive and consequential damages and class action relief; including provisions in the agreement that purport to waive the protections of an equitable mortgage; and requiring the homeowner to cover all fees and costs, including transaction costs, the costs of maintenance of the property, appraisal costs, payment of taxes and insurance, payment of all seller's costs, payment of additional administrative fees, indemnification, and Unlock's attorneys' fees.

## SECOND CLAIM FOR RELIEF
**(Mortgage Lending Requirements, C.R.S. §§ 38-40-101 *et seq.*)**
**(On Behalf of Plaintiff and the Colorado Class against Unlock Defendants)**

143. Plaintiff incorporates by reference all paragraphs above.

144. Under Colorado's mortgage laws, a "residential mortgage loan" is "a loan that is primarily for personal, family, or household use and that is secured by a mortgage, deed of trust, or other equivalent, consensual security instrument on a dwelling[.]" C.R.S. §§ 12-10-702(21), 38-40-103.5(1)(d).

145. The Unlock transaction is a residential mortgage loan because: (1) it provides homeowners an upfront payment that it ensures, absent an unprecedented drop in home values, the homeowner will have to repay Unlock; (2) the loan is to be used primarily for personal, family or household use; and (3) Unlock secures the upfront payment by a deed of trust.

146. Unlock is a mortgage company, mortgage lender and/or mortgage loan originator. C.R.S. §§ 12-10-702(12), (13), (14), C.R.S. §§ 38-40-105(7)(d), (e).

147. Colorado law proscribes mortgage lenders and mortgage loan originators from engaging in a number of prohibited acts, including:

a. Knowingly advertising, displaying, distributing, or broadcasting false, deceptive, or misleading statements with regard to rates, terms, or conditions of a mortgage loan, as prohibited by C.R.S. § 38-40-105(1)(a);

b. Making false promises or misrepresentations or concealing essential or material facts to entice borrowers to enter into a mortgage transaction when under the terms of the transaction, the mortgage lender or mortgage loan originator, knew or reasonably should have known, of the falsity, misrepresentation, or concealment, as prohibited by C.R.S. § 38-40-105(1)(b);

c. Facilitating the consummation of a mortgage loan agreement that is unconscionable, as prohibited by C.R.S. §§ 38-40-105(1)(d), (2); and

d. Knowingly facilitating the consummation of a mortgage loan transaction that violates C.R.S. § 12-10-713, by among other things, knowingly making misrepresentations or knowingly making false or misleading advertisements, as prohibited by C.R.S. § 38-40-105(1)(e).

148. Unlock engages in these prohibited acts by, among other things:

a. Knowingly advertising, displaying, distributing, or broadcasting false, deceptive, or misleading statements with regard to the Unlock Agreement;

b. Making false promises or misrepresentations or concealing essential or material facts to entice borrowers to enter into the Unlock Agreement, when Unlock knew or reasonably should have known, of the falsity, misrepresentation, or concealment; and

c. Facilitating unconscionable Unlock Agreements.

149. Unlock thereby engages in prohibited acts and violates C.R.S. § 38-40-105.

**THIRD CLAIM FOR RELIEF**
**(Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 *et seq.*)**
**(On Behalf of Plaintiff and the Colorado Class against Unlock Defendants)**

150. Plaintiff incorporates by reference all paragraphs above.

151. The Colorado Consumer Protection Act prohibits "persons" from engaging in myriad of unfair or deceptive trade practices in the course of business. C.R.S. § 6-1-105.

152. Unlock is a person as defined by C.R.S. § 6-1-102(6) because it is a corporation and/or other legal or commercial entity.

153. Unlock engaged in unfair and/or deceptive trade practices, including but not limited to:

a. Advertising and providing misleading representations regarding the rates, terms, and conditions of its product;

b. Providing false and misleading statements in the transaction documents, including false statements that the security interest could be enforced through Conversion and without a foreclosure process;

c. Extending loans that exceed a finance charge of 12% without obtaining the state licensing approval necessary to do so;

d. Extending loans that carry any effective interest amount or finance charge, without disclosing that interest rate or finance charge;

e. Mischaracterizing the transaction as not a loan, and therefore not subject to the various consumer protection laws that apply to a credit product or loan;

f. Misrepresenting that its Annualized Cost formula was comparable to a traditional interest rate;

g. Failing to maintain appropriate licensure or otherwise comply with lending laws;

h. Structuring the Agreement over the course of 100 pages, and using complex formulas, cross-references, and definitions to prevent consumers from understanding the terms, costs, and consequences of the transaction;

i. Placing restraints on consumers' use of their homes, including restrictions on renting out the home during the term, and imposing a maximum debt amount that restricts homeowners' ability to obtain refinancing and other mortgage products; and

j. Placing consumers in highly lopsided and unfair transactions that benefit Unlock while placing the costs and risks on consumers, including through indemnification and fee shifting.

154. Unlock's conduct constitutes violations of the Consumer Protection Act by:

a. Making false representations of the characteristics and benefits of the transaction, in violation of C.R.S. § 6-1-105(1)(e);

b. Advertising goods, services, or property with intent not to sell them as advertised, C.R.S. § 6-1-105(1)(i);

c. Making false or misleading representations of fact concerning the price of their services in violation of C.R.S. § 6-1-105(1)(*l*);

d. Failing to meaningfully or effectively disclose material information about the transaction to induce consumers to enter into the transaction in violation of C.R.S. § 6-1-105(1)(u);

e. Failing to obtain necessary governmental licenses and permits, namely, the failure to obtain licenses required for supervised lenders, C.R.S. §§ 5-1-301(2), 5-1-

301(46), 5-2-301, and for mortgage companies and mortgage loan originators, C.R.S. § 12-10-704, 705, in violation of C.R.S. § 6-1-105(1)(z);

f. Violating C.R.S. § 38-40-105 in violation of C.R.S. § 6-1-105(1)(uu);

g. Violating C.R.S. § 12-10-710 in violation of C.R.S. § 6-l-105(1)(aaa);

h. Violating C.R.S. § 12-10-713 in violation of C.R.S. § 6-l-105(1)(bbb); and

i. Knowingly or recklessly engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts or practices in violation of C.R.S. § 6-1-105(1)(rrr).

155. Unlock's acts occurred in the course of its business activities.

156. Unlock's acts significantly impact the public, including by:

a. Originating at least 532 Agreements throughout Colorado while obscuring the nature, risk, and cost of the transaction;

b. Recording at least 532 liens that unlawfully encumber consumers' properties;

c. Advertising and marketing to actual and prospective borrowers who have no particular expertise or sophistication in complex financial products;

d. Presenting complex loan documents to unsophisticated borrowers unfamiliar with the home loan regulatory landscape;

e. Placing restraints on the sale and financing of real property, thereby impacting liquidity in the real estate market;

f. Forcing sale of real property against the wishes of the homeowner, thereby depriving homeowners of the benefit of their equity and reducing their ability to secure replacement housing;

g. Preventing heirs from being able to stay in the home and assume the loan after the last surviving borrower passes away, thereby reducing availability in the housing market;

h. Prohibiting rental or extended absence from the home without Unlock consent, thereby reducing availability in the housing market; and

i. Drafting form contracts that are offered to borrowers with significantly imbalanced bargaining power on a take-it-or-leave-it basis.

157. Unlock's acts caused injury to the Plaintiff and the Class, including by:

a. Misrepresenting the true costs, nature, and risks of their product, which prevented Plaintiff and the Class from being able to accurately assess whether to enter into the transaction, and continuing to obscure the true cost and nature of the product during the Agreement;

b. Contracting for and collecting finance charges and fees, including Origination Fees, appraisal fees, settlement fees, and administration fees;

c. Failing to obtain requisite licensing, such that Unlock was prohibited in the first instance from originating the transaction; and

d. Recording liens that unlawfully encumber consumers' property, thereby impacting consumers' ability to obtain other credit or sell their homes.

158. Plaintiff and the Colorado Class are thus entitled to and seek all available remedies under the Colorado Consumer Protection Act.

**FOURTH CLAIM FOR RELIEF**
**(Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*.)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

159. Plaintiff incorporates by reference all paragraphs above.

160. Under TILA, a "residential mortgage loan" is defined as "any consumer credit transaction . . . secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling[.]" 15 U.S.C. § 1602(dd)(5).

161. Unlock's agreements are secured by a deed of trust.

162. Unlock's agreements also count as "any consumer credit transaction." A transaction qualifies whenever (1) "credit is offered or extended" to (2) "a natural person," and (3) "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).

163. Unlock's agreements are made to natural persons and primarily for personal, family, and household purposes.

164. Unlock's agreements involve an offer of credit, defined as "the right granted by a creditor to a debtor to defer payment of debt[.]" 15 U.S.C. § 1602(f). Unlock grants the right to defer payment of a debt when it gives an advance of money equal to a percentage of the value of the home and then defers repayment of that debt until certain triggering events require payment of double the advance percentage of the value of the home (capped by the Annualized Cost Limit).

165. Unlock is also "a creditor." 15 U.S.C. § 1602(g). Unlock regularly extends "consumer credit . . .for which the payment of a finance charge is or may be required[.]" *Id.*

166. Unlock's Agreements are subject to a finance charge, including at least the Origination Fee, any closing costs that are not bona fide and reasonable, and the difference between the Investment Percentage and the Unlock Percentage. *See* 15 U.S.C. § 1605; 12 C.F.R. § 1026.4.

167. Unlock is the entity to whom the contracts at issue in this matter are initially payable. 15 U.S.C. § 1602(g).

168. Unlock has entered into more than five similar contracts, secured by a dwelling, with consumers within the preceding calendar year. Alternatively, Unlock entered into at least two similar contracts secured by a dwelling, with consumers, and subject to additional requirements for high-cost mortgages within the preceding twelve months. *Id.*

169. Because Unlock's product is a residential mortgage loan under TILA, it violates the statute several times over, including but not limited to the following:

a. Unlock originated mortgage loans in Colorado, while being unlicensed to originate mortgage loans in Colorado, in violation of 15 U.S.C. § 1639b(b)(1)(A). In expectation of compensation or other monetary gain, Unlock, among other things, took a mortgage loan application, offered a mortgage loan, arranged a mortgage loan, assisted a consumer in applying for a mortgage loan, or otherwise obtained or made a mortgage loan. Unlock also advertised or communicated that it could or would perform the mortgage lending activities at issue in this case;

b. Unlock's contract includes a mandatory arbitration clause. 15 U.S.C. § 1639c(e)(1), (3);

c. Unlock violated 15 U.S.C. § 1639c(a) by failing to make a reasonable and good faith determination that borrowers had the ability to repay its loans; and

d. Unlock failed to provide disclosures required for consumer credit transactions generally and mortgage transactions specifically including those required by 15 U.S.C. § 1638(a) and 12 C.F.R. §§ 1026.18, .19, .23, .31, .37, and .38.

170. These provisions are violated solely by virtue of the fact that Unlock's product is a residential mortgage loan—even if it is not also either a high-cost mortgage or a reverse mortgage.

171. Additionally, however, Unlock's product also violates other provisions of TILA that regulate these specific kinds of residential mortgages.

172. A "high-cost mortgage" is defined as one secured by a consumer's principal dwelling, other than a reverse mortgage, with an APR that is, for a first mortgage, more than 6.5

percentage points above, and for a subordinate mortgage, more than 8.5 percentage points above, "the average prime offer rate . . . for a comparable transaction." 15 U.S.C. § 1602(bb)(1)(A)(i)(I)-(II).

173. Unlock's typically 19.9% Annualized Cost Limit is a formula for calculating compound interest.

174. No matter what comparable mortgage product is used (whether fixed or adjustable rate, 10 years or less), a 19.9% interest rate is far more than 8.5 percentage points above the average prime offer rate. For example, on October 2, 2023, the variable-rate mortgage average prime offer rate was 7.09% for a 10-year term and 8.18% for a one-year term.

175. Unlock does not comply with the requirements that TILA imposes on high-cost mortgages in numerous ways, including but not limited to the following:

a. Unlock failed to provide disclosures expressly required by statute that, among other things, identify the product as "a loan." 15 U.S.C. § 1639(a);

b. Unlock issues high-cost mortgages "based on the consumers' collateral without regard to the consumers' repayment ability[.]" 15 U.S.C. § 1639(h);

c. Unlock fails to ensure that borrowers receive the required "[p]re-loan counseling" and pre-counseling disclosures. 15 U.S.C. § 1639(u);

d. Unlock financed points and fees in connection with the transaction. 15 U.S.C. § 1639(m);

e. Unlock's loans include a "balloon payment[]," because the entirety of the loan is due all at once. 15 U.S.C. § 1639(e); and

f. On information and belief, Unlock structured the transaction to evade the provisions regulating high-cost mortgages. 15 U.S.C. § 1639(r).

176. In the alternative, Unlock's product is a reverse mortgage, which is another form of residential mortgage loan that poses particular risks for homeowners.

177. Unlock's product meets some of the criteria for a reverse mortgage: Unlock issues a nonrecourse transaction in which it (1) gives an advance; (2) receives security through a deed of trust against a principal dwelling; and (3) payment of any "any principal, interest, and shared appreciation or equity is due and payable" upon either a default or *only* after: "(A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc).

178. Unlock does not comply with reverse mortgage protections, however, by imposing

a 10-year term on its mortgage loans. 15 U.S.C. § 1602(cc).

179. Unlock further failed to comply with the requirements for issuing reverse mortgage loans, including but not limited to, by failing to make required disclosures such as the projected total cost of the mortgage. 15 U.S.C. § 1648; 12 C.F.R. § 1026.33.

180. Plaintiff suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiff's interest in the property.

181. Although 15 U.S.C. § 1640(e) ordinarily requires that an action for damages be commenced within one year from the date of the violation—or three years from the date of the violation for certain TILA violations—the limitations period is subject to equitable tolling in appropriate circumstances. Tolling is warranted where, among other circumstances, the defendant's own conduct prevented the plaintiff from discovering the violation or from timely asserting her rights.

182. Unlock's Agreement was drafted and deployed in such a manner calculated to dissuade consumers like Plaintiff from recognizing or pursuing her federal rights under TILA. In particular, the Forward Sale and Exchange Agreement explicitly states that the product is not a loan and contains a mandatory arbitration clause and class action waiver.

183. This action was filed within one year of Plaintiff's discovery of the violations. The limitations period of § 1640(e) is therefore tolled, and all of Plaintiff's claims are timely. To hold otherwise would reward Defendants who concealed their violations long enough to time-bar its victims' remedy.

184. Upon information and belief, the Unlock Trust Defendants are the only assignees of the Unlock Agreements in Colorado.

185. Assignees of consumer credit transactions secured by real property are equally liable for a creditor's TILA violations if the TILA violation is apparent on the face of the disclosure statement and the assignment was voluntary. 15 U.S.C. § 1641(e). For high-cost mortgages, assignees are subject to all claims and defenses that a consumer could assert against the creditor. 15 U.S.C. § 1641(d).

186. Unlock's failure to use any of the disclosure terms required by TILA is a violation apparent on the face of the Unlock Agreements.

187. Unlock's assignment of any HEAs to the Unlock Trust Defendants was voluntary.

188. As a result of these violations of TILA, pursuant to 15 U.S.C. § 1640, Plaintiff, on behalf of herself and the Colorado Class, seeks actual damages, statutory damages, an amount

equal to the sum of all finance charges and fees paid, an award of reasonable attorneys' fees and costs, and all other appropriate relief as permitted by statute or as is equitable and just.

**FIFTH CLAIM FOR RELIEF**
**(Truth in Lending Act, Right of Rescission, 15 U.S.C. § 1635)**
**(On Behalf of Plaintiff and the Rescission Subclass against All Defendants)**

189. Plaintiff incorporates by reference all paragraphs above.

190. Subject to certain exceptions, in consumer credit transactions involving a security interest in a borrower's principal dwelling, creditors must "clearly and conspicuously disclose" a borrower's right to rescind the transaction pursuant to the procedures set out in TILA and provide borrowers the appropriate form to exercise the right to rescind. 15 U.S.C. § 1635(a); 12 C.F.R. § 1026.23.

191. A borrower's right to rescind expires three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first. 15 U.S.C. § 1635(f).

192. The borrower has the right to rescind the transaction until the later of three days following the consummation of the transaction, or "the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required" under TILA. *Id.* § 1635(a).

193. For purposes of extending a borrower's right to rescind, the "material disclosures required" are, among other things, "the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule," and the additional disclosures required for high-cost mortgages. 12 C.F.R. § 1026.23(a)(3)(ii).

194. Unlock did not provide Plaintiff or any members of the Colorado Class the notice of rescission, rescission model form, or any of the material disclosures required under TILA.

195. Plaintiff, through her counsel, sent a notice of rescission to Defendant UP Solutions on August 27, 2026. Unlock did not grant her rescission request or release its security interest in response.

196. Plaintiff, through her counsel, asked Defendant UP Solutions to identify any assignee of her deed of trust and confirm whether her rescission request had been conveyed to that assignee, if any. Defendant UP Solutions did not provide the requested information.

197. There is no assignment recorded for Defendant UP Solutions' deed of trust on Plaintiff's home.

198. On October 1, 2026, Plaintiff, through her counsel, mailed a notice of rescission to the registered agent for each securitization trust related to any of the Unlock Agreements, including

the Unlock Trust Defendants.

199. Plaintiff hereby rescinds and requests that the Court enforce the rescission of her transaction with Unlock, pursuant to 15 U.S.C. § 1635. Plaintiff also seeks to rescind her transaction as against any assignee of her deed of trust, which, upon information and belief, is one of the Unlock Trust Defendants. 15 U.S.C. § 1641(c).

200. Plaintiff seeks a declaration, pursuant to C.R.C.P. 57 and C.R.S. § 13-51-105, that Plaintiff and the Rescission Subclass have the right to rescind their loans, including a declaration that Plaintiff and the Rescission Subclass are not liable for any finance charges or other charges imposed by Defendants in the event they exercise their right of rescission; that such right of rescission is considered exercised by this action for purposes of the time limitation in 15 U.S.C. § 1635(f); and all other appropriate relief to the Rescission Subclass as permitted by statute or as is equitable and just.

201. Plaintiff further seeks actual damages, statutory damages, an award of reasonable attorneys' fees and costs, and all other appropriate relief to the Rescission Subclass as permitted by statute or as is equitable and just.

## SIXTH CLAIM FOR RELIEF
**(UCCC, Right of Rescission, C.R.S. § 5-5-203)**
**(On Behalf of Plaintiff and the Rescission Subclass against All Defendants)**

202. Plaintiff incorporates by reference all paragraphs above.

203. Under the UCCC, in the case of a consumer credit transaction with a security interest in the consumer's principal dwelling, "the consumer shall have the same right to rescind the transaction as provided in the federal 'Truth in Lending Act' and regulations thereunder. In order to comply with this code, a creditor shall comply with those provisions on the right of rescission of certain transactions." C.R.S. § 5-5-203.

204. Unlock did not provide Plaintiff or any members of the Classes the notice of rescission, rescission model form, or any of the material disclosures required under TILA.

205. Plaintiff seeks a declaration, pursuant to C.R.C.P. 57 and C.R.S. § 13-51-105, that Plaintiff and the Rescission Subclass have the right to rescind their loans, including a declaration that Plaintiff and the Rescission Subclass are not liable for any finance charges or other charges imposed by Defendants in the event they exercise their right of rescission; that such right of rescission is considered exercised by this action for purposes of the time limitation in 15 U.S.C. § 1635(f); and all other appropriate relief to the Rescission Subclass as permitted by statute or as is equitable and just.

206. Plaintiff further seeks actual damages, statutory damages, an award of reasonable

attorneys' fees and costs, and all other appropriate relief to the Rescission Subclass as permitted by statute or as is equitable and just.

**SEVENTH CLAIM FOR RELIEF**
**(UCCC, Disclosure, C.R.S. § 5-3-101)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

207. Plaintiff incorporates by reference all paragraphs above.

208. The UCCC requires that a "creditor shall disclose to the consumer to whom credit is extended with respect to a consumer credit transaction the information, disclosures, and notices required by the federal 'Truth in Lending Act,' the federal 'Consumer Leasing Act', and any regulation thereunder." C.R.S. § 5-3-101(2).

209. Under the UCCC, the "information, disclosures, and notices required by [the Truth in Lending Act, the Consumer Leasing Act, and the regulations thereunder] must be provided if the transaction is a consumer credit transaction under this code, even though the transaction is one of a class of credit transactions exempted by [the aforementioned laws]." C.R.S. § 5-3-101(3).

210. Under TILA, creditors must disclose, among other things, the finance charge and annual percentage rate of a loan. 15 U.S.C. § 1638(a)(3), (4).

211. Because Unlock is a creditor and the Unlock Agreement is a consumer credit transaction and credit under the UCCC, Unlock is required to make disclosures as required by TILA and its accompanying regulations.

212. Unlock does not make the required TILA disclosures. Therefore, the Unlock Agreements violate Section 5-3-101 of the UCCC.

213. A creditor who fails to disclose information required by Section 5-3-101 is liable to a consumer for twice the amount of the finance charge in connection with the transaction, but not more than $1,000, and the costs of the action together with reasonable attorneys' fees as determined by the court. C.R.S. § 5-5-202(1). An assignee of the original creditor may be liable for the same, "where the assignee, its subsidiaries, or affiliates were in a continuing business relationship with the original creditor either at the time the credit was extended or at the time of the assignment." C.R.S. § 5-5-202(4).

214. The Unlock Trust Defendants were in a continuing business relationship with Unlock at the time the credit was extended and the time of assignment of the Unlock Agreements to each of the trusts.

215. Although C.R.S. § 5-5-202(5) ordinarily requires that an action for violation of the disclosure provisions in Section 5-3-101 of the UCCC be commenced within one year from the

date of the occurrence of the violation, the limitations period is subject to equitable tolling or equitable estoppel in appropriate circumstances. Tolling is warranted where, among other circumstances, the defendant's own conduct prevented the plaintiff from discovering the violation or from timely asserting her rights. Equitable estoppel applies when the defendant contributes to the running of a statute of limitations by its acts or omissions.

216. Unlock's Agreement was drafted and deployed in a manner calculated to dissuade consumers like Plaintiff from recognizing or pursuing her rights regarding a consumer credit transaction pursuant to the UCCC. In particular, the Forward Sale and Exchange Agreement explicitly states that the product is not a loan and contains a mandatory arbitration clause and class action waiver.

217. This action was filed within one year of Plaintiff's discovery of the violations. The limitations period of C.R.S.§ 5-5-202(5) is therefore tolled, and all of Plaintiff's claims are timely. To hold otherwise would reward Defendants who concealed their violations long enough to time-bar their victims' remedy.

218. Plaintiff and the Colorado Class are thus entitled to and seek all available remedies under the UCCC. C.R.S. § 5-5-202(1), (4).

**EIGHTH CLAIM FOR RELIEF**
**(UCCC, Advertising, C.R.S. § 5-3-110)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

219. Plaintiff incorporates by reference all paragraphs above.

220. The UCCC states that a "creditor may not advertise, print, display, publish, distribute, broadcast, transmit, or cause to be advertised, printed, displayed, published, distributed, broadcast, or transmitted in any manner any false, misleading, or deceptive statement or representation with regard to the rates, terms, or conditions of credit of a consumer credit transaction." C.R.S. § 5-3-110.

221. Unlock advertises, prints, displays, publishes, distributes, broadcasts, or transmits false, misleading, or deceptive statements or representations regarding the rates, terms, and/or conditions of the Unlock Agreement and therefore violates this provision of the UCCC, including through statements that its product is not a loan and that its Annualized Cost Limit is comparable to a traditional loan interest rate.

222. Therefore, the Unlock Agreements violate Section 5-3-110 of the UCCC. Plaintiff and the Colorado Class are thus entitled to and seek all available remedies under the UCCC.

**NINTH CLAIM FOR RELIEF**
**(UCCC, Colorado Consumer Equity Protection Act, C.R.S. §§ 5-3.5-101, *et seq.*)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

223. Plaintiff incorporates by reference all paragraphs above.

224. The Colorado legislature chose to provide additional state protections to those consumer credit transactions that meet the TILA definition of "high-cost mortgages" based on their annual percentage rate threshold, which are considered "covered loans" under the Colorado Consumer Equity Protection Act (CEPA). C.R.S. § 5-3.5-101(2); *see* 15 U.S.C. § 1602(bb).

225. Colorado's CEPA prohibits making these high-cost covered loans based on the consumer's collateral and without regard to the consumer's repayment ability, including the consumer's current and expected income, current obligations, and employment. C.R.S. § 5-3.5-103(1)(b).

226. Creditors making high-cost CEPA "covered loans" in Colorado must also provide a specifically worded cautionary notice entitled "CONSUMER CAUTION." *Id.* § 5-3.5-103(1)(a).

227. Unlock originated CEPA "covered loans" because its 19.9% Annualized Cost Limit—which applies the formula for compound interest—is far more than 8.5 percentage points above the average prime offer rate. *See* 15 U.S.C. § 1602(bb)(1)(A)(II).

228. Unlock did not make the required cautionary notice disclosures, nor did it make loans based on consumers' ability to repay.

229. Therefore, the Unlock Agreements violate CEPA, Sections 5-3.5-101 *et seq.* of the UCCC.

230. Colorado's CEPA may be enforced in the same manner as the Truth in Lending Act's provisions for high-cost mortgages, including against persons engaged in the assignment or securitization of covered loans. C.R.S. § 5-3.5-201.

231. Plaintiff and the Colorado Class are thus entitled to and seek all available remedies under the Colorado CEPA. C.R.S. § 5-3.5-201.

**TENTH CLAIM FOR RELIEF**
**(UCCC, Supervised Loans, C.R.S. § 5-2-301)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

232. Plaintiff incorporates by reference all paragraphs above.

233. For consumer loans, unless they are supervised loans, Colorado sets the maximum

finance charge at 12% per year. C.R.S. § 5-2-201(1).

234. Supervised loans are consumer loans in which the rate of the finance charge exceeds 12% per year. C.R.S. § 5-1-301(47).

235. The UCCC requires that unless a person has first obtained a license from the Administrator authorizing the person to make supervised loans, that person "shall not engage in the business of . . . [m]aking supervised loans or undertaking direct collection of payments from or enforcement of rights against consumers arising from supervised loans he or she has previously made[.]" C.R.S. § 5-2-301.

236. Unlock's Agreements are consumer loans, C.R.S. § 5-1-301(15), and they are subject to a finance charge, including at least the Origination Fee, any closing costs that are not bona fide and reasonable, and the difference between the Investment Percentage and the Unlock Percentage. C.R.S. §§ 5-1-301(20)(a), (b), 5-2-202(4).

237. Unlock makes loans with an Annualized Cost Limit of typically 19.9%, which is a compound interest formula applied to the Investment Payment. Thus, all Unlock Agreements contract for a finance charge that exceeds 12% per year.

238. Absent an unprecedented drop in home values, for at least the first three years of any Unlock loan, the Annualized Cost Limit will set the interest charged to a homeowner seeking to exit the loan. Consumers who make a Settlement Payment during this time, and for several years longer into the loan term, will typically pay a finance charge that exceeds 12% per year.

239. Unlock did not have a license from the Colorado UCCC Administrator when the Attorney General sent a cease-and-desist letter on November 1, 2024. Upon information and belief, Unlock still does not have a license from the Colorado UCCC Administrator.

240. As of June 2026, Unlock estimated that it had already collected interest in excess of the maximum 12% interest rate from at least 167 consumers in Colorado. Upon information and belief, this interest was collected by Unlock on behalf of the Unlock Trust Defendants.

241. Unlock intends to continue collecting on its remaining HEAs in Colorado on behalf of itself and/or the Unlock Trust Defendants.

242. Unlock engaged in the business of making unlicensed supervised loans, and it collected on, and continues to collect on, those unlicensed supervised loans, in violation of C.R.S. § 5-2-301. The Unlock Trust Defendants are assignees of the Unlock Agreements who are undertaking direct collection of payments or enforcing security rights arising from those debts. C.R.S. § 5-5-201(1).

243. Plaintiff further seeks, on behalf of herself and the Colorado Class, all other

appropriate relief as permitted by statute or as is equitable and just. C.R.S. § 5-5-201(1).

**ELEVENTH CLAIM FOR RELIEF**
***In the Alternative to UCCC Claims: Counts Six – Ten***
**(Reverse Mortgage Lending Requirements, C.R.S. §§ 11-38-101 *et seq.*)**
**(On Behalf of Plaintiff and the Colorado Class against Unlock Defendants)**

244. Plaintiff incorporates by reference all paragraphs above.

245. The Colorado legislature created lending requirements specific to reverse mortgages in order to "better serve the elderly citizens of this state" and ensure that "Colorado's elderly homeowners" could access equity in their homes. C.R.S. § 11-38-101.

246. Under the UCCC, consumer loans do not include reverse mortgages as defined in the Colorado code section 11-38-102. C.R.S. § 5-1-301(15)(b).

247. Under Colorado law, a "reverse mortgage" is defined as "a written instrument evidencing or creating a nonrecourse loan secured by real property which . . . provides cash advances[;] . . . requires no partial or other payment of principal or interest until the entire loan becomes due and payable; and is made by any lender[.]" C.R.S. § 11-38-102(4).

248. A "lender" includes persons who regularly make loans or advances secured by interests in residential real property. C.R.S. § 11-38-102(3).

249. In Colorado, reverse mortgages may become due and payable if:

a. The home securing the reverse mortgage is sold;

b. The borrower ceases to occupy the home as a principal residence;

c. Any fixed maturity date agreed to by the lender and the borrower is reached;

d. An event occurs which is specified in the terms of the reverse mortgage and which jeopardizes the lender's security; or

e. Upon death of the borrower. C.R.S. § 11-38-107(1).

250. The Unlock Agreement is a reverse mortgage because it provides a lump sum cash advance to homeowners and does not require payments until the Agreement terminates. The Unlock Agreement is non-recourse because Unlock recovery is limited by the value of the property at the time the Agreement terminates. Moreover, the Unlock Agreement becomes due and payable upon the sale or transfer of the property, death of the last surviving owner, expiration of the Agreement term, or a material and uncured event of default by the homeowner.

251. Unlock is a lender because it regularly makes loans or advances secured by an interest in real property, as evidenced by land records reflecting hundreds of Agreements in Colorado.

252. Colorado law has a number of requirements governing reverse mortgages that serve to protect consumers against predatory practices and inform consumers of the risk of entering into a reverse mortgage transaction, including:

a. Before closing, a reverse mortgage lender must provide to a borrower the projected total loan cost rate, which includes the annual interest rate charged, expressed as a single annual average rate of interest. The disclosures must also explain why the total loan cost rate on reverse mortgages is greatest in the early years of the loan and present a table of projections of the loan cost rate at certain anniversary dates during the loan term, beginning at the end of year two, and using at least three home appreciation percentages. C.R.S. § 11-38-109; and

b. A reverse mortgage lender must attest the applicant has been advised by the lender to obtain independent counseling regarding the advisability of entering into a reverse mortgage transaction and that the applicant has either obtained counseling or waived counseling in writing. The statute states that "[n]o reverse mortgage shall be made by a lender" unless such attestation is received. C.R.S. § 11-38-111.

253. Unlock extends reverse mortgages without the required disclosures of the projected total loan cost rate, and without advising applicants to obtain independent counseling, in violation of C.R.S. §§ 11-38-109, 11-38-111. Therefore, Unlock violates the statutory requirements applicable to reverse mortgages.

## TWELFTH CLAIM FOR RELIEF

**(Declaratory Judgment, C.R.S. §§ 13-51-101 *et seq.* and C.R.C.P. 57)**
**(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

254. Plaintiff incorporates by reference all paragraphs above.

255. Pursuant to C.R.C.P. 57 and C.R.S. §§ 13-51-105, -106, this Court may declare the rights or legal relations, whether or not further relief is or could be claimed, of any person interested under a written contract or whose rights, status, or other legal relations are affected by a statute or contract.

256. The declaratory relief requested clarifies the rights, status, and obligations of the parties. An actual controversy exists between the Class and Defendants because Unlock has initiated Agreements that violate the Colorado Uniform Consumer Credit Code, Colorado Consumer Protection Act, the Truth in Lending Act, and the Colorado Mortgage Lending Laws and/or Reverse Mortgage Laws. Therefore, Plaintiff and the Class's rights and legal relations are

affected by these statutes and the Unlock Agreements. The Unlock Agreements impose financial obligations on Plaintiff and the Class and encumber their property. Plaintiff and the Class seek a declaration as to the validity of the Agreements, as well as their rights and duties under the Agreements.

257. Plaintiff and the Class seek a declaration that their rights and duties under the Unlock Agreements are void, voidable, invalid, and/or otherwise unenforceable in whole or in part. Plaintiff and the Class seek a declaratory judgment from this Court as follows:

a. Defendants' contracts are void, unconscionable, invalid, and/or unenforceable, and that no amounts are owed, C.R.S. §§ 5-5-109, 6-1-113(2.9), 38-40-105(2);

b. Defendants cannot impose a finance charge or interest on Plaintiff or similarly situated consumers, C.R.S. §§ 5-5-109, 6-1-113(2.9), 38-40-105(2);

c. homeowners are not obligated to pay the finance charge for an Unlock Agreement, and Unlock is not permitted to collect a finance charge for an Unlock Agreement, unless Unlock has obtained a license to operate as a supervised lender prior to the Unlock Agreement being originated pursuant to C.R.S. §§ 5-1-301(2), (46), 5-2-301, 5-5-201; and

c. the Conversion provision, indemnification provision, fee shifting provisions, and arbitration provision in the Unlock Agreement are invalid and unenforceable because they violate public policy and are unconscionable.

258. Plaintiff and the Rescission Subclass seek a declaratory judgment from this Court as follows:

a. Plaintiff and the Rescission Subclass have the right to rescind their Unlock Agreements under 15 U.S.C. § 1635 and C.R.S. § 5-5-203;

b. Plaintiff and the Rescission Subclass are not liable for any finance charges or other charges imposed by Defendants in the event they exercise their right of rescission; and

c. the right of rescission is considered exercised by this action for purposes of the time limitation in 15 U.S.C. § 1635(f).

## **THIRTEENTH CLAIM FOR RELIEF**
### ***In the Alternative* (Unjust Enrichment)**
### **(On Behalf of Plaintiff and the Colorado Class against All Defendants)**

259. Plaintiff incorporates by reference all paragraphs above.

260. Unjust enrichment is a quasi-contractual, equitable remedy designed to undo a benefit conferred on one party at the unfair expense of another party. To prevail on an unjust enrichment claim, a party must prove that (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation.

261. Defendants received benefits at Plaintiff and the Class's expense by:

a. Contracting for and collecting finance charges and fees, including origination fees, appraisal fees, settlement fees, and administration fees; and

b. Recording liens that unlawfully encumber consumers' property, thereby impacting consumers' ability to obtain other credit or sell their homes.

262. In light of Unlock's unconscionable agreements, false and misleading representations, and violations of federal and state mortgage lending laws, it would be unjust for Defendants to retain these benefits.

263. Should a court declare the Unlock Agreements void, voidable, or unenforceable, Plaintiff and the Class should be entitled to recover these benefits pursuant to a theory of quantum meruit.

## JURY DEMAND

264. Plaintiff demands a trial by jury as to all issues so triable.

## OTHER ALLEGATIONS

265. As part of discovery, Plaintiff will be requesting certain documents and information from Defendants. Defendants are hereby notified of their document preservation obligations.

266. Plaintiff's claim is a good faith, non-frivolous claim filed for the express purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or United States or state constitutional right and the meaning, lawfulness, or constitutionality has not been determined by the Colorado Supreme Court. In particular, Plaintiff brings claims, as a matter of first impression, to apply consumer protection laws to Unlock Agreements, and to determine the extent of damages, including equitable relief damages.

## REQUEST FOR RELIEF

267. Plaintiff respectfully requests that the Court enter judgment against Defendants as

follows:

a. Determining that the action is properly maintained as a class action, certifying Plaintiff as the class representative, and appointing Plaintiff's counsel as counsel for Class Members;

b. Issuing an Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to declaring void, terminating, voiding, rescinding, and or reformulating the Unlock Agreements or preventing collection on the Unlock Agreements;

c. Ordering prompt notice of this litigation to all potential Class Members;

d. Awarding Plaintiff and Class Members their compensatory damages, statutory damages, consequential damages, attorney's fees, and litigation expenses as provided by law;

e. Awarding Plaintiff and Class Members their pre-judgment, post-judgment and moratory interest as provided by law;

f. Awarding Plaintiff and Class Members penalties as provided by law; and

g. Awarding Plaintiff and Class Members such other and further relief as the Court deems just and proper.

Respectfully submitted this 1st of October, 2026.

*s/* Caroline Parker

Caroline Parker

Rachel Dempsey, Atty Reg. # 57708
Caroline Parker, Atty. Reg. # 60358
TOWARDS JUSTICE
1580 N Logan Street
Ste. 660, PMB 44465
Denver, CO 80203-1994
Telephone: (720) 441-2236
rachel@towardsjustice.org
caroline@towardsjustice.org

*s/* Adrienne Warrell

____________________________________

Adrienne Warrell

Adrienne Warrell, Atty. Reg. # 1614022 (DC)
Eric Halperin, Atty Reg. # 491199 (DC)
Cara Petersen, Atty. Reg. # 476990 (DC)
HALPERIN PETERSEN & MIKKILINENI LLP
1025 Connecticut Ave. NW, Suite 717
Washington, DC 20036
Telephone: (202) 987-3719
adrienne@hpmjustice.com
eric@hpmjustice.com
cara@hpmjustice.com

*Counsel for Plaintiff*