DATE FILED
October 1, 2026 10:55 AM
FILING ID: E2B197918B36B
CASE NUMBER: 2026CV31955

**THIS EXCHANGE AGREEMENT IS NOT A LOAN**

**THIS IS AN AGREEMENT PURSUANT TO WHICH UNLOCK PROVIDED OWNER A PAYMENT IN EXCHANGE FOR A RIGHT TO RECEIVE A SPECIFIED PERCENTAGE INTEREST IN THE VALUE OF THE OWNER'S HOME UPON THE OCCURRENCE OF CERTAIN EVENTS SET FORTH IN THIS EXCHANGE AGREEMENT**

# FORWARD SALE AND EXCHANGE AGREEMENT

This Unlock Forward Sale and Exchange Agreement ("Exchange Agreement") is made between the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("Owner" or "You" or "Your") and Unlock Partnership Solutions Inc., a Delaware corporation, with its principal offices at 270 Madison Ave, Suite 702, New York, NY 10016, and its successors and assigns ("Unlock").

This Exchange Agreement is made together with and incorporates the Unlock Performance Deed of Trust or Performance Mortgage, as applicable ("Security Instrument"). Together these documents are collectively referred to herein as the "Unlock Agreement."

WHEREAS, as of the Effective Date, You and Unlock each desire to enter into the Unlock Agreement and You have reviewed and agreed to: (i) the terms of the Unlock Agreement, including without limitation all of the related numerical amounts of the Starting Home Value, Investment Payment, Investment Percentage, Exchange Rate, Unlock Percentage, Origination Fee, Annualized Cost Limit, Total Home Finance Limit and Expiration Date; and (ii) pay all Appraisal Expenses, Inspection Expenses, Closing Costs and any other costs incurred in connection with the Unlock Agreement;

WHEREAS, the Unlock Agreement sets forth the representations, warranties, duties and covenants of You during the Term and in reliance upon the terms and conditions set forth in the Unlock Agreement, Unlock wishes to tender the Investment Payment and purchase the Unlock Percentage, and You wish to accept the Investment Payment and sell, grant, transfer and otherwise convey the Unlock Percentage to Unlock, as described herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, You and Unlock agree as follows:

**1. <u>Unlock Agreement Terms.</u>**

1.1 <u>Recitals.</u> The recitals set forth above are acknowledged by the parties to be true and correct and are incorporated herein by reference.

1.2 <u>Defined Terms.</u> Defined terms are capitalized throughout the Unlock Agreement. The values of certain terms appear in the following Table of Key Terms. Other terms are defined as they are used throughout the Unlock Agreement or in the Glossary attached as Exhibit F.

| TABLE OF KEY TERMS | | |
|---|---|---|
| Defined Term | Value | Notes |
| Effective Date | October 08, 2023 | |
| Expiration Date | October 07, 2033 at 11:59:59PM EDT | The maximum term is 10 years. |
| Property | 15161 E 116th Drive, Commerce City, CO 80603 | As further defined in the attached Exhibit A. |
| Occupancy | Principal Residence | You have declared this as Your Occupancy intention as of the Effective Date. |
| Starting Home Value | $520,000 | The mutually agreed upon value of the Property as of the Effective Date. |
| Investment Payment | $65,400.00 | The gross amount of money you received from Unlock on the Effective Date. |
| Investment Percentage | 12.58% | The Investment Payment expressed as a percentage of Starting Home Value.<br>Investment Payment / Starting Home Value = Investment Percentage<br>$65,400.00 / $520,000 = 12.58% |
| Exchange Rate | 2.05x | The price of your Unlock Agreement. |
| Unlock Percentage | 25.78% | The percentage of your Property's future value that Unlock will receive when the Unlock Agreement ends upon a Settlement Event. Calculated as:<br>Investment Percentage x Exchange Rate = Unlock Percentage<br>12.58% x 2.05x = 25.78% |
| Origination Fee | $3,204.60 | A fee payable to Unlock at Closing that offsets some of the costs Unlock incurs to process and administer Your transaction. |
| Annualized Cost Limit | 19.90% | The Annualized Cost of Your Unlock Agreement will never exceed this limit. |
| Total Home Finance Limit | 85.00% | Limits the amount of financing, such as mortgage loans and the Unlock Share, that can be secured by Your Property to a specific percentage of the Appraised Value as described in Section 12, and subject to adjustment as provided in Section 14.8. |
| Maintenance Addendum | None | |

1.3 Forward Sale and Exchange.

1.3.1 On the Effective Date, Unlock agrees to pay You the Investment Payment.

1.3.2 In exchange for the Investment Payment, You hereby agree to sell, transfer and otherwise convey to Unlock on the Effective Date the right to receive the Unlock Percentage.

1.3.3 Unlock has a right to elect to convert its Unlock Percentage to an undivided fee simple ownership percentage in the Property ("Conversion") equal to the Unlock Percentage. Unlock can exercise its right to a Conversion only upon the occurrence of a Settlement Event. In the event Unlock exercises its right to a Conversion, such Conversion will be documented in a separate written agreement between You and Unlock, the form of which is set forth in Exhibit B hereto. You agree to cooperate and promptly execute all documentation necessary to complete the Conversion in the applicable form attached to the Unlock Agreement and/or the form provided by Unlock.

1.3.4 You are selling the Unlock Percentage to Unlock in consideration of (1) the Investment Payment; (2) Unlock's express waiver of its Conversion right and its right to receive the Unlock Share until the occurrence of a Settlement Event; (3) other Unlock obligations under the Unlock Agreement; and (4) Your other rights and benefits under the Unlock Agreement.

1.4 The Investment Payment is not a loan to You or indebtedness to Unlock, nor is it a principal amount which Unlock is entitled to recover at any time. You will not make any monthly interest or any other periodic payments to Unlock based upon the amount of the Investment Payment.

1.5 Closing.

1.5.1 In connection with the execution and delivery of this Unlock Agreement ("Closing"), Unlock has: (i) wired the Investment Payment to an escrow account maintained by the Escrow Agent; (ii) provided a closing statement to You and the Escrow Agent that sets forth the dollar amounts involved in the Closing and (iii) provided all required documents and closing instructions.

The Escrow Agent has conducted the Closing, at which You have:

(a) Executed and delivered to the Escrow Agent originals of the Unlock Agreement documents and any addenda or ancillary documents provided by Unlock.

(b) Provided any other documents and information reasonably requested or otherwise necessary to complete the Closing, and secure and perfect the Unlock Agreement and Unlock's lien on the Property.

(c) Provided satisfactory written evidence that Unlock has been added as a loss payee (or as Unlock otherwise directs) on all Owner insurance policies.

1.5.2 The Escrow Agent has disbursed monies from the related escrow account where the Investment Payment is being held as follows:

(a) To the appropriate third parties, all third-party expenses associated with the Closing of the Unlock Agreement, unless paid by Unlock, including Appraisal Expenses, Inspection Expenses, Closing Costs and any other costs incurred in connection with the Unlock Agreement. In any situation where Unlock had already paid an expense on Your behalf during the processing of Your application, Escrow Agent instead disbursed such amount to Unlock.

(b) To Unlock, the Origination Fee.

(c) To You, the remaining balance of the Investment Payment following the payments described above ("Net Closing Proceeds").

1.6 <u>Term of Agreement.</u>

1.6.1 The Term of the Unlock Agreement begins on the Effective Date and will end on the earliest to occur of: (i) the day that a Settlement Event is completed (the "Settlement Date"); and (ii) the Expiration Date, subject to extension under limited circumstances as provided herein and subject to the limited survival provisions of Section 21.27.

1.7 <u>Property Value.</u>

1.7.1 You and Unlock agree that the Property's value as of the Effective Date is the Starting Home Value.

1.7.2 The Property's future value, when calculated at any time during the Term, is called the "Ending Home Value". The Ending Home Value will be determined as follows:

(a) If the Property is being sold, Ending Home Value will typically equal the Gross Sale Price, subject to adjustment as set forth in Section 2.

(b) If the Property is not being sold, the Ending Home Value will be determined by obtaining a Property Appraisal in accordance with Section 8.

(c) In an Event Of Default, including a foreclosure sale, Unlock may elect to determine Ending Home Value in accordance with Section 8.4(c).

1.8 <u>Settlement.</u>

1.8.1 The following calculations apply when the Unlock Agreement ends upon the occurrence of a Settlement Event:

(a) The Ending Home Value will be determined depending on the applicable Settlement Event.

(b) The Ending Home Value may be subject to an Improvement Adjustment and/or a Maintenance Adjustment when calculating the Unlock Share, as set forth in Section 7. The Improvement Adjustment enables You to keep any value You have added to the Property as a result of material home improvements that were made during the Term. The Maintenance

Adjustment holds You responsible for any loss in Property value caused by Your failure to properly maintain the Property. The adjusted Ending Home Value is called Sharable Value and is calculated as follows:

***Sharable Value =***

***Ending Home Value - Improvement Adjustment + Maintenance Adjustment***

(c) The "Unlock Share" is the dollar amount that Unlock will receive for its percentage of the Property's Sharable Value, calculated as:

***Unlock Share = Sharable Value X Unlock Percentage***

The Unlock Share will be subject to the Annualized Cost Limit set forth in the Table of Key Terms, in accordance with Section 10. The Annualized Cost Limit is a cap on the amount Unlock will receive upon a Settlement Event.

(d) During the Term You may require administrative assistance from Unlock for which Unlock may charge Administration Fees, as set forth in Section 15, and Unlock may make payments or incur expenses on Your behalf to protect the value of the Property, including in connection with an Event Of Default as defined in Section 16 ("Protective Advances'). You are responsible for payment or reimbursement of any Administration Fees and Protective Advances, and any that remain outstanding at any time are called Unpaid Owner Obligations, as set forth in Section 21.4.

(e) On the Settlement Date, Unlock will receive the "Settlement Payment," calculated as:

***Settlement Payment = Unlock Share + Unpaid Owner Obligations***

1.8.2 Subject to Section 21.27, the Unlock Agreement will end and Unlock will receive the Settlement Payment on the Settlement Date upon the occurrence of one of the following "Settlement Events":

(a) Intended Settlement Events:

(i) You decide to sell the Property (see Section 2)

(ii) You decide to buy Unlock out (see Section 3)

(iii) Upon Your death, or the later of Your death or Your spouse's or domestic partner's death, if such individual has been added as a signatory to the Unlock Agreement during the Term (see Section 4)

(iv) Upon reaching the Expiration Date (see Section 5)

(b) Unintended or unusual Settlement Events:

(i) An uncured Event Of Default (see Section 16 and Section 17)

(ii) Destruction of the Property where it is not rebuilt (see Section 18)

(iii) Full condemnation of the Property (see Section 19)

(iv) Voluntary Release by Unlock (see Section 21.7)

1.8.3 You will pay all third-party transaction expenses associated with any Settlement Event, unless paid by Unlock or a buyer of the Property, including, as applicable, Property Appraisal, Property Inspection and Closing Costs.

1.8.4 In any sale of the Property, sale proceeds will be distributed in the following order of priority:

(a) First, all third-party transaction expenses are paid;

(b) Second, all liens senior to Unlock, if any, are paid in full;

(c) Third, Unlock receives the Settlement Payment, if any;

(d) Fourth, all lienholders junior to Unlock, if any, are paid in full; and

(e) Fifth, You receive the remaining balance, if any.

1.8.5 Notwithstanding anything to the contrary in the Unlock Agreement, Unlock shall have no obligation to release its lien on the Property to the extent there are insufficient amounts in escrow to pay transaction expenses and Administration Fees, release all liens senior to Unlock and pay any other expenses required in order to deliver clear title to the Property, and pay Unlock the Settlement Payment.

1.8.6 You can also request one or more partial buyouts of Your Unlock Agreement during the Term, in accordance with Section 6.

1.9 Your Obligations During the Term.

1.9.1 The Exchange Agreement contains various provisions that apply during the Term which are designed to protect the value of the Property and Your and Unlock's respective interests in it. Accordingly, You agree to all covenants provided under the Unlock Agreement, including, but not limited to, the following:

(a) Staying current on Your housing obligations, such as Your mortgage and property taxes, in accordance with Section 11.3.

(b) Maintaining appropriate insurance on the Property, in accordance with Section 18.

(c) Maintaining the Property in good condition, subject to normal wear and tear, in accordance with Section 13.

(d) Making sure that Your use and occupancy of the Property are fully compliant with all state, federal and local laws and abiding by the occupancy requirements of the Unlock Agreement, in accordance with Section 14.

(e) Abiding by the Total Home Finance Limit with respect to obtaining new or refinanced debt secured by the Property, in accordance with Section 12.

(f) Notifying Unlock when a non-signatory to Your Unlock Agreement becomes an owner or a principal resident of the Property or Your marriage or domestic partner status changes.

**2. Settlement Event: Permitted Sale.**

2.1 You may sell the Property to a buyer at any time during the Term, as long as Your sale complies with the requirements of this Section 2.1, or as otherwise agreed to in writing prior to such sale by Unlock (a "Permitted Sale").

(a) You must notify Unlock in writing of Your decision to market, sell or transfer the Property, at least 45 days prior to the proposed closing of the sale or transfer.

(b) You must timely provide Unlock with copies of all documents relating to the proposed sale or transfer of the Property, including listing agreements, offers to purchase, appraisals, inspection reports, pest reports, preliminary title reports, escrow instructions, staging agreements and any other relevant documents.

(c) If the Property is untidy or in disrepair such that its marketability is materially impaired, Unlock may offer to make one or more Protective Advances to pay for repairs, cosmetic improvements and/or staging, in support of achieving the best possible sale price. If Unlock makes cosmetic improvements and/or provides staging and You damage or destroy any such cosmetic improvements and/or staging materials, You will be responsible for the damage, and any unpaid amount will become part of Unpaid Owner Obligations.

(d) The sale must be consummated through an appropriate real property escrow account using the services of an Escrow Agent, and the sale must comply with applicable law, including that all necessary disclosures in connection with a sale of real property are made.

(e) The sale must be at arm's length, made on commercially reasonable terms and entered into in good faith, meaning without fraud or deceit carried out by unrelated or unaffiliated parties, as by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property.

(f) If the buyer obtains a standard contractor's inspection report and a standard pest report

in connection with their purchase, or if You obtained any such reports to support the marketing of the Property, Unlock may, in its discretion accept these in lieu of obtaining a Property Inspection, or Unlock may elect to obtain a Property Inspection in accordance with Section 8.

(g) Ending Home Value will be equal to the "Gross Sale Price" (subject to adjustment in accordance with Section 2.1(i)), which is the sale price to a bona fide, arms-length, third-party buyer, including the fair market value of any non-cash consideration (such as a seller concession), and not including deductions for Closing Costs, taxes, documentary fees, mortgage loans, other liens or secured loans, sales commissions, or appraisal expenses. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1.

(h) The sale should be conducted in accordance with customary local process, using a licensed listing agent or attorney and, except as described in Section 2.1(i)(i) or Section 2.1(i)(ii), by placing the Property on the open market through the Multiple Listing Service (MLS). However, You are not required to use a real estate professional to assist with Your sale.

(i) Unlock may obtain a Property Appraisal before the closing. In any sale or transfer by You where Unlock determines, in good faith, that the proposed Gross Sale Price differs materially from the market value of the Property, or from an Appraised Value, including in any:

> (i) "Sale-By-Owner Transaction," which means a sale of the Property conducted either without a public listing of it on the MLS, or where the terms and conditions of the sale have been principally negotiated by You without agency representation, or
>
> (ii) "Intrafamily Transaction," which means a purchase, sale or transfer of the Property proposed between You and any of Your family members by blood or marital relation, or
>
> (iii) Transaction where the buyer is a business entity rather than an individual person,

Unlock will have the right, in its sole discretion, to take the following actions: (a) make an offer in writing to purchase the Property from You on the same terms and conditions as the proposed offer from the third-party buyer and, if such offer is rejected by You, to obtain a written affidavit under oath from You stating the reasons for the rejection; (b) require You and the third-party buyer to execute an affidavit under oath attesting that the relationship between You and the buyer is at arm's length and that the proposed transaction is at a fair market price; and/or (c) use an Appraised Value to determine Ending Home Value in accordance with Section 8 and calculate the Unlock Share.

(j) The closing date of a Permitted Sale must be scheduled so as to allow Unlock sufficient time to obtain and review any required appraisals and inspection reports and determine the amount of any Improvement Adjustment or Maintenance Adjustment.

(k) The sale or transfer cannot convey title "subject to" the lien created by the Unlock

Agreement. You must convey title free and clear of any liens and satisfy any loans and other obligations secured by liens on the Property.

(l) You will pay all costs in connection with the Permitted Sale, including Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses, unless paid by Unlock, and not any expenses to be paid by the third-party buyer.

(m) If the closing date scheduled for a Permitted Sale falls after the Expiration Date, the Term and the Expiration Date will, in Unlock's discretion, automatically extend for such reasonable period needed to accommodate the closing.

(n) Unlock will not be liable to You for any loss relating to any delay or postponement of the closing of a sale resulting from Unlock's reasonable inquiries and actions.

2.2 In advance of a Permitted Sale, Unlock may elect to exercise its right to a Conversion of the Unlock Percentage in accordance with Section 1.3.3, in which case Unlock will provide You notice of such election, Unlock and You will enter into a separate Conversion Agreement, and You will cooperate in promptly executing all other documentation (in the applicable form attached to the Unlock Agreement and/or the form provided by Unlock) necessary to complete the Conversion on or prior to the date of the Permitted Sale.

2.3 At the time of a Permitted Sale where Unlock has elected a Conversion:

(a) Unlock will deliver to You and to Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment.

(b) You will deed Unlock its percentage interest in the Property through escrow for the Permitted Sale, as described in the Conversion Agreement.

(c) You and Unlock, as co-owners of the Property, will deed the Property to the third-party buyer through escrow; and

(d) The Escrow Agent will close the Permitted Sale, transfer title to the third-party buyer, and liquidate Unlock's and Your respective percentage interests in the Property.

(e) In accordance with local and customary practice and applicable law, Unlock will release its lien on the Property, as described in the Conversion Agreement.

2.4 As an alternative to Conversion, You can elect to settle the Unlock Agreement by tendering to Unlock, through escrow for the Permitted Sale, the Settlement Payment. Unlock will deliver to You and to Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment. Following such payment, Unlock will deliver executed, notarized documents required by Escrow Agent for the Permitted Sale to affect a full release of the Unlock Agreement, including Unlock's lien on the Property.

2.5 Any attempted sale or transfer of the Property that does not comply with these Permitted

Sale requirements shall be deemed an Event Of Default and shall be conclusively deemed to prejudice Unlock's rights hereunder.

2.6 If a Permitted Sale is being undertaken by Your Estate, the words "Your Estate" will replace "You" and "Your" in this Section.

3. **Settlement Event: Owner Buyout.**

3.1 You can end the Unlock Agreement without selling Your Home, at any time during the Term, by electing an Owner Buyout in accordance with the following requirements:

(a) You must submit a Buyout Request Form to Unlock and include copies of any listings for sale or offers to purchase that may exist at least 60 days ahead of the desired Owner Buyout closing date, which must occur on or before the Expiration Date.

(b) Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and a Property Inspection, at your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1.

(c) Unlock will select an Escrow Agent who will open escrow to facilitate the Owner Buyout. Unlock will deliver to You and Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment and closing instructions. In addition to the Settlement Payment, You will pay all costs in connection with the Owner Buyout, including Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses, in accordance with the closing statement prepared by the Escrow Agent and approved by Unlock. You will deliver into escrow the amount stipulated in such closing statement. Upon Escrow Agent's delivery and Unlock's acceptance of the Settlement Payment from You, Unlock will deliver executed, notarized documents required by Escrow Agent to affect a full release of the Unlock Agreement, including Unlock's lien on the Property.

(d) If You receive or have pending a written offer for the purchase of the Property, the Unlock Share will be calculated using the greater of the then-current Appraised Value or the gross amount of such purchase offer ("Offered Value"). If You fail to disclose an Offered Value that exceeds the Appraised Value used to calculate the Unlock Share at the time of Owner Buyout or within 180 days thereafter, and the Property is sold for such Offered Value, You will be liable to Unlock for the difference in the Unlock Share had the Unlock Share been calculated based upon the Offered Value.

(e) Unlock will retain the right to reject any Owner Buyout where Unlock has not had adequate opportunity to obtain and review appraisals, inspections, pest reports or other required documents, or Unlock deems Your tender of the Settlement Payment insufficient, inadequate, or untimely.

(f) If the Owner Buyout closing date is delayed and will occur after the Expiration Date, the Term and the Expiration Date will automatically extend for such reasonable period in Unlock's

discretion needed to accommodate the closing.

3.2 If an Owner Buyout is being requested by Your Estate, the words "Your Estate" will replace "You" and "Your" in this Section.

**4. <u>Settlement Event: Death of the Last Surviving Signatory.</u>**

4.1 You must identify to Unlock, at all times during the Term, the person or persons who will acquire legal title to Your interest in the Property on account of your death (each such person or persons together or individually, is referred to in the Unlock Agreement as "Your Estate"). You must at all times during the Term notify Unlock immediately in writing (a) if the identity of Your Estate changes during the Term of the Unlock Agreement, and (b) of the name, postal address, e-mail address and contact telephone number of the person who will represent Your Estate in connection with the Unlock Agreement.

4.2 "Last Surviving Signatory" means the last surviving individual who is a signatory to the Unlock Agreement, including any signatory added by addendum after the Effective Date. Your Estate must notify Unlock immediately in writing of the death of the last Surviving Signatory.

4.3 Upon Unlock's receipt of notice of the death of the Last Surviving Signatory, Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and Property Inspection, at Your Estate's expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1. Unlock will deliver to Your Estate a Settlement Statement containing a calculation of the Settlement Payment.

4.4 Your Estate is required to settle the Unlock Agreement upon the death of the Last Surviving Signatory, through either a Permitted Sale or an Owner Buyout, with a Settlement Date no later than 180 days following the date of death or such longer time as Unlock may agree in writing or in accordance with applicable law. Your Estate is required to notify Unlock of the chosen settlement method within 30 days following the date of death. An Owner Buyout resulting from the death of the Last Surviving Owner is not subject to the Buyout Active Date restriction.

4.5 If Unlock determines that Your Estate has commenced a good faith effort to sell the Property in a Permitted Sale within the 180-day period, Unlock, in its discretion, may extend the Settlement Date deadline for a maximum of two consecutive 90-day periods (for a maximum total of 360 days from the date of death) to permit Your Estate to complete the Permitted Sale.

4.6 If Your Estate is unable to make the Settlement Payment for an Owner Buyout, it may need to sell the property in order to settle the Unlock Agreement.

4.7 If Your Estate does not start the process to settle the Unlock Agreement through either a Permitted Sale or an Owner Buyout within 60 days following the date of death (or such longer time as Unlock may agree in writing or in accordance with applicable law), Unlock may elect a Conversion of

the Unlock Percentage in accordance with Section 1.3.3, in which case:

(a) Unlock will provide Your Estate notice of such election. Unlock and Your Estate will enter into a separate Conversion Agreement.

(b) Unlock will select an Escrow Agent who will open escrow, and Your Estate will deed Unlock its percentage interest in the Property through escrow pursuant to the Conversion Agreement.

(c) Unlock and Your Estate, as co-owners of the Property, will promptly market and sell the Property in order to liquidate their respective percentage interests. Your Estate will provide all necessary cooperation (including access to the Property) in order to promptly market and complete the sale of the Property.

(d) If needed, the Term and the Expiration Date will automatically extend for such reasonable period, in Unlock's discretion, to accommodate Unlock's Conversion and the closing of such subsequent sale.

(e) Your Estate will pay all Closing Costs owed in connection with the sale of the Property following Unlock's Conversion other than any Closing Costs which will be paid by the third-party buyer. In no event shall Unlock be liable for any Closing Costs.

4.8 Your Estate will administer and protect the Property to preserve Unlock's rights and the value of the Unlock Share following the death of the Last Surviving Signatory.

4.9 All time periods specified in this Section 4 will run from the actual date of the death of the Last Surviving Signatory. Failure of Your Estate or any other individual or entity to notify Unlock of the death of the Last Surviving Signatory will not reduce or suspend the running of the time periods and shall be deemed an Event Of Default.

5. **Settlement Event: Expiration of the Unlock Agreement.**

5.1 You are required to settle the Unlock Agreement on or before the Expiration Date, through either a Permitted Sale or an Owner Buyout. If You are unable to make the Settlement Payment for an Owner Buyout, You may need to sell the property prior to the Expiration Date in order to settle the Unlock Agreement.

5.2 Unlock will start the settlement process by obtaining a Property Appraisal and Property Inspection to determine Ending Home Value and Property condition, at Your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1. Unlock will deliver to You a Settlement Statement containing a calculation of the Settlement Payment.

5.3 You must notify Unlock of Your intended method of settlement no later than 90 days prior to the Expiration Date.

5.4 If Unlock determines that there is a good faith effort underway to sell the Property in a Permitted Sale at the Expiration Date, Unlock, in its discretion, may extend the Expiration Date deadline for a maximum of two consecutive 90-day periods to permit You to complete the Permitted Sale.

5.5 On the Expiration Date (or if the Expiration Date falls on a Sunday or legal public holiday specified in 5 U.S.C. 6103(a), the last business day before the Expiration Date), if You have not completed a Permitted Sale or an Owner Buyout, Unlock, in its discretion, may elect a Conversion of the Unlock Percentage in accordance with Section 1.3.3, in which case:

(a) Unlock will provide you notice of such election. Unlock and You will enter into a separate Conversion Agreement.

(b) Unlock will select an Escrow Agent who will open escrow, and You will deed Unlock its percentage interest in the Property through escrow pursuant to the Conversion Agreement.

(c) Unlock and You, as co-owners of the Property, will promptly market and sell the Property. You will provide all necessary cooperation in order to promptly market and complete the sale of the Property.

(d) The Term and the Expiration Date will automatically extend for such reasonable period, in Unlock's discretion, to accommodate Unlock's Conversion and the closing of such subsequent sale.

(e) You will pay all Closing Costs owed in connection with the sale of the Property following Unlock's Conversion other than any Closing Costs which will be paid by the third-party buyer. In no event shall Unlock be liable for any Closing Costs.

**6. <u>Partial Buyout.</u>**

6.1 The Unlock Agreement allows you to request a Partial Buyout at any time during the Term, in accordance with this Section 6.

6.2 You must submit a Partial Buyout Request Form to Unlock, in which You will state what portion of Your Agreement You want to buy out, and include copies of any listings for sale or offers to purchase that may exist, at least 60 days ahead of the desired closing date of the Partial Buyout, which must occur at least 180 days before the Expiration Date.

6.3 Unlock will select an Escrow Agent who will open escrow to facilitate the Partial Buyout. Unlock will deliver to You and Escrow Agent a "Partial Settlement Statement" containing a calculation of the "Partial Settlement Payment" and closing instructions.

6.4 The following calculations will apply:

(a) Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and a Property Inspection, at your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value

and the Unlock Share will be calculated in accordance with Section 1.8.1.

(b) The portion of the Unlock Share You want to buy out will determine the dollar amount required (the "Partial Unlock Share").

(c) Unpaid Owner Obligations must be paid in full at the time of a Partial Buyout. Unlock will calculate the "Partial Settlement Payment" as follows:

***Partial Settlement Payment = Partial Unlock Share + Unpaid Owner Obligations***

(d) The Unlock Percentage will be reduced by the exact percentage of the Unlock Share paid in the Partial Buyout, as follows:

***Reduced Unlock Percentage =***

***(1 - (Partial Unlock Share / Unlock Share)) X original Unlock Percentage***

6.5 You will deliver the Partial Settlement Payment into escrow together with all Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses incurred in connection with the Partial Buyout, in accordance with the closing statement prepared by the Escrow Agent and approved by Unlock. Upon Escrow Agent's delivery and Unlock's acceptance of the Partial Settlement Payment from You, Unlock and You will enter into an amendment of the Exchange Agreement to reflect the reduced Unlock Percentage as described above.

6.6 If You receive or have pending a written offer for the purchase of the Property, the Unlock Share will be calculated using the greater of the then-current Appraised Value or the Offered Value. If You fail to disclose an Offered Value that exceeds the Appraised Value used to calculate the Unlock Share at the time of the Partial Buyout or within 180 days thereafter, and the Property is sold for such Offered Value, You will be liable to Unlock for the difference in the Unlock Share had the Unlock Share been calculated based upon the Offered Value.

6.7 Unlock will retain the right to reject any Partial Buyout where Unlock has not had adequate opportunity to obtain and review appraisals, inspections, pest reports or other required documents, or Unlock deems Your tender of the Partial Settlement Payment insufficient, inadequate, or untimely. Unlock may decline a Partial Buyout request if the remaining Unlock Percentage would be less than 25% of the Unlock Percentage as of the Effective Date.

**7. <u>Adjustments to Ending Home Value.</u>**

7.1 <u>Improvement Adjustment.</u>

(a) You may make improvements to the Property without Unlock's consent during the Term of the Unlock Agreement. All improvements must comply with all applicable laws, including zoning, permitting and the use of licensed tradespeople.

(b) If You believe that any of Your improvements materially increased the value of the

Property ("Material Improvements"), You may request that an "Improvement Adjustment" be made to the Ending Home Value at the time of a Settlement Event.

(c) An improvement is a Material Improvement under the Unlock Agreement only if it adds to the value of the Property, as reasonably determined by Unlock; in contrast to ordinary and necessary maintenance and repairs, which maintain the general condition and value of the Property. Costs of ordinary and necessary maintenance and repairs to keep the Property in an efficient operating condition, as more particularly outlined in U.S. Treasury Regulation 1.162-4 (as amended from time to time), are not eligible for an Improvement Adjustment. For the avoidance of doubt, certain maintenance items, such as replacing a roof or HVAC, are considered ordinary and necessary maintenance and repair, regardless of the cost, and do not qualify for an Improvement Adjustment.

(d) An "Improvement Adjustment" is subject to these additional requirements:

(i) You must request an Improvement Adjustment in writing at least 45 days before any Settlement Event or any event that requires a determination of the Ending Home Value.

(ii) As part of the request, You must specify the Material Improvements for which an Improvement Adjustment is sought and provide Unlock with photographic and supporting evidence of the Material Improvements in accordance with subsection (iv) below.

(iii) A Property Appraisal will be obtained to determine if Your Material Improvements have increased the Ending Home Value of the Property. Specifically, the appraiser will provide two values for the Property: (i) the actual fair market value of the Property as-is (which is called the "Actual Value"); and (ii) a hypothetical amount representing what the value of the Property would be if You had not made the Material Improvements (which is called the "Hypothetical Value"). If the Property Appraisal is conducted in connection with a Permitted Sale, and the proposed Gross Sale Price is not deemed by Unlock to differ materially from the market value of the Property, the appraiser will be instructed to assume that the Gross Sale Price is the Actual Value of the Property. The difference between the Actual Value and the Hypothetical Value is the dollar amount of the Improvement Adjustment. The appraiser will be instructed to consider the age, depreciation and potential functional obsolescence of Material Improvements, and not to consider the cost of the Material Improvements.

(iv) You will maintain, and provide to Unlock upon any request for an Improvement Adjustment, photographic and other physical documentation of the Property before completion of the Material Improvements, which will be sufficient in scope, clarity, number and detail to permit the appraiser to compare the Actual Value to the Hypothetical Value, in appraiser's independent discretion.

(v) No Improvement Adjustment will be given to the extent (i) the appraiser

determines that the Material Improvements have become functionally obsolete; (ii) any Material Improvements result in a violation of the Unlock Agreement; or (iii) the photographic and other supporting evidence provided by You is not of sufficient quality to support the appraiser's calculation.

(vi) Material Improvements that in the aggregate have added less than $10,000 to the Property value do not qualify for an Improvement Adjustment unless agreed to by Unlock.

(e) The Improvement Adjustment will typically reduce the Ending Home Value when calculating the Sharable Value and the Unlock Share. If the Property Appraisal process described above determines that the Actual Value minus the Hypothetical Value yields a negative number, Unlock may apply any such decrease in value as a "Negative Improvement Adjustment" in which case the Ending Home Value would be increased by the amount of the Negative Improvement Adjustment to account for the reduction in fair market value to the Property as a result of the Material Improvements. If Unlock believes the process described above would likely result in a Negative Improvement Adjustment, then Unlock may obtain such Property Appraisal.

(f) Provided all of the conditions of this Section 7.1 are met, Unlock will apply the Improvement Adjustment to the Ending Home Value when calculating the Sharable Value and the Unlock Share.

7.2 Maintenance Adjustment.

(a) In connection with a Settlement Event Unlock determines that either:

(i) You have breached Your duties to maintain and repair the Property as required under the Unlock Agreement; or

(ii) Ending Home Value is negatively affected as the direct result of any repair items, defects or conditions, or damage to the Property or its title which either existed as of the Effective Date or which occurred or developed during the Term ("Deferred Maintenance"),

Unlock will have the right, in consultation with one or more independent, third-party appraisers, property inspectors, home repair contractors, and other experts not affiliated with Unlock, to make a commercially reasonable estimate of the dollar amount which is required, at that time, to repair or perform such Deferred Maintenance, without reference to any repair estimates that may have been obtained by Owner, and to add such dollar amount as a "Maintenance Adjustment" to Ending Home Value when calculating the Sharable Value and the Unlock Share.

(b) Unlock may also apply a Maintenance Adjustment to Ending Home Value when calculating the Sharable Value and the Unlock Share where:

(i) as of the Effective Date, Unlock identified and expressly reserved for a Maintenance Adjustment (by attaching a Maintenance Addendum to the Unlock Agreement in the form of the attached Exhibit G) any Deferred Maintenance items which, if not remedied promptly or within a reasonable time, posed clear and serious risks to the Property improvements or Property value, and You failed to correct such items during the Term; or

(ii) You knew or had reason to know of any Deferred Maintenance items as of the Effective Date or during the Term of the Unlock Agreement but failed or neglected to disclose them to Unlock.

(c) Unlock will not apply a Maintenance Adjustment unless the Property value has been negatively impacted by $10,000 or more, unless agreed to by You.

(d) Unlock will have no liability in connection with, or for Your failure to cure, any Deferred Maintenance items.

**8. <u>Property Appraisal.</u>**

8.1 A "Property Appraisal" is an independent determination of Property value obtained from a professional appraiser or appraisal management company selected by Unlock and unaffiliated with either You or Unlock, and who satisfies the requirements of Fannie Mae, Freddie Mac or FHA and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and related regulations, and any applicable state laws, as of the date of the Property Appraisal, and performed in compliance with all applicable laws and the Uniform Standards of Professional Appraisal Practice, or an alternative property valuation as specified in Section 8.7

8.2 Whenever a Property Appraisal is obtained by Unlock under the Unlock Agreement, You are required to cooperate with the appraiser by granting full access to the Property, making available any relevant documents and information in Your possession pertaining to the Property and ensuring that the Property is presented in reasonable condition to be appraised.

8.3 Property Appraisals may be used:

(a) To determine Starting Home Value and as an input to determine Property Condition and the need for a Property Inspection as of the Effective Date.

(b) To determine Property value during the Term in connection with Unlock's investor reporting needs, an Event Of Default or a calculation of Total Home Finance under Section 12.

(c) In connection with a Settlement Event or a Partial Buyout:

(i) To establish or validate the Property's market value and the Ending Home Value.

(ii) As an input to determine Property condition and the need for a Property Inspection and a possible Maintenance Adjustment.

(iii) To determine the amount of any Improvement Adjustment and/or Maintenance Adjustment and the Sharable Value.

8.4 When establishing Ending Home Value and calculating the Unlock Share:

(a) In any Settlement Event where the Property is being sold, Ending Home Value will equal the proposed Gross Sale Price as described in Section 2.1(g); provided that a Property Appraisal may be obtained to determine if the proposed Gross Sale Price differs materially from the market value of the Property, in which case the Appraised Value, as determined in Section 8.5, may be used as Ending Home Value.

(b) In any Settlement Event where the Property is not being sold, Ending Home Value will equal the Appraised Value, as determined in Section 8.5.

(c) Notwithstanding the provisions of Sections 8.4(a), 8.4(b) and 8.5, in any Event Of Default, Unlock may elect to obtain a Property Appraisal and provide instructions to the appraiser that the Property is to be appraised on a "non-distressed" basis, and to use the "non-distressed" Appraised Value as Ending Home Value.

8.5 The Appraised Value is the dollar value of the Property that Unlock will determine and You and Unlock will agree upon where a Property Appraisal has been obtained after the Effective Date. In most situations, a single Property Appraisal will establish the Appraised Value. However, if You or Unlock believes, in good faith, that the first Property Appraisal contains a material omission or material error of fact, either party, at its own cost, no later than 10 days after receipt of the Property Appraisal, may request any of all of the following:

(a) a reconsideration of the Property Appraisal by the appraiser who provided it;

(b) an additional Property Appraisal by a different appraiser;

(c) an alternative property valuation such as a Broker Price Opinion or Automated Valuation Method (AVM).

You and Unlock will then work cooperatively, expeditiously and in good faith to agree on the Appraised Value based on all available information. If You and Unlock are unable to agree, the Appraised Value will be determined by arbitration in accordance with Section 20.

8.6 In any situation under the Unlock Agreement where You are requesting an Improvement Adjustment, Unlock will obtain a Property Appraisal, at your expense, and task the appraiser with the additional requirement to determine the amount of the Improvement Adjustment, as provided in Section 7.

8.7 Alternatives. If an Appraised Value is needed under the Unlock Agreement, Unlock, in its discretion, may determine that an alternative property valuation such as a Broker Price Opinion or Automated Valuation Method (AVM) is sufficient and may obtain such valuation in lieu of a Property Appraisal. In connection with any Settlement Event where the Property is being sold, and there is a

pre-existing appraisal available that may satisfy Unlock's requirements, such as an appraisal obtained by a third-party buyer in connection with their purchase mortgage, Unlock may, in its discretion, accept or reject such existing appraisal for purposes of establishing the Appraised Value. In certain situations where Unlock determines that the Property is difficult to value, Unlock may require more than one Property Appraisal as input to a determination of Appraised Value.

8.8 Appraisal Expenses.

(a) Costs incurred in obtaining a Property Appraisal or other valuation of the Property are called "Appraisal Expenses." To the extent allowed by applicable law, and unless paid by Unlock, You will pay all Appraisal Expenses in connection with the first Property Appraisal or other valuation of the Property obtained in connection with: (i) initial valuation of the Property prior to execution of the Unlock Agreement to establish the Starting Home Value; (ii) any Settlement Event; (iii) any Partial Buyout; (iv) any Event Of Default; (v) any allocation of insurance or condemnation proceeds; (vi) any other determination of an Ending Home Value; (vii) any determination of an Improvement Adjustment or Maintenance Adjustment; or (viii) any Approved Subsequent Loan as set forth in Section 12.

(b) If there is more than one Property Appraisal or other valuation obtained in connection with any of the events described in this Section, the Appraisal Expenses will be paid by the requesting party, or if both parties agree that an additional Property Appraisal or other valuation should be obtained, by both parties divided equally. If Appraisal Expenses have not been paid by the party required to bear them, the other party may subtract them out of the party's funds from escrow at the closing of a Settlement Event, as allowed by applicable law. In the case of unpaid Appraisal Expenses by Owner, such amounts shall be considered Unpaid Owner Obligations.

8.9 All Property Appraisals and alternative valuation tools must conform to Unlock's most current requirements. A Property Appraisal or alternative valuation report may be deemed invalid by Unlock in its discretion if the report is more than 60 days old.

9. **<u>Property Inspection.</u>**

9.1 A "Property Inspection" is an independent determination of Property condition obtained from a professional inspection company selected by Unlock and unaffiliated with either You or Unlock. The property inspector and/or inspection company must have experience in the local community and be appropriately licensed, in good standing, in the jurisdiction in which the Property is located, where required. Inspections may be general in nature or specific in scope, such as a roof or pest inspection. As a result, more than one inspection may be required to determine Property condition, in which case the term Property Inspection, as used in the Unlock Agreement, may refer to multiple inspections.

9.2 Whenever Unlock obtains a Property Inspection, You are required to cooperate with the inspector(s) by granting full access to the Property, making available any relevant documents and information in Your possession pertaining to the Property and ensuring that the Property is presented in reasonable condition to be inspected.

9.3 Property Inspections may be used:

(a) To determine the Property's condition as of the Effective Date.

(b) To determine the Property's condition during the Term in connection with Unlock's investor reporting needs or an Event Of Default.

(c) To determine the Property's condition and the amount of any Improvement Adjustment or Maintenance Adjustment in connection with a Settlement Event or a Partial Buyout.

9.4 Costs incurred in obtaining a Property Inspection are called "Inspection Expenses." To the extent allowed by applicable law, and unless paid by Unlock, You will pay all Inspection Expenses in connection with the first Property Inspection of each type obtained in connection with: (i) any initial inspection of the Property prior to execution of the Unlock Agreement; (ii) any Settlement Event; (iii) any Partial Buyout; (iv) any Event Of Default; (v) any allocation of insurance or condemnation proceeds; (vi) any other determination of an Ending Home Value; and (vii) any determination of an Improvement Adjustment or Maintenance Adjustment.

9.5 If there is more than one Property Inspection of a given type obtained in connection with any of the events described in this Section, the Inspection Expenses will be paid by the requesting party, or if both parties agree that an additional Property Inspection should be obtained, by both parties divided equally. If Inspection Expenses have not been paid by the party required to bear them, the other party may subtract them out of the party's funds from escrow at the closing of a Settlement Event, as allowed by applicable law. In the case of unpaid Inspection Expenses by Owner, such amounts shall be considered Unpaid Owner Obligations.

9.6 In connection with any Settlement Event where the Property is being sold, and there is a pre-existing property inspection available that may satisfy Unlock's requirements, such as an inspection obtained by a third-party buyer in connection with their purchase, Unlock may, in its discretion, accept or reject such existing property inspection.

9.7 All Property Inspections must conform to Unlock's most current requirements.

9.8 To monitor Property condition during the Term of the Unlock Agreement, Unlock may, at its expense:

(a) Conduct reasonable inspections of the interior and exterior of the Property, including Property Inspections and inspections conducted with drone photography.

(b) Require You to provide written answers to questions regarding any conditions known to You which may affect the Property or its value.

**10. <u>Annualized Cost Limit.</u>**

10.1 The cost of Your Unlock Agreement on an annual basis ("Annualized Cost") is subject to and capped at the Annualized Cost Limit set forth in Table of Key Terms. Whenever the Unlock Share

is calculated in connection with a Settlement Event or Partial Buyout, Unlock will also determine the exact number of days that passed between the Effective Date and the Settlement Date (or closing date of the Partial Buyout). This number, called the "Term Days", will be used to calculate the Annualized Cost and the "Maximum Unlock Share", as follows:

***Annualized Cost =***

***(Unlock Share / Investment Payment) ^ (365 / Term Days) - 1***

***Maximum Unlock Share =***

***Investment Payment X (1 + Annualized Cost Limit) ^ (Term Days / 365)***

The Maximum Unlock Share is the greatest amount the Unlock Share can be when determining the Settlement Payment or Partial Settlement Payment. If the Annualized Cost exceeds the Annualized Cost Limit, the Unlock Share will be set equal to the Maximum Unlock Share when calculating the Settlement Payment or Partial Settlement Payment.

**11. Owner Representations, Warranties and Covenants.**

11.1 Owner makes the representations, warranties and covenants in this Section 11 to, and for the benefit of, Unlock. The representations, warranties and covenants of Owner in this Section 11 shall be deemed made and restated on and as of, as applicable: (a) the Effective Date; (b) the closing date of a Settlement Event; (c) an Unlock Conversion; and (d) upon the assignment of the Unlock Agreement by Unlock, as permitted hereunder. Unlock is relying on the accuracy and completeness of the representations, warranties and covenants of Owner set forth in this Section 11 in entering into the Unlock Agreement.

11.2 Title. As of the Effective Date, all Owners, individually and collectively, will appear on record title to the Property as holding fee simple title to one hundred percent (100%) of the Property. You will have good and marketable title to the Property, which will be free of any license, easement, or other encumbrance or restriction against the title to the Property, other than Approved Existing Loans and Permitted Encumbrances, which are defined below.

(a) "Approved Existing Loan" means, as of the Effective Date, any pre-existing loan secured by a lien on the Property which is (i) listed in the property title report obtained by Unlock ("Title Report") or (ii) otherwise known to and approved in writing by Unlock.

(b) "Permitted Encumbrance" means all licenses, easements, or other title restrictions to the Property that exist as of the Effective Date, and are listed in the Title Report, plus any additional licenses, easements or title restrictions agreed to in writing by Unlock after the Effective Date.

As of the Effective Date, You represent that the Title Report accurately reflects all pre-existing loans secured by a lien on the Property and all Permitted Encumbrances, and to the extent that the it does not, and there are any existing loans secured by a lien on the Property or any licenses, easements, or

other title restrictions to the Property that are not reflected in the Title Report, You have disclosed them in full detail to Unlock.

During the Term You will keep the Property free of any liens, title exceptions, and easements except for: liens securing Approved Existing Loans or Approved Subsequent Loans (as defined in Section 12.4) and Permitted Encumbrances.

11.3 Secured Obligations. A "Secured Obligation" is an obligation secured by a lien on the Property, including, but not limited to: mortgage loans, home equity lines of credit, Property taxes and assessments, homeowner association dues or assessments and mechanics liens. During the Term You will promptly pay, and at all times remain current on, all Secured Obligations and You will provide Unlock proof of payment upon request. You will provide advance written notice of Your intent to apply for any deferrals or forbearance of any Secured Obligation. If there is a default under any Secured Obligation, You will take immediate action necessary to: (i) cure the default, (ii) terminate any foreclosure or enforcement action, (iii) satisfy the Secured Obligation, and/or (iv) remove or release such lien from the Property. You, and not Unlock, are solely liable for all Secured Obligations, including in the event of an Unlock Conversion.

11.4 Litigation. You represent and warrant that there is no foreclosure, notice of default, notice of sale, condemnation, environmental, zoning, or land-use regulation proceeding; or any lawsuit, arbitration, proceeding, tax claim, or special assessment that is pending or threatened against Owner, the Property, or that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or Owner's ability to perform its obligations under the Unlock Agreement.

11.5 Legal Use. You represent, warrant and covenant that the use and occupancy of the Property are fully compliant, and will be fully compliant during the Term, with all state, federal and local laws, zoning ordinances, and regulations, including environmental prohibitions.

11.6 Property Condition. You warrant there are no material defects or conditions on or affecting the Property or title to the Property undisclosed to Unlock, which are now known to or could reasonably have been discovered by You, which could affect the use or value of the Property. You acknowledge that evidence of misrepresentation or non-disclosure as to the condition of the Property by You raises a presumption of bad faith and is a breach of the Unlock Agreement.

11.7 Environmental Matters. There is not any violation of, or claim of violation of any federal, state, or local environmental law or regulation, including, without limitation, those relating to hazardous materials ("Environmental Laws"). In addition, there is no presence of any hazardous materials on, in, or about the Property or property in the vicinity of the Property. Owner shall not, and shall not allow others to, violate any Environmental Laws with respect to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

**11.8** Your Decision. **You understand that entering into the Unlock Agreement can have significant tax, financial and estate planning consequences. You understand that Unlock will have a lien on the Property and an Event Of Default that is uncured could result in a foreclosure by Unlock in which case You could lose the Property. You understand that Unlock does not provide tax advice and makes no representations as to the tax advantages or disadvantages which may accrue to You in connection with the Property or the Unlock Agreement. You are not relying on any information or representation by Unlock, its agents, affiliates, officers, or employees regarding: (i) the value of the Property; and (ii) the advisability of You entering into the Unlock Agreement, including but not limited to tax, legal, financial, and estate planning consequences. You acknowledge that Unlock has urged You to discuss the Unlock Agreement with family members, heirs, and with independent tax, legal and financial advisors to ensure an understanding of the risks and benefits of the Unlock Agreement with respect to Your particular situation. You represent and warrant that You have had the opportunity to seek independent advice regarding such matters and by entering into the Unlock Agreement You fully understand the terms, conditions and potential consequences.**

11.9 Non-Owner Occupants. As of the Effective Date You have identified all residents of legal age who occupy the Property but who are not signatories to the Unlock Agreement ("Non-Owner Occupants") and informed them of the existence, terms and potential impact of the Unlock Agreement on (i) Your Estate and (ii) their ability to inherit or continue living in the Property. You shall promptly so inform any additional Non-Owner Occupants at all times during the Term.

11.10 Reliance. Unlock relies on information provided by You when making its investment decision. You have promptly delivered all available documentation and information requested by Unlock during the underwriting of Your application. All documentation and information You have provided to Unlock fairly and accurately reflects the condition of the Property and Your financial condition and is truthful, complete, and not misleading.

11.11 Authority. You are one or more individuals with the legal power, authority and full capacity to enter into and to consummate all transactions contemplated by the Unlock Agreement. The execution and delivery of the Unlock Agreement will not conflict with, or result in an acceleration or breach of any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which Owner is a party or by which any portion of the Property may be bound.

11.12 No Change. You warrant that there has been no material change in Your financial condition since Your application was last submitted to Unlock.

11.13 Status of Owner. You represent and warrant that You are either (a) single or unmarried and You are not in a domestic partnership, and that in each case no spouse, domestic partner or former spouse or domestic partner has any interest in the Property that you have not disclosed in writing to Unlock, (b) married or in a domestic partnership and Your spouse or domestic partner has an interest

in the Property, and such person has signed the Unlock Agreement, or (c) married or in a domestic partnership and Your spouse or domestic partner does not have an interest in the Property, and such person has signed the Consent of Spouse/Domestic Partner set forth in Exhibit D hereto.

11.14 Continuing Obligation. You warrant You have a continuing obligation to comply with the representations made in this Section 11 and to notify Unlock during the Term if any representation You have made ceases to be materially accurate or true.

**12. Total Home Finance Limit and Approved Subsequent Loans.**

12.1 During the Term of the Unlock Agreement, there is a limit on the amount of financing that can be secured by the Property ("Total Home Finance"). Total Home Finance is calculated as follows:

***Total Home Finance = (Housing Debt + Unlock Share) / Appraised Value***

***Where "Housing Debt" equals the total principal balance of loans secured by the Property, including the unused portion of any credit lines secured by the Property.***

***And where Unlock Share ignores any impact of the Annualized Cost Limit and any impact of a potential Improvement Adjustment and/or Maintenance Adjustment.***

12.2 During the Term of the Unlock Agreement, Total Home Finance cannot exceed the Total Home Finance Limit as set forth in the Table of Key Terms, subject to adjustment in accordance with Section 14.8.

12.3 The Total Home Finance Limit applies both to Approved Existing Loans, as defined in Section 11.2, and Approved Subsequent Loans, as defined below.

12.4 If, during the Term of the Unlock Agreement, You want to obtain an "Approved Subsequent Loan", You must:

(a) Provide Unlock with loan documentation related to the proposed loan as follows:

(i) Immediately upon Your receipt of the "Loan Estimate" as required under federal regulations (or equivalent disclosure if your loan does not mandate a Loan Estimate), but in no case less than seven business days prior to the proposed close of the loan, You must provide a full copy of it to Unlock.

(ii) Immediately upon Your receipt of the "Closing Disclosure" as required under federal regulations (or similar disclosure if your loan does not mandate a Closing Disclosure), but in no case less than two business days prior to the proposed close of the loan, You must provide a full copy of it to Unlock.

(b) Cooperate with Unlock to obtain a Property Appraisal, to be completed no later than 10 business days prior to the proposed close of the loan.

(c) Ensure that copies of all loan documents and all documents recorded against the Property

are delivered to Unlock immediately following the closing of the loan.

(d) Obtain Unlock's prior written consent to the loan. Unlock will not unreasonably withhold consent if:

(i) The Appraised Value of the Property is greater than or equal to the Starting Home Value and the proposed loan will not result in a breach of the Total Home Finance Limit, as possibly adjusted in accordance with Section 14.8; or

(ii) The Appraised Value of the Property is less than the Starting Home Value, the proposed loan is being used solely to refinance existing senior debt secured by the Property, and the amount of the proposed loan is less than or equal to the principal balance of the debt being refinanced, plus actual and reasonable refinancing costs.

Notwithstanding the foregoing, Unlock in its discretion may refuse to consent to any lien on the Property that could materially impair its rights, including, reverse mortgage loans, shared appreciation mortgage loans, mortgage loans with negative amortization or prepayment penalties, private or non-institutional loans, unrecorded loans secured by the Property, and certain loans with payment reset or other variable payment features.

(e) Unlock will subordinate the priority of its rights under the Unlock Agreement to the lien of any lender that extends to You an Approved Subsequent Loan, provided that: (i) the Approved Subsequent Loan satisfies the requirements of this Section 12.4; (ii) any requested subordination and loan documents contain only reasonable and customary terms common to such agreements and acceptable to Unlock in its discretion; and (iii) You pay all costs incurred by Unlock associated with the subordination.

(f) Unlock makes no representations or warranties regarding the availability or terms of any loan that You may seek during the Term of the Unlock Agreement, and Unlock will have no liability to You as a result of the unavailability or unfavorable terms of any such loan. Note that mortgage lenders may not agree to lend on a property with an Unlock Agreement to the same extent or on the same terms as they would for a property without an Unlock Agreement. It is possible that You will need to terminate Your Unlock Agreement in order to complete a future home loan.

## 13. <u>Property Condition.</u>

13.1 You will maintain the Property in good condition, and no worse than its condition as of the Effective Date, subject to normal wear and tear. You will prevent any waste, deterioration or decrease in value due to the Property's condition. You will periodically perform customary and reasonable repairs as needed or as required. You are solely responsible for all ordinary maintenance costs incurred in connection with maintaining the condition and value of the Property.

13.2 You acknowledge that Unlock will have no liability to You or to any third party for, and You hold Unlock harmless from, any loss or liability in connection with, any defect or condition on or

affecting the Property, whether known or unknown.

**14. Occupancy and Property Use.**

14.1 You will enjoy sole right of occupancy of the Property under the Unlock Agreement as an owner and not as a tenant or lessee, whether or not Unlock has elected a Conversion, subject to limited Unlock rights of entry and repair following an Event Of Default or as otherwise set forth in the Unlock Agreement.

14.2 You will (i) use the Property solely as a residential property, except for a "home office" in compliance with the Internal Revenue Code and applicable U.S. tax regulations; and (ii) occupy the Property as stated in the Table of Key Terms.

14.3 If Your Occupancy is declared as Principal Residence in the Table of Key Terms: (i) You will occupy the Property as "Principal Residence" throughout the Term, which means that You live and sleep in the Property for no less than 180 days out of any 365-day period. Unlock will not unreasonably withhold consent to a temporary lapse in occupancy if You make arrangements satisfactory to Unlock to care for the Property while You are not occupying it. (ii) You may rent part of the Property without Unlock's consent, but You cannot rent 100% of the Property.

14.4 If Your Occupancy is declared as Second Home in the Table of Key Terms: (i) You are not required to occupy the Property as "Principal Residence. (ii) You may rent part of the Property without Unlock's consent, but You cannot rent 100% of the Property.

14.5 If Your Occupancy is declared as Rental Property in Table of Key Terms: (i) You are not required to occupy the Property as "Principal Residence. (ii) You may rent all or part of the Property without Unlock's consent.

14.6 Regardless of Occupancy declaration, You cannot enter into any lease or rental agreement with a term that expires after the Expiration Date of the Unlock Agreement.

14.7 In any Settlement Event where Unlock determines that an existing rental agreement or tenant who is occupying or has rights to occupy the Property or a portion of the Property is having a negative impact on the Unlock Share, You, at Your expense, will be responsible for terminating such rental agreement or removing such tenant from the Property, or otherwise for compensating Unlock for the loss in Unlock Share, in accordance with the following process:

(a) The Settlement Payment will be calculated at the time the Settlement Event is triggered and is being delayed due to an existing rental or tenant issue.

(b) Unlock and You will monitor the situation and cooperate to complete the Settlement Event as soon as the rental or tenant issue is resolved.

(c) When the Settlement Event can proceed, the Settlement Payment will be recalculated. If the newly calculated amount is less than the previously calculated amount, the difference will be

added to the amount of the Settlement Payment.

14.8 If Your Occupancy is declared as Principal Residence in the Table of Key Terms on the Effective Date, and You begin using the Property as a Second Home or Rental Property during the Term, Unlock may, in its discretion, lower the Total Home Finance Limit to what it would have been if You had originally declared Your Occupancy as a Second Home or Rental Property.

**15. Administration Fees.**

15.1 Unlock may charge reasonable Administration Fees in connection with the handling of various events that can occur during the Term of the Unlock Agreement, including, without limitation a change to title, a subordination in connection with new or refinanced debt, a Settlement Event, an Event Of Default, a Protective Advance and a Non-Distressed Sale. The schedule of charges for Administration Fees is set forth in the attached Exhibit E.

15.2 Administration Fees are due and payable by You when incurred. However, Unlock may elect, in its discretion, to defer payment of Administration Fees until a later date, or until the occurrence of a Settlement Event ("Deferred Fees"). Unpaid Administration Fees and Deferred Fees shall be considered Unpaid Owner Obligations.

**16. Default.**

16.1 The occurrence of any of the following will constitute an "Event Of Default" under the Unlock Agreement:

(a) Failure to Perform. You breach or fail to perform in accordance with any provision of the Unlock Agreement, or You take any action to impede a Conversion or interfere with or negatively impact Unlock's rights.

(b) Misrepresentation. You (i) make any representation, (ii) provide Unlock with any information or (iii) fail to provide Unlock with any information, whether oral or written, in each case, that is false, inaccurate or misleading, including with respect to the condition or value of the Property, in connection with the amount or kind of consideration given to You in any sale or transfer of the Property, when a non-signatory to Your Unlock Agreement becomes an owner or a principal resident of the Property, or when Your marriage or domestic partner status changes; or (iv) fail to correct a representation that has become untrue within a reasonable time after learning of the new information regarding the representation.

(c) Delinquencies. You become delinquent on any obligation regarding the Property, including on any loans secured by, or with respect to any taxes or assessments owed on, the Property.

(d) Occupancy. You violate the occupancy provisions of Section 14.2 through 14.6 or the Non-Owner Occupant provisions of Section 11.9.

(e) Unauthorized Transfers. You transfer or attempt to transfer the Property, or any interest

in the Property, other than in accordance with the Unlock Agreement.

(f) Unapproved Liens. A lien attaches to the Property without Unlock's prior written approval, or You obtain any loan secured or to be secured by the Property that Unlock has not approved in writing, whether recorded or unrecorded.

(g) Financial Difficulty. You become insolvent or unable to pay Your debts, or there is a voluntary or involuntary commencement of a bankruptcy against You, or an appointment of a receiver for Your assets, or You make a general assignment for the benefit of creditors, or any similar event or proceeding.

(h) Insurance. You fail to maintain insurance on the Property, as prescribed in the Unlock Agreement.

(i) Notices. You fail to timely provide to Unlock any notice(s) required under the Unlock Agreement.

(j) Condition of Property. You fail to maintain, preserve or repair the Property in accordance with Section 13.1.

(k) Transfer of Agreement. Any assignment, attempted assignment, or other transfer of the Unlock Agreement by You in violation of the Unlock Agreement.

(l) Rental Terms. The Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date.

(m) Cooperation. You fail to cooperate with Unlock or any of Unlock's agents to affect a sale of the Property in connection with a Settlement Event.

(n) Other Adverse Acts. Any other occurrence, action or inaction by You which may have an adverse effect on the Property, the legal ownership of the Property, the value of the Property, or Unlock's rights.

**17. Unlock Rights and Remedies.**

17.1 Your performance under the Unlock Agreement will be secured as a recorded lien on the Property by recording the Security Instrument in the county or local jurisdiction where the Property is located.

17.2 Upon an Event Of Default, Unlock will provide You with a Notice Of Default which will state the triggering circumstances. Except as otherwise provided in the Unlock Agreement, You will have thirty (30) days from the notice delivery date to cure the default, subject to Section 17.4 and the provisions of any laws which apply to the Unlock Agreement. If You fail to cure within thirty (30) days, Unlock may exercise any of its rights or remedies, subject to applicable law, including the following:

(a) Unlock may make Protective Advances in accordance with Section 17.12.

(b) Unlock may demand for You to promptly remedy any material defect or adverse condition on the Property.

(c) Unlock or its agents may enter the Property to (i) to conduct Property Inspections and Property Appraisals; (ii) to prevent waste of the Property; and (iii) for any other purpose reasonable to prevent continuing harm to or diminution in value of the Property.

(d) Unlock may seek monetary damages against You, including interest, attorney's fees, and costs.

(e) Unlock may be irreparably injured and will have the right to specific performance, injunctive relief, or any other equitable relief against You.

(f) Unlock may elect to exercise its right to a Conversion, then solicit and sell the entire Property, including Owner's interest therein, to one or more third parties, and receive the Settlement Payment from the proceeds of such Property sale. Upon the sale of the Property, Owner shall be entitled to receive all other proceeds after the Settlement Payment is paid to Unlock and Closing Costs have been paid to the applicable parties.

(g) Unlock may exercise its rights and remedies under the Security Instrument, including its foreclosure right. This could result in a termination and settlement of the Unlock Agreement. In the event Unlock elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 17.2, Unlock may declare the Settlement Payment immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

17.3 If Unlock is required to pay money pursuant to a preference claim in a bankruptcy proceeding involving You, then such amount will become an Unpaid Owner Obligation and Unlock is entitled to assert a claim against You for the same amount.

17.4 In any default situation where, in Unlock's discretion, absent immediate action there could be material damage to the Property, Unlock's interests therein or the value of the Unlock Share, Unlock may suspend the 30-day cure period and take immediate action to exercise any of its rights or remedies, subject to applicable law.

17.5 Unlock is entitled to demand immediate termination of the Unlock Agreement, the return of the Investment Payment and any other payments tendered to You, and the payment of the amount, if any, by which the Settlement Payment exceeds the Investment Payment, together with any and all attorney's fees and costs incurred by Unlock in connection with such termination in an Event Of Default related to: (i) fraud, bad faith, or misrepresentation or nondisclosure by You; or (ii) a transfer or sale, or attempted transfer or sale, of the Property by You in violation of the terms of the Unlock Agreement.

17.6 In the event of (i) fraud, bad faith, or misrepresentation or nondisclosure by You; (ii) any

transfer or sale, or attempted transfer or sale, of the Property by You in violation of the terms of the Unlock Agreement, or (iii) any other uncured default by You under the terms of the Unlock Agreement, Unlock, in its discretion, may increase the Settlement Payment by an amount equal to ten percent (10%) of the Investment Payment.

17.7 Owner and Unlock each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; provided, however, that Unlock will retain the right to seek a partition, (i) in the event of, and as part of any action arising out of an uncured Event Of Default, or (ii) in connection with any claim or action by Owner which asserts that any provision of the Unlock Agreement is against the law or unenforceable.

17.8 In an Event Of Default which has resulted in a foreclosure action by a mortgage lender, tax authority or other lien holder (and provided that You have first reasonably exhausted any loss mitigation remedies offered to You by such lienholder), Unlock, in its discretion, may offer to You the remedy of a "Non-Distressed Sale," as follows: If You accept Unlock's offer of a Non-Distressed Sale, Unlock may cure the default through one or more Protective Advances; in exchange You will give Unlock the power to exclusively and unilaterally market and sell the Property, and You will cooperate and execute all documentation required by Unlock to market the Property and complete the Non-Distressed Sale. The Non-Distressed Sale remedy is intended to prevent the Property from going to foreclosure and becoming a "distressed" property, to protect Your and Unlock's interest in the Property, and to prevent a foreclosure event from impacting Your credit.

17.9 In any Event Of Default which leads to a sale of the Property: (i) Unlock may elect to calculate the Unlock Share based on an Appraised Value in accordance with Section 8.4(c); and (ii) You will pay all costs in connection with the sale, including Closing Costs, any Appraisal Expenses and Inspection Expenses and any other expenses, unless paid by Unlock, but not any closing costs to be paid owed by the third-party buyer.

17.10 The remedies provided in the Unlock Agreement are cumulative. A party who asserts a right or seeks a remedy may also assert other rights or seek other remedies available at law, equity or otherwise.

17.11 In connection with any Event Of Default, the Expiration Date will automatically extend for whatever time is necessary to permit Unlock to exercise its rights and remedies.

17.12 <u>Protective Advances.</u> If You fail to protect the Property and Unlock's rights therein, Unlock may make "Protective Advances," as defined in this Section, as Unlock deems appropriate. Unlock may make Protective Advances for things such as:

(a) The placement of insurance; the payment of taxes, assessments, levies, liabilities, obligations and other charges of every nature on the Property;

(b) The making of necessary repairs;

(c) The cure of any defaulted loans secured by the Property; or

(d) The removal of a receiver appointed for the Property.

Unlock will provide 30 days' written notice to You, to correct Your default, or such longer period as may be required by applicable law. If, after the 30-day notice period, You have not cured the default, Unlock may make the payments itself. All such payments by Unlock (including attorneys' fees incurred in litigation or arbitration with parties other than You) are deemed Protective Advances. Notwithstanding the foregoing notice period, prior notice from Unlock is not required if the Unlock Agreement expressly so provides, or when Unlock determines that prompt action is necessary to protect the Property and Unlock's rights.

You consent to Unlock's unilateral authority to determine the appropriateness or necessity of making any Protective Advances in accordance with the Unlock Agreement. Unlock incurs no liability for its election not to take any action authorized under this Section 17.12.

17.13 Unlock may demand prompt reimbursement for any Protective Advances. You must reimburse Unlock no later than 10 days after demand. Protective Advances incur interest at the rate of 8% per annum, subject to applicable law, from the date of demand until paid in full. Protective Advances, plus any associated interest charges, to the extent You do not reimburse Unlock, become a component of Unpaid Owner Obligations.

**18. Insurance.**

18.1 Coverage.

18.1.1. You must maintain at Your sole expense:

(a) Insurance on the Property against fire and other hazards included in the special form (HO 3) policy (and any successor forms).

(b) Hazard insurance, including flood hazard, and any other insurance Unlock may reasonably require and which is common for similar properties in similar locations, in an amount equal to the current replacement cost of the improvements on the Property, or the maximum amount as available under applicable law, which amount will be increased not less frequently than annually as the replacement cost of the improvements increases.

(c) Liability insurance on the Property against such risks with coverage in an amount of at least one million dollars ($1,000,000) for any single occurrence, or such lesser amount as is reasonable for similar properties in Your location.

18.1.2. You hereby authorize Unlock to communicate with all insurance companies at any time to ensure the maintenance of policies, the coverage, and the reimbursement of losses.

18.1.3. Unlock must be named as an additional "named insured" and "loss payee" under all hazard and liability insurance policies obtained by You related to the Property.

18.1.4. You may obtain insurance from any insurance carrier reasonably acceptable to Unlock that has a Financial Strength Rating of "B" or better from A.M. Best (or equivalent rating from Kroll, S&P or Demotech).

18.1.5. You must provide Unlock with copies of all insurance policies related to the Property when the insurance is obtained and at any time there is a change in carrier or policy. You must provide Unlock with proof of coverage upon request.

18.1.6. If You fail to maintain or obtain the insurance coverage required by this Section 18.1, Unlock may obtain such coverage on the Property. Any such expenses paid by Unlock are Protective Advances.

18.2 Distribution of Insurance Proceeds for Losses.

18.2.1. Subject to Your obligations and the requirements in connection with any Approved Existing Loans or Approved Subsequent Loans, insurance for losses will be distributed as described in this Section 18.2.

18.2.2. You and Unlock will cooperate in the pursuit, settlement, and adjustment of any losses under any insurance policies.

18.2.3. In the event of damage to the Property where insurance claim proceeds are sufficient to restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, the Unlock Agreement will continue, and the proceeds must promptly be applied to such restoration or repair, further subject to:

(a) Unlock has the right to approve any restoration or repair plans, including the contractors or subcontractors used and the costs associated with the restoration or repair.

(b) Unlock has the right to release insurance proceeds to the individuals or entities performing the repair and restoration work in one or more progress payments as the work is completed.

(c) Unless required by law, Unlock is not required to pay You any interest or earnings on insurance proceeds.

(d) You are responsible for ensuring that any repair or restoration work is completed in a cost-effective manner that in no way impairs the structural integrity, habitability or value of the Property.

(e) You are responsible for obtaining any governmental approvals or permits that are required for such repair or restoration work.

18.2.4. Unlock has no obligation to pay any amount of the restoration or repair of the Property even if the insurance proceeds are insufficient to complete the restoration or repair. You are responsible for any shortfall. If restoration or repair is not economically feasible due to insufficient

insurance claim proceeds because the Property was underinsured, Unlock, in its discretion, may require You to pay for the restoration or repair out of Your other assets.

18.2.5. If restoration or repair is not economically feasible due to insufficient insurance claim proceeds where the Property was not underinsured, all insurance proceeds will be allocated in the following order:

(a) To payment of reasonable expenses incurred by You or Unlock in collecting and contesting with the insurers the payments under the relevant insurance policies, including attorney's fees that have been approved by Unlock;

(b) To payment of all Approved Existing Loans or Approved Subsequent Loans that have priority over the Unlock Agreement;

(c) To Unlock, in an amount equivalent to the Settlement Payment as it would have been calculated had the Unlock Agreement been settled immediately before the destruction or damage occurred; and

(d) To You, the balance of the proceeds.

The Unlock Agreement will end upon payment to Unlock of the insurance proceeds as described in Section 18.2.5(c) above.

18.2.6. In the event of loss to Unlock resulting directly from Your failure to maintain insurance, maintain insurance at the required coverage level, or obtain a claim, Unlock shall be entitled to all remedies available under the Unlock Agreement, including, without limitation, in connection with an Event Of Default, and/or available at law or in equity.

**19. <u>Condemnation.</u>**

19.1 If the Property is condemned in whole or in part during the Term, You shall immediately notify Unlock of such condemnation and all condemnation proceeds will be distributed as follows:

(a) To repay any reasonable costs and expenses incurred by You or Unlock in collecting and contesting the condemnation proceeds, including attorney's fees that have been approved by Unlock;

(b) To payments for extinguishing all Approved Existing Loans or Approved Subsequent Loans that have priority over the Unlock Agreement;

(c) To Unlock, in amount equal to the Settlement Payment;

(d) To You, the balance of the proceeds.

19.2 In the case of a full condemnation, the Unlock Agreement will end upon payment to Unlock of the condemnation proceeds as described in Section 19.1(c) above.

19.3 In the case of a partial condemnation: (i) The Unlock Agreement will continue and Unlock will retain its rights with respect to any Property that has not been condemned; and (ii) after distribution of the proceeds of the partial condemnation in accordance with Section 19.1, for all remaining calculations to be made under the Unlock Agreement, the Unlock Share will be reduced by an amount equal to any condemnation proceeds paid to Unlock under Section 19.1(c) above.

**20. Arbitration.**

20.1 In the event of any inconsistencies between the terms and conditions of the Unlock Agreement (or any of them) and the terms and conditions of this Section 20, this Section 20 shall control and be binding.

20.2 OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND, BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ.

20.3 Procedure. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS ("JAMS"), AND THAT A SINGLE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW, EXCEPT AS OTHERWISE SET FORTH IN THE UNLOCK AGREEMENT. OWNER UNDERSTANDS THAT UNLOCK WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

20.4 Remedy. EXCEPT AS PROVIDED BY THE RULES AND THE UNLOCK AGREEMENT,

ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THE UNLOCK AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

20.5 Availability of Injunctive Relief. BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF BENEFICIARY ALLEGES OR CLAIMS A BREACH OF THE UNLOCK AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE SETTLEMENT PAYMENT IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE UNLOCK AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

20.6 Small Claims Court. NOTWITHSTANDING THE ARBITRATION AGREEMENT ABOVE, BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION, PROVIDED THE COURT'S REQUIREMENTS ARE SATISFIED.

20.7 Class Action Waiver. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR UNLOCK MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

**21. Miscellaneous.**

21.1 Multiple Owners. If You are more than one individual:

(a) The Unlock Agreement must be signed by each of You;

(b) All of You are jointly and severally liable for liabilities and obligations under the Unlock Agreement;

(c) Notice required to be given to You is adequate if given to any of You; and

(d) Unlock may treat any notice received from any one of You as notice from all of You.

21.2 Revocable Trusts. If You are the trustee of a Revocable Trust:

(a) All trustees and all trustors must be disclosed in writing to Unlock prior to the Effective Date and must sign the Unlock Agreement;

(b) All rights and powers specified for, and all actions required of, You in the Unlock Agreement that are exercised by a trustee are deemed approved and exercised by all trustees unanimously;

(c) All trustees and all trustors, in their capacities as individuals, are jointly and severally liable with You for Your liabilities and obligations under the Unlock Agreement;

(d) All representations and warranties by You in the Unlock Agreement are made by all trustees on behalf of the Revocable Trust and by all trustees and all trustors in their capacities as individuals;

(e) Notice required to be given to You is adequate if given to any of the trustees;

(f) Unlock may treat any notice received from any trustee as notice from all trustees and from You.

21.3 Notices.

21.3.1. You will immediately provide Unlock with written notice of any event that may have a material effect upon the Property, the value of the Property, or Unlock's rights, including but not limited to (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property, or (v) the occurrence of an Event Of Default.

21.3.2. All required notices must be in writing and will be considered given when delivered (i) personally, (ii) to the mailing address set forth in the attached Exhibit C by overnight delivery by a nationally recognized courier service, or (iii) by email to the email address specified for You or Unlock, as applicable, set forth in Exhibit C.

21.3.3. The following notices are deemed not given by You (or Your Estate) to Unlock until Unlock makes written confirmation of receipt to You: notices of default and notices of sale in connection with secured liens on the Property; notices of delinquency in tax or insurance payments on the Property; notices of Your death; and notices of the commencement of legal or other action concerning the Property, or of Your bankruptcy proceedings.

21.3.4. During the term, You and Unlock will each provide the other with prompt notice regarding any changes to Exhibit C. Notice to You shall also be effective when delivered to any other individual whom You have designated in writing to Unlock as authorized to receive notices under the Unlock Agreement.

21.4 Unpaid Owner Obligations. Unpaid Owner Obligations, in total, are the sum of (i) any

unreimbursed Protective Advances plus any associated unpaid interest, fees and other charges; (ii) any unpaid Administration Fees; (iii) any Deferred Fees; (iv) any unpaid Appraisal Expenses and Inspection Expenses; and (v) any other amounts expended by Unlock to protect its rights or the value of the Property in an Event Of Default.

21.5 Not A Loan. Unlock and Owner agree that the Unlock Agreement and the transaction contemplated thereunder, including payment of the Investment Payment and the sale of the Unlock Percentage, is not a loan or extension of credit. Owner does not have an obligation to repay the Investment Payment, and there are not any required periodic payments of principal, interest or any other finance charges. As set forth herein, Unlock may lose all or a portion of the Investment Payment. The Security Instrument secures Owner's performance and obligations under the Unlock Agreement and not in connection with a promissory note, loan or extension of credit. The Annualized Cost Limit is not an annual percentage rate limit, but rather a limit on Unlock's investment return. To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws.

21.6 Tax Benefits. Unlock is not entitled to any tax advantages that You benefit from relating to the Property, including, without limitation, all available deductions for taxes and mortgage interest paid by You.

21.7 Voluntary Release by Unlock. Unlock may voluntarily rescind its rights under the Unlock Agreement in writing at any time, in which case Unlock will affect a full release of the Unlock Agreement, and You may keep the Investment Payment and have no further obligation to Unlock.

21.8 Release of Security Instrument. The Exchange Agreement shall remain in full force and effect subject to the terms and conditions herein in the event Unlock voluntarily releases the Security Instrument on the Owner's Property.

21.9 Successors and Assignees.

21.9.1. Unlock may assign, participate, hypothecate, securitize or sell, in whole or in part, the Unlock Percentage and/or Unlock's right and title to, and interest in the Unlock Agreement at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any such transaction, Owner agrees and consents that Unlock may in its discretion disclose any and all documents and information in its possession relating to Owner and the Property, including without limitation, "return information" information as such term is defined under the Internal Revenue Code (Title 26 of the United State Code), such as tax transcripts, subject to its assignee's agreement to continue to observe Unlock's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Unlock's assignee, such other future assignee, shall automatically have all the rights and remedies of Unlock under the Unlock Agreement. Unlock and Owner shall execute and deliver in recordable form, if requested, at Unlock's expense, such other documents as are appropriate to reflect the assignment of the Unlock Agreement. Owner

agrees to cooperate with such assignee and execute such additional documents as may be necessary to ensure assignee's interest in the Unlock Agreement. Unlock, or its successors and assigns, shall notify Owner no later than 60 days after the effective date of any such assignment.

21.9.2. Absent Unlock's prior written consent, which consent may be withheld in Unlock's discretion, Owner may not assign or otherwise transfer the Unlock Agreement. In the event of an assignment of the Unlock Agreement pursuant to this paragraph the original Owner, jointly and severally with the additional Owner, shall continue to remain liable under the Unlock Agreement, and such assignment will not trigger a Settlement Event. You shall be liable for all costs and expense incurred by Unlock related to such assignment.

21.9.3. The Unlock Agreement shall be binding upon and insure to the benefit of Owner and Unlock and their respective heirs, successors and assignees. If Owner dies, then the Unlock Agreement shall be binding on Owner's estate. The death of Owner shall not terminate the Unlock Agreement. Nothing in this provision shall permit assignment by Owner or Owner's estate of the Unlock Agreement contrary to the express provisions of the Unlock Agreement.

21.10 Right to Obtain or Disclose Certain Information. Subject to applicable laws, Unlock may obtain certain personal and financial information as necessary to maintain the Unlock Agreement, including Your credit report histories, or current balances and payoff amounts of loans secured by the Property. Subject to applicable laws, Unlock may share certain personal and financial information about the Unlock Agreement with affiliates, subsidiaries, investors, assignees and those with which it intends to conduct business. This information includes, without limitation, the address and general location of the Property, Property Appraisal reports and other valuations of the Property, and the financial terms of the Unlock Agreement.

21.11 Covenants to Run with Land. The provisions of the Unlock Agreement are deemed to be covenants running with the land as reflected in the Security Instrument. The interpretation of the phrase "covenants running with the land" shall be within the meaning of the applicable law of the state where the Property is located so as to give it the broadest possible application.

21.12 Indemnification. You hereby agree to indemnify, defend and hold Unlock, its affiliates and their respective directors, officers, agents and employees harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees and costs) (collectively "Losses") arising out of or relating to: (i) a breach of any of Your covenants, representations or warranties under the Unlock Agreement; (ii) any act or omission by You or Your agents; (iii) the Property; or (iv) the use of electronic or digital signatures and electronic methods of submission with respect to this Unlock Agreement and any documents or notices delivered pursuant to this Unlock Agreement or the related documents, including the risk of Unlock acting on unauthorized instructions, and the risk of interception and misuse by third parties. You will not, without Unlock's prior written consent, which shall not be unreasonably withheld, settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to Unlock. The indemnification provided by You herein shall be with respect to Losses involving third

parties and Losses between You and Unlock. Without limiting Your indemnification obligation, in no event will Unlock's aggregate liability arising out of or related to the Unlock Agreement or the Property exceed the Investment Payment.

21.13 Delegation of Duties. Unlock may execute any of its duties under the Unlock Agreement by or through agents. Unlock is entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of advice from counsel will be deemed to have been taken in good faith. Unlock will not be responsible for the negligence or misconduct of any agent that Unlock selects.

21.14 Relationship. Unlock shall not be deemed a partner, joint venturer, trustee, agent, representative, lender or fiduciary with, or of, You. You expressly waive any claims against any of Unlock's agents, assignees, affiliates, employees, directors or funding sources.

21.15 Applicable Law and Venue. The Agreement will be governed by the law of the state in which the Property is located. Any lawsuit or arbitration arising directly or indirectly out of the Agreement will be contested in the venue where the Property is located. EACH PARTY IRREVOCABLY APPOINTS THE INDIVIDUAL(S) IDENTIFIED IN ON EXHIBIT C TO RECEIVE NOTICES ON ITS/HIS/HER BEHALF, AS ITS AGENT FOR SERVICE OF ALL PROCESS IN ANY ARBITRATION OR LAWSUIT, WITH REGISTERED MAIL SERVICE AGREED TO BE BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

21.16 Waiver of Jury Trial. YOU AND UNLOCK HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHTS EACH MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE UNLOCK AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH.

21.17 Further Assurances. The parties agree to correct any error or inaccuracy in the Unlock Agreement to ensure that such documents reflect the true and correct terms upon which the parties agreed to enter into and to replace any missing or misplaced documentation, to confirm and restate any authorities granted hereunder to the extent such authority is impacted by a change in any law, rule or regulation, and to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to affect the intent and purposes of the Unlock Agreement.

21.18 Severability. Each provision of the Unlock Agreement must be interpreted in a way that is valid under applicable law. If any provision is held invalid or unenforceable, such adjudication shall not affect, impair, invalidate, or nullify the remainder of the Unlock Agreement, but shall only affect that provision.

21.19 Waivers. A waiver by Unlock of a breach of any term in the Unlock Agreement by You will

not be considered (i) waiver of a further breach of the same term, or (ii) a waiver of a breach of any other term, or (iii) a waiver of Unlock's right to declare an immediate or subsequent default.

21.20 No Third-Party Beneficiaries. The Unlock Agreement is entered into for the protection and benefit of Unlock and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies or recourse under the Unlock Agreement.

21.21 Consent of Spouse/Domestic Partner. If You are married or in a civil union or registered domestic partnership on the date of the Unlock Agreement and Your spouse or domestic partner, as applicable, is not named on the title to the Property and does not have an interest in the Property under applicable law, Unlock may require Your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of the attached Exhibit D. If You should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or domestic partnership, as applicable, You and Your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner, except if that individual is added on the title to the Property or otherwise has an interest in the Property under applicable law, in which case he/she must execute, acknowledge and deliver the Unlock Agreement and all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Unlock may reasonably require (and fully cooperate, or procure cooperation with, all filings and recordings as Unlock may reasonably require) in each case to protect its rights and interest under the Unlock Agreement including, without limitation, Unlock's interest in the Property. If Your spouse or domestic partner does not execute the Unlock Agreement within the thirty (30) days after the marriage, civil union, or domestic partnership, or such other time period as mutually agreed upon in writing between You and Unlock, Your death, rather than the later of Your death or Your spouse's or domestic partner's death, shall be deemed a Settlement Event in accordance with Sections 1.8.2 and 4.

21.22 Subordination of Homestead and Waivers. If You have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subject to all of our rights under and subordinated in all respects to the Security Instrument and Exchange Agreement, and any amounts due under the Unlock Agreement, and to all extensions and modifications of the Unlock Agreement.

21.23 Injunction. Notwithstanding anything to the contrary in the Unlock Agreement or otherwise, if Unlock is stayed or enjoined from enforcing any of its rights under the Unlock Agreement, then any deadline or notice period prescribed in the Unlock Agreement is automatically stayed for the duration of such stay, injunction or legal prohibition.

21.24 Entire Agreement. The Unlock Agreement and its Exhibits and attachments and any other documents executed at the Closing contain the entire understanding between the parties.

21.25 Titles. Titles are inserted in the Unlock Agreement for reference purposes only and must not be used to interpret the Unlock Agreement.

21.26 Counterparts. The Unlock Agreement and its attachments may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same Unlock Agreement. You and Unlock intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties. You and Unlock further agree that the Unlock Agreement and any other documents to be delivered in connection herewith may be electronically signed using any electronic process or digital signature provider as specified in writing by Unlock to You, and that any electronic signatures appearing on the Unlock Agreement or such other documents are the same as handwritten signatures for the purposes of validity, enforceability and admissibility.

21.27 Survival. The indemnification provisions, obligations to pay any Unpaid Owner Obligations, obligations to pay Closing Costs, all covenants, representations and warranties of You, and all other provisions which are required by their terms to be enforceable following expiration or termination, including, without limitation, provisions prescribing monetary remedies, fees, costs and expenses owed by You in connection with any Event Of Default or any Offered Value as described in Section 3.1(d) or Section 6.6 will, in each case, survive for three years after the end of the Unlock Agreement.

*Colorado Appendix*

**As a result of Owner's breach of any provision of the Unlock Agreement, Unlock may at its option, as an alternative remedy to electing to exercise the power of sale and foreclosure of the Property pursuant to the Unlock Agreement, declare any and all Liquidated Damages as Unlock's sole and exclusive remedy and relief under the Unlock Agreement, where "Liquidated Damages" is calculated as an amount equal to the sum of (i) the Settlement Payment as calculated pursuant to the Unlock Agreement , (ii) in connection with Owner's failure to make any monetary payment, the sum of all monetary obligations owed to Unlock by You under the Unlock Agreement, and (iii) any and all amounts, properly chargeable to Owner as necessary to satisfy Owner's obligations under the Unlock Agreement with respect to Owner's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other amounts. UNLOCK AND OWNER ACKNOWLEDGE THAT THE ACTUAL DAMAGES TO UNLOCK WHICH WOULD RESULT FROM OWNER'S BREACH OF ANY PROVISION OF THE UNLOCK AGREEMENT WOULD BE EXTREMELY DIFFICULT TO CALCULATE OR ESTABLISH ON THE DATE OF THE UNLOCK AGREEMENT. IN ADDITION, OWNER DESIRES TO HAVE A LIMITATION PUT UPON OWNER'S POTENTIAL LIABILITY TO UNLOCK IN THE EVENT OF SUCH BREACH BY OWNER. BY PLACING THEIR INITIALS IN SPACES HEREINAFTER PROVIDED, UNLOCK AND OWNER SPECIFICALLY ACKNOWLEDGE AND AGREE, AFTER NEGOTIATION BETWEEN UNLOCK AND OWNER, THAT THE AMOUNT OF THE LIQUIDATED DAMAGES CONSTITUTES A REASONABLE ESTIMATE OF THE HARM CAUSED TO UNLOCK DUE TO SUCH BREACH BY OWNER AND SHALL BE DISBURSED TO AND RETAINED BY UNLOCK AS LIQUIDATED DAMAGES IN THE EVENT OF SUCH BREACH BY OWNER. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS INTENDED STRICTLY AS COMPENSATION AND IS NOT INTENDED AS A FORFEITURE OR PENALTY.**

**Initials of Owner:** ____________________

**Initials of Unlock:** ______AM______

BY INITIALING BELOW, OWNER EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER ANY APPLICABLE LAW TO TERMINATE AND REPURCHASE THE UNLOCK AGREEMENT, WITHOUT ANY FEE OR PENALTY, UPON ANY SUCH TERMINATION AND REPURCHASE OF THE UNLOCK AGREEMENT, AND (B) AGREES THAT IF, FOR ANY REASON, ANY TERMINATION AND REPURCHASE OF THE UNLOCK AGREEMENT IS MADE OR THE SETTLEMENT PAYMENT IS OTHERWISE DUE AND OWING, THEN OWNER SHALL BE OBLIGATED TO PAY UNLOCK THE CALCULATED SETTLEMENT PAYMENT AND OWNER AGREES THAT UNLOCK'S PAYMENT OF THE INVESTMENT PAYMENT SET FORTH IN THE UNLOCK AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT.

**Initials of Owner:** ______________

[Unlock Exchange Agreement signature page]

**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ENFORCEMENT OF THE TERMS OF THE UNLOCK AGREEMENT MAY RESULT IN THE SALE AND LOSS OF YOUR PROPERTY. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH UNLOCK AND/OR UNLOCK'S AGENT(S), INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PROGRAM GUIDE ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THE UNLOCK AGREEMENT, AS APPLICABLE.**

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Unlock Forward Sale and Exchange Agreement as of the Effective Date.

**UNLOCK PARTNERSHIP SOLUTIONS INC.:**

By: Amy Marsili

Title: Vice President

Date: October 08, 2023

**Owner:**

By: ____________

Name: Sheila M. Johnsen

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of COLORADO )

County of ____________________ ) SS.

)

The foregoing instrument was acknowledged before me this _____ day of _______, 20__ by ____________________.

WITNESS my hand and official seal.

____________________________________[SEAL]
Notary Public

Printed Name: ________________________

Notary registration number: ____________

My commission expires: _________________

[AFFIX NOTARIAL SEAL]

**EXHIBIT A**

**PROPERTY DESCRIPTION**

The following described real estate, situated in Adams County, Colorado to-wit:

SUB: BUFFALO RUN SUBD FILING NO 1 BLK:7 LOT:3

Subdivision Plat
BUFFALO RUN SUB FILING NO 1

**Parcel ID / APN:** 0172306115008

[End of legal description]

**EXHIBIT B**

**UNLOCK CONVERSION AGREEMENT**

This Unlock Conversion Agreement ("Agreement") is made between the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("Owner" or "You" or "Your") and Unlock Partnership Solutions Inc., a Delaware corporation, with its principal offices at 270 Madison Ave, Suite 702, New York, NY 10016, and its successors and assigns ("Unlock"), as of [Conversion Agreement Effective Date] ("Conversion Effective Date").

WHEREAS, You and Unlock entered into that certain Forward Sale and Exchange Agreement dated and effective as of October 08, 2023 ("Exchange Agreement"), secured by Your property located at 15161 E 116th Drive, Commerce City, CO 80603 and any improvements thereon ("Property"), whereby you sold, transferred and conveyed to Unlock the right to receive 25.78 percent ("Unlock Percentage") of the future value of the Property.

WHEREAS, under the Exchange Agreement Unlock has the right to elect to convert the Unlock Percentage to an undivided fee simple ownership percentage in the Property ("Conversion") equal to the Unlock Percentage, upon the occurrence of certain defined events, as set forth in the Exchange Agreement ("Settlement Event").

WHEREAS, a Settlement Event has occurred and Unlock has elected to exercise its right to a Conversion.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, You and Unlock agree as follows:

**1. Conversion Terms.**

(a) Unlock and You agree that the Unlock Percentage shall convert into an undivided fee simple ownership percentage in the Property, including the related oil, mineral and water rights if currently owned by Owner, equal to the Unlock Percentage ("Unlock Ownership Percentage").

(b) Within [x] days of the Conversion Effective Date, Unlock shall select an escrow agent in order to conduct the Conversion. Unlock shall provide the escrow agent with instructions for the Conversion closing. You and Unlock shall agree to a Conversion closing date not later than [x] days from the Effective Date ("Conversion Closing Date"). You agree to pay all fees, costs and charges in connection with completing the Conversion.

(c) You shall transfer and convey the Unlock Ownership Percentage to Unlock by executing a deed, the form of which is determined by Unlock, in accordance with applicable law. You agree to cooperate and execute all other documentation on or prior to the Conversion Closing Date which Unlock deems necessary to complete the Conversion.

(d) After the Conversion Closing Date and upon confirmation that Unlock's ownership has been recorded on title, Unlock will take the necessary steps to release its lien on the Property.

(e) On and after the Conversion Closing Date, You and Unlock will be co-owners of the Property,

Draft Do Not Sign

[illegible]

(f) Unlock agrees that You shall continue to have the right to remain in possession and reside in the Property until the Property is sold or transferred, as set forth in the Exchange Agreement. On and after the Conversion Effective Date, You shall not enter into a new lease, renew or extend an existing lease, or otherwise rent the Property, except in accordance with the terms and conditions of the Exchange Agreement.

(g) On and after the Conversion Effective Date, You agree that You shall remain responsible for all liabilities, costs, charges and any other amounts related to the ownership of the Property, including, without limitation, property taxes, assessments, maintenance and insurance. Unlock shall have no responsibility for payment of any of these items, and You agree that You shall not seek payment of such amounts by Unlock. You agree to defend, indemnify and hold Unlock harmless from all third-party claims directly or indirectly related in any way to such items. The indemnification provided by You herein shall be with respect to losses involving third parties and losses between You and the Unlock.

**2. Miscellaneous.**

(a) The Agreement will be governed by the law of the state in which the Property is located. Any lawsuit or arbitration arising directly or indirectly out of the Agreement will be contested in the venue where the Property is located.

(b) You understand that by entering into this Agreement you are transferring a portion of the ownership of Your Property to Unlock. You have consulted with your tax, legal, financial and estate planning advisors regarding the consequences of the Conversion.

(c) The Exchange Agreement and related Security Instrument shall remain in full force and effect in accordance with the terms and conditions thereof.

[SIGNATURE PAGE FOLLOWS]

Draft Do Not Sign

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Unlock Conversion Agreement as of the Conversion Effective Date.

| **UNLOCK PARTNERSHIP SOLUTIONS INC.:** | **OWNER:** |
|---|---|
| By: ____________ | By: ____________ |
| Title: ____________ | Title: ____________ |
| Date: ____________ | Date: ____________ |

Draft Do Not Sign

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of COLORADO )

County of ______________________ ) SS.

)

The foregoing instrument was acknowledged before me this ______ day of ________, 20__ by ______________________.

WITNESS my hand and official seal. ________________________________[SEAL]

Notary Public

Printed Name: ____________________________

Notary registration number: ______________

[AFFIX NOTARIAL SEAL] My commission expires: ___________________

Draft Do Not Sign

**EXHIBIT C**

**NOTICE ADDRESSES**

Notice shall be effective when made in writing to the addresses below:

| **UNLOCK:** | **OWNER:** |
| --- | --- |
| Unlock Partnership Solutions Inc.<br><br>548 Market St, STE 31036<br>San Francisco, CA 94104<br><br>**Personal or Overnight Delivery**<br>Unlock Partnership Solutions Inc.<br>270 Madison Ave, Suite 702<br>New York, NY 10016<br><br>**Fax:** 844-916-4006<br><br>**Email:** support@unlock.com | Sheila M. Johnsen<br><br>15161 E 116th Drive<br><br>Commerce City, CO 80603<br><br>**Email:** arends.sheila@yahoo.com |

**EXHIBIT D**

**CONSENT OF SPOUSE/DOMESTIC PARTNER**

*Adam L Johnsen*, the spouse or registered domestic partner of Owner ("**Spouse**"), without assuming personal liability for the obligations under the Unlock Agreement, as an inducement to Unlock to enter into the Unlock Agreement, agrees to subject and subordinate Spouse's interest, whether arising as the result of being married to or the registered domestic partner of Owner or arising in any other manner, to the lien and security interest of the Unlock Agreement, and waives and releases all claims with respect thereto, including without limitation any claim for homestead exemption or allowance. Spouse agrees to the execution of the Unlock Agreement by Owner and agrees to be bound thereby to the extent of Spouse's interest in any assets or property of Owner and further agrees that the community assets of Owner and Spouse shall be bound thereby. This consent shall not be construed as an agreement by Spouse that Spouse's separate property is subject to the claims of Unlock arising out of enforcement of the Unlock Agreement.

**Spouse/Domestic Partner:**

By: ________________

Name: Adam L Johnsen

Date: ________________

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of COLORADO )

County of ____________________ ) SS.

)

The foregoing instrument was acknowledged before me this _____ day of _______, 20__ by ____________________.

WITNESS my hand and official seal.

____________________________________[SEAL]
Notary Public

Printed Name: ________________________

Notary registration number: ____________

[AFFIX NOTARIAL SEAL]

My commission expires: _________________

# EXHIBIT E

## ADMINISTRATION FEE SCHEDULE

| | |
|---|---|
| **Processing changes to Title:** | **$300.00** |
| Addition or removal of **Unlock Agreement** signatory | |
| Other changes to Title including change of Title to Trust | |
| **Processing Protective Advances made by Unlock (per advance) due to:** | **$250.00** [1] |
| Non-payment of property insurance, property taxes, mortgage or other obligation | |
| Deferred maintenance | |
| **Processing Subordination Requests:** | **$300.00** |
| **Recording and Reconveyance (per document):** | **$75.00** |
| Release of lien | |
| Quitclaim deeds | |
| Other requested release documentation | |
| **Processing an Owner Buyout or Partial Buyout:** | **$500.00** |
| **Processing a Permitted Sale:** | **$500.00** |
| **Administering an Event Of Default** | **$500.00 - $3500.00 (estimated)** [2] |

In addition to the fees itemized above, other actual, necessary, bona fide, reasonable, out-of-pocket fees and costs, customary to the area, which are paid by Unlock to third parties (including persons and entities retained by Unlock) may be charged to Owner from time to time during the Term or upon a Settlement Event, including fees and costs related to title, legal, recording, and appraisal, whether incurred in connection with an Event Of Default, a Settlement Event, or otherwise.

The above listed fees are estimates based on the current costs of the service provided. These fees are subject to change as the costs of providing any such services change. If a fee has changed at the time Owner requests any one of the above services, a disclosure of the then-current charge will be provided to Owner. Please note that additional fees for expediting requests may apply.

---

[1] Plus interest on amounts advanced, in accordance with the Unlock Agreement.

[2] The range of Administrative Fees and/or Protective Advances which may be charged by Unlock in connection with an Event Of Default is an estimate only, given the difficulty of actually predicting the cost. As a result, the actual amount of such Administrative Fees and/or Protective Advances may vary depending on the duration, and difficulty of resolution, of any given Event Of Default and may significantly exceed the estimate given here. Under no circumstances, however, shall Unlock charge any Administrative Fees or Protective Advances in connection with an Event Of Default unless they are customary, reasonable, bona fide and actually incurred. Interest may be charged on such Administrative Fees and/or Protective Advances, in accordance with the Unlock Agreement.

**EXHIBIT F**

**GLOSSARY OF TERMS**

Administration Fees are reasonable fees that may be charged to Owner by Unlock to perform various services during the Term, as described in Section 15.1.

Annualized Cost is the annualized percentage cost of the Investment Payment over the Term, as described in Section 10.

Annualized Cost Limit is a percentage cap on the Annualized Cost, as set forth in the Table of Key Terms and described in Section 10.

Approved Existing Loans are any pre-existing loans, as of the Effective Date, known to and approved by Unlock as described in Section 11.2.

Approved Subsequent Loans are loans secured by liens on the Property that are approved by Unlock and originated after the Effective Date, as described in Section 12.4.

Closing Costs are costs incurred in connection with the origination of the Unlock Agreement, any Permitted Sale or other sale of the Property, an Owner Buyout or a Partial Buyout, including, without limitation, recording fees and costs, credit reports, reconveyance fees, escrow fees, title report and insurance fees, federal, state, local and documentary transfer taxes, and real estate broker and other sales commissions.

Deferred Fees are Administration Fees for which Unlock elects, in its discretion, to defer payment until a later date, as described in Section 15.2.

Deferred Maintenance is any repair items, defects or conditions, or damage to the Property or its title which either existed as of the Effective Date or which occurred or developed during the Term, as described in Section 7.2.

Effective Date is the date of origination of the Unlock Agreement, as set forth in the Table of Key Terms.

Ending Home Value is the value of the Property at the time of a Settlement Event or Partial Buyout. It typically equals the Gross Sale Price if the home is being sold as described in Section 2.1(g). It is determined by a Property Appraisal if the home is not being sold as described in Section 8.5.

Escrow Agent is a title company or neutral third-party settlement agent, title agent or attorney closing firm reasonably acceptable to Unlock that closes or settles any transaction contemplated under the Unlock Agreement.

Event Of Default is a breach of the terms of the Unlock Agreement by Owner, as described in Section 16.

Exchange Rate is the price of the Unlock Agreement, as set forth in the Table of Key Terms.

Expiration Date is the date upon which the Unlock Agreement expires, as set forth in the Table of Key Terms. Reaching the Expiration Date is a Settlement Event, as described in Section 5.

Gross Sale Price is the gross price agreed upon by Owner and a new third-party buyer when the Property is being sold, as described in Section 2.1(g).

Improvement Adjustment is an adjustment to Ending Home Value that may be made so that Unlock does not share in any Property value attributable to Property improvements made by Owner during the Term, as described in Section 7.1.

Investment Payment is the gross cash payment paid by Unlock and received by Owner at origination, as set forth in the Table of Key Terms.

Investment Percentage is the Investment Payment expressed as a percentage of Starting Home Value, as set forth in the Table of Key Terms.

Last Surviving Signatory is the last surviving individual who is a signatory to the Unlock Agreement, including any signatory added by addendum after the Effective Date. The death of the Last Surviving Signatory is a Settlement Event, as described in Section 4.

Maintenance Addendum is an addendum to the Exchange Agreement (see Exhibit G) whereby Unlock reserves for a Maintenance Adjustment certain Deferred Maintenance items identified as of the Effective Date, as described in Section 7.2.

Maintenance Adjustment is an adjustment to Ending Home Value that may be made so that Unlock does not share in any loss in Property value attributable to Owner's failure to properly maintain the Property during the Term, as described in Section 7.2.

Maximum Unlock Share is the greatest amount the Unlock Share can be when determining the Settlement Payment or Partial Settlement Payment, as described in Section 10.

Net Closing Proceeds is the net amount you receive from the Unlock Agreement, as described in Section 1.5.2(c).

Non-Distressed Sale is a remedy to a foreclosure action by a mortgage lender, tax authority or other lien holder that Unlock, in its discretion, may offer to Owner. It is intended to result in a non-distressed sale of the Property and protect Owner's and Unlock's interest therein, as described in Section 17.8.

Non-Owner Occupants are residents of legal age who occupy the Property but who are not signatories to the Unlock Agreement, as described in Section 11.9.

Offered Value is the gross amount of any pending written offer for the purchase of the Property, as described in Sections 3.1(d) and 6.6.

Origination Fee is a fee charged to Owner by Unlock at closing to offset some of the processing and administrative costs of the Unlock Agreement, as set forth in the Table of Key Terms.

Owner Buyout is a Settlement Event in which Owner chooses to buy Unlock out in accordance with the provisions of Section 3.

Partial Buyout is similar to an Owner Buyout in which Owner may choose to buy out only a portion of the Unlock Agreement, as described in Section 6.

Partial Settlement Payment is the payment Unlock will receive from a Partial Buyout as described in Section 6.4.

Partial Unlock Share is the portion of the Unlock Share Owner may choose to buy out in a Partial Buyout as described in Section 6.4.

Permitted Encumbrances are all licenses, easements, or other title restrictions to the Property that are approved by Unlock, as described in Section 11.2.

Permitted Sale is a Settlement Event in which Owner sells the Property in accordance with the provisions of Section 2.

Property Appraisal is an independent determination of Property value as described in Section 8.

Property Inspection is an independent determination of Property condition as described in Section 9.

Protective Advances are payments made or expenses incurred by Unlock on Owner's behalf to protect the value of the Property, as described in Section 17.12.

Secured Obligation is an obligation secured by a lien on the Property, as described in Section 11.3.

Settlement Date is the date the Unlock Agreement is terminated and settled in accordance with the Unlock Agreement.

Settlement Event is an event which leads to the termination and settlement of the Unlock Agreement, as described in Section 1.8.2.

Settlement Payment is the payment Unlock will receive from a Settlement Event, as described in Section 1.8.1.

Settlement Statement is s statement provided by Unlock to You (or Your Estate) and Escrow Agent in connection with a Settlement Event.

Sharable Value is the adjusted Ending Home Value used to calculate the Unlock Share, as described in section 1.8.1.

Starting Home Value is the value of the Property determined by Unlock and agreed to by Owner as of the Effective Date, as set forth in the Table of Key Terms.

Term is the period of time between the Effective Date and the Settlement Date.

Total Home Finance is the total amount of financing that is secured by the Property during the Term, as described in Section 12.1.

Total Home Finance Limit is the percentage limit on the amount of financing that can be secured by the

Property, as set forth in the Table of Key Terms, described in Section 12 and subject to adjustment as provided in Section 14.8.

Unlock Percentage is the percentage of the home's future value that Unlock will share, as set forth in the Table of Key Terms.

Unlock Share is the dollar amount of Unlock's percentage share of the Sharable Value to be received from a Settlement Event, as described in section 1.8.1.

Unpaid Owner Obligations are the total of any unpaid Administration Fees, Deferred Fees, Protective Advances (and any associated interest or other charges), Appraisal Expenses, Inspection Expenses and other amounts expended by Unlock to protect its rights or the value of the Property, as described in Section 21.4.

Your Estate is the person or persons who will acquire legal title to Your interest in the Property on account of your death as described in Section 4. Depending on the terms of Your estate plan or if You do not have an estate plan, Your estate may include but is not limited to the executor(s), administrator(s) or personal representative(s) of Your estate, if Your interest in the Property will pass to such executor(s), administrator(s) or personal representative(s) on account of Your death, or the successor trustee(s) of Your revocable living trust if Your interest in the Property will pass pursuant to Your revocable living trust to such successor trustee(s) on account of Your death, or the person who is a beneficiary under a revocable transfer on death deed or its equivalent under applicable state law if Your interest in the Property will pass to such beneficiary on account of Your death.

## EXHIBIT G

## MAINTENANCE ADDENDUM TO UNLOCK AGREEMENT

Reference is made to that certain Unlock Agreement by and between Sheila M. Johnsen ("Owner") and [Unlock], its successors and assigns ("Unlock") in connection with the Property. Capitalized terms used herein are defined in the Unlock Agreement.

Section 7.2 of the Unlock Agreement provides for Unlock to identify, as of the Effective Date, on a Maintenance Addendum to the Unlock Agreement, certain repair items, defects or conditions on the Property (Deferred Maintenance), and expressly reserve such Deferred Maintenance items for application by Unlock of a Maintenance Adjustment in connection with the determination of the Sharable Value and the Unlock Share at the time of a Settlement Event, Partial Buyout or Event Of Default.

The following Deferred Maintenance items are so identified and reserved:

[maintenance items]

If the Deferred Maintenance items listed above have not been fully corrected or repaired by Owner at the time of any determination of the Sharable Value and the Unlock Share, Unlock will have the right under the Unlock Agreement to make, in consultation with one or more independent, third-party appraisers, property inspectors, home repair contractors and other experts not unaffiliated with Unlock, a commercially reasonable estimate of the dollar amount which is required, at that time, to repair such Deferred Maintenance, without reference to any repair estimates that may have been obtained by Owner, and to apply such dollar amount as a "Maintenance Adjustment" to Ending Home Value when calculating the Sharable Value, the Unlock Share and the Settlement Amount.

Unlock will have no liability in connection with, or for Owner's failure to cure, the Deferred Maintenance items listed above.

Draft Do Not Sign

This Addendum may be executed in counterparts.

**UNLOCK PARTNERSHIP SOLUTIONS INC.:**

By: Amy Marsili

Title: Vice President

Date: October 08, 2023

**OWNER:**

________________________

Name: Sheila M. Johnsen

**OWNER:**

________________________

Name: Adam L Johnsen

Draft Do Not Sign

Prepared by, recording requested by,
and when recorded mail to:

Unlock Partnership Solutions Inc.
270 Madison Ave, Suite 702
New York, NY 10016

Exchange Agreement ID: [redacted]0876

(Space Above for Recorder's Use)

**PERFORMANCE DEED OF TRUST**

**NOTICE TO RECORDER: THIS DOCUMENT CONSTITUTES A SECURITY AGREEMENT AND FIXTURE FILING UNDER ARTICLE 9 OF THE UCC (AS DEFINED HEREIN) AND SHOULD BE FILED AND INDEXED IN THE REAL PROPERTY RECORDS NOT ONLY AS A DEED OF TRUST, BUT ALSO AS A SECURITY AGREEMENT AND FIXTURE FILING.**

**FIXTURE FILING NOTICE: THIS DEED OF TRUST CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO THE COLORADO UNIFORM COMMERCIAL CODE AND COVERS PROPERTY WHICH IS OR WILL BECOME FIXTURES RELATED TO THE REAL PROPERTY HEREIN DESCRIBED.**

This **PERFORMANCE DEED OF TRUST**, together with any riders hereto ("**Performance Deed of Trust**"), is made as of OCTOBER 08, 2023 ("**Effective Date**"), by SHEILA M. JOHNSEN, whose mailing address is 15161 E 116th Drive, Commerce City, CO 80603 (each in his/her individual capacity and as grantor, individually or collectively, "**Owner**"), to PUBLIC TRUSTEE OF ADAMS ("**Trustee**"), for the benefit of UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation, whose mailing address is 270 Madison Ave, Suite 702, New York, NY 10016, and its successors and assignees ("**Beneficiary**" or "**Unlock**").

**RECITALS**

A. This Performance Deed of Trust is given in connection with the execution of that certain Forward Sale and Exchange Agreement ("**Exchange Agreement**"), which is hereby incorporated into this Performance Deed of Trust as if set forth in full, and entered into by and between Owner and Beneficiary, pursuant to which Owner (a) grants and conveys to Beneficiary the right to receive an undivided percentage interest (the "**Unlock Percentage**") in the future value of Owner's real property and Improvements (as defined herein) thereon in County of ADAMS, State of Colorado, as more particularly described in Schedule A attached hereto and incorporated herein by this reference, and commonly known as 15161 E 116TH DRIVE, COMMERCE CITY, CO 80603 ("**Land**"), and (b) agrees that upon the occurrence of certain events under the Exchange Agreement, Unlock has the right to convert the Unlock Percentage (the "**Conversion**") to an undivided fee simple ownership interest equal to the Unlock Percentage in and to the Real Property (as

defined herein). In exchange for granting and conveying the Unlock Percentage to Beneficiary, Beneficiary paid to Owner a payment amount equal to SIXTY-FIVE THOUSAND, FOUR HUNDRED Dollars ($65,400.00) (the "**Investment Payment**"), subject to the terms and conditions of the Exchange Agreement.

B. Beneficiary desires to secure the rights granted to it in the Exchange Agreement and the performance of Obligations (hereinafter defined).

C. This Performance Deed of Trust is given pursuant to the Exchange Agreement, and payment, fulfillment, and performance of the obligations due under the Exchange Agreement and certain other ancillary documents executed by Owner and Beneficiary concurrently herewith (which documents, together with this Performance Deed of Trust are collectively termed the "**Transaction Documents**") are secured by this Performance Deed of Trust in accordance with the terms set forth herein.

D. Pursuant to the Exchange Agreement, Owner has made certain covenants and promises to, or for the benefit of, Beneficiary in connection with the Real Property, all as more particularly described, and on the terms and conditions stated in the Exchange Agreement.

E. Execution of this Performance Deed of Trust is intended, among other things, to give notice, in the form set out in Schedule B attached hereto and incorporated herein by this reference, of (a) the Exchange Agreement, (b) certain rights and responsibilities of Owner as to Beneficiary, and (c) the covenants and promises set forth in the Exchange Agreement that run with the land and will be binding upon any person who acquires Owner's interest in the Real Property so long as the Exchange Agreement has not expired or been terminated.

1. **Grant in Trust.** OWNER HEREBY IRREVOCABLY grants, bargains, sells, and conveys to Trustee, IN TRUST, WITH POWER OF SALE, for the use and benefit of Beneficiary, its successors and assigns, all of Owner's present and future estate, right, title, and interest in and to the following property, rights, interests and estates now owned, or hereafter acquired by Owner (collectively, the "**Property**"), none of which constitutes agricultural real estate:

**a.** Real Property. The Land together with all improvements, replacements and additions now or hereafter erected on the Land (collectively, the "**Improvements**") and all easements, appurtenances and fixtures now or hereafter a part of the Land and Improvements (collectively, the "**Real Property**").

**b.** Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Real Property, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively,

the "**Leases**") and all right, title and interest of Owner, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Owner or its agents or employees from any and all sources arising from or attributable to the Real Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Owner and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Settlement Payment. As used herein, "**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors. The assignments of Owner's interests under this clause (b) is a security interest in such interests, including the cash proceeds, cash, checks and deposit accounts relating thereto.

**c.** Insurance Proceeds. All insurance proceeds in respect of the Real Property under any insurance policies covering the Real Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Real Property (collectively, the "**Insurance Proceeds**").

**d.** Condemnation Awards. All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Real Property (collectively, the "**Awards**").

**e.** Easements and Rights of Way. All easements, rights of way, appurtenances and other rights used in connection with the Real Property or as a means of access thereto.

**f.** Additional Land. All additional lands, estates and development rights hereafter acquired by Owner for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Performance Deed of Trust which additional lands and estates shall, thereafter, automatically become part of the Land, as such term is used herein;

**g.** Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures, inventory and goods) and other property of every kind and nature whatsoever, owned by Owner, or in

which Owner has or shall have an interest, or usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Owner, or in which Owner has or shall have an interest, or usable in connection with the present or future operation and occupancy of the Real Property (collectively, the "**Personal Property**"), and the right, title and interest of Owner in and to any of the Personal Property which may be subject to any security interests, as defined under the Uniform Commercial Code as in effect in the applicable jurisdiction (the "**UCC**"), superior in lien to the lien of this Performance Deed of Trust and all proceeds and products of the above; and

**h.** Other Rights. Any and all other rights of Owner in and to the items set forth in clauses (a) through (g) above.

**CONDITIONS TO GRANT:** TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Beneficiary and its successors and assigns, forever, WITH THE POWER OF SALE, to secure Owner's payment to Beneficiary of the Settlement Payment and the performance of the Obligations at the time and in the manner provided in the Transaction Documents and this Performance Deed of Trust;

**PROVIDED, HOWEVER,** these presents are upon the express condition that, if Owner shall well and truly (a) pay to Beneficiary the Settlement Payment at the time and in the manner provided in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, (b) perform the Obligations as set forth in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Owner's obligation to indemnify and hold harmless Beneficiary pursuant to the provisions hereof shall survive any such payment and release.

2. **Secured Obligations.**

**a.** Obligations. Owner makes the grant, transfer and assignment set forth in Section 1 for the purpose of securing the following "**Obligations**":

(1) the payment of the Settlement Payment;

(2) all other obligations of Owner contained herein;

(3) the payment and/or performance of all other obligations of Owner contained in the Transaction Documents;

(4) each obligation of Owner contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Exchange Agreement;

(5) any expenditures made by Beneficiary pursuant to, or under, this

Performance Deed of Trust, including, without limitation, any Protective Advances; and

(6) payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively "**Attorneys' Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Performance Deed of Trust, to the interpretation or enforcement of the parties' rights under this Performance Deed of Trust, or to the Property.

**b.** Investment Payment. Owner shall not be obligated to repay any part of the Investment Payment; and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Owner to be paid pursuant to the Exchange Agreement.

3. **UCC Security Agreement and Fixture Filing.** This Performance Deed of Trust also is intended to be and shall constitute a "security agreement" within the meaning of the UCC for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the UCC. Owner hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

**a.** Owner agrees that Beneficiary may file either this Performance Deed of Trust, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/ or in the Office of the Secretary of State of the State of Colorado or other appropriate office of any state or jurisdiction, as a financing statement for any of the items specified above as part of the Property.

**b.** This Performance Deed of Trust constitutes a financing statement filed as a fixture filing pursuant to, and is effective in accordance with, the applicable provisions of Article 9 of the UCC, and any similar or successor provisions. With respect to said fixture filing (a) debtor is Owner and Owner's name and address appear in the first paragraph of this Performance Deed of Trust, and (b) the secured party is Beneficiary and Beneficiary's name and address appears in the first paragraph of this Performance Deed of Trust. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Owner. By executing and delivering this Performance Deed of Trust, Owner hereby grants to Beneficiary, as security for the Obligations, a security interest in all "accounts", "deposit accounts", "chattel paper", "equipment", "fixtures", "inventory", "general intangibles" and "goods" (as such terms are defined in the UCC) to the full extent that the foregoing may be subject to the UCC.

**c.** Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

**d.** Owner shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Beneficiary may reasonably require.

**e.** On any default hereunder, Beneficiary shall have the remedies of a secured party under the UCC and may also invoke the remedies in Section 7. In exercising any of these remedies, Beneficiary may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the UCC or the remedies in Section 7.

4. **Assignment of Leases and Rents.** Owner hereby absolutely and unconditionally assigns to Beneficiary and Trustee all of Owner's right, title and interest in and to all current and future Leases and Rents; it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

**a.** Owner hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Performance Deed of Trust, to collect the Rents, reserving unto Owner the right, prior to any default by Owner in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

**b.** Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by appointment of a receiver, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine. Beneficiary's rights under this clause (b) include its rights to appoint a receiver under all applicable laws, as in effect from time to time.

**c.** The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Performance Deed of Trust, shall not cure or waive any default or notice of default under this Performance Deed of Trust or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Owner to lease or rent the Property in contravention of any provision of the Exchange Agreement; nor shall anything in this section modify any provision in the Exchange Agreement relating to the use, lease or occupancy of the Property.

5. **Covenants, Representations and Warranties of Owner .** Owner hereby agrees as follows:

**a.** Owner represents and warrants that Owner has good and marketable title to the Property and has the right to grant and convey the Property.

**b.** Owner will observe and perform all of the covenants and agreements under the

Transaction Documents.

**c.** To appear in and defend any action or proceeding purporting to affect the security of this Performance Deed of Trust or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' Fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Performance Deed of Trust or to collect the Obligations or to protect Beneficiary's rights under this Performance Deed of Trust; and/or (ii) in connection with the enforcement of any provisions of this Performance Deed of Trust or in connection with foreclosure upon the collateral granted under this Performance Deed of Trust (whether or not suit is filed).

**d.** To pay at least ten days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Performance Deed of Trust, and all costs, fees and expenses of this Performance Deed of Trust.

(1) If Owner fails to make any payment or to do any act as provided in this Performance Deed of Trust, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Performance Deed of Trust, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Performance Deed of Trust.

(2) Such performance by Beneficiary or Trustee shall not require notice to, or demand on, Owner and shall not release Owner from any obligation under this Performance Deed of Trust.

(3) Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Performance Deed of Trust, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Performance Deed of Trust, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

**e.** To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Performance Deed of Trust; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate as specified in the Transaction Documents from the date of such demand (or as otherwise specified by applicable law), not to exceed the maximum rate allowed by law at the time of such demand.

**f.** To keep the Property in good condition and repair, and in a condition substantially similar to its condition on the date hereof, except for normal wear and tear and shall not remove or demolish any building thereon, and shall not materially destroy, damage or impair the Property, allow the Property to materially deteriorate or commit waste on the Property. Owner shall also comply with all laws

affecting the Property or requiring any alterations or improvements to be made thereon and shall not permit any act upon the Property in violation of the law.

g. Not to initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.

h. On demand, to fully cooperate with Beneficiary in filing and recording this Performance Deed of Trust and any of the other Transaction Documents creating a lien or security interest or evidencing the lien hereof, including without limitation any financing statements, upon the Property and other collateral and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Beneficiary in, the Property. Owner will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Transaction Documents, and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Transaction Documents or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

i. At the cost of Owner, and without expense to Beneficiary, to do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Beneficiary shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Beneficiary and Trustee the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Owner may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms of this Performance Deed of Trust or for filing, registering or recording this Performance Deed of Trust, or for complying with all legal requirements. Owner, on demand, will execute and deliver and hereby authorizes Beneficiary to file one or more financing statements or execute in the name of Owner to the extent Beneficiary may lawfully do so, one or more chattel mortgages or other instruments, to evidence more effectively the security interest of Beneficiary in the Property. Owner grants to Beneficiary an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Beneficiary at law and in equity, including without limitation such rights and remedies available to Beneficiary pursuant to this clause (i).

6. **Power of Attorney.** Owner hereby irrevocably appoints Beneficiary as Owner's attorney-in-fact (such agency being coupled with an interest). As such attorney-in-fact Beneficiary may, after providing notice to Owner pursuant to the Exchange Agreement (without the obligation to do so) in Beneficiary's name, or in the name of Owner, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default

under this Performance Deed of Trust, take any other action required of Owner; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

**7. Default and Foreclosure and Power of Sale. Beneficiary shall give notice to Owner prior to enforcement following Owner's breach of any covenant or agreement in the Transaction Documents. The notice shall specify: (i) the default; (ii) the action required to cure the default; (iii) a date, not less than thirty (30) days from the date the notice is given to Owner, by which the default must be cured; and (iv) that failure to cure the default on or before the date specified in the notice may result in all sums secured by this Performance Deed of Trust becoming due and payable and sale of the Property. The notice shall further inform Owner of the right to reinstate after enforcement and the right to bring a court action to assert the non-existence of a default or any other defense of Owner to enforcement and sale. If the default is not cured on or before the date specified in the notice, Beneficiary at its option may require immediate payment in full of all sums secured by this Performance Deed of Trust without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Beneficiary shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 7, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**To the fullest extent permitted by applicable law, if Beneficiary invokes the power of sale, Beneficiary shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Beneficiary's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Beneficiary or Trustee shall mail copies of the notice as prescribed by applicable law to Owner and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Owner, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Beneficiary or its designee may purchase the Property at any sale.**

**To the extent permitted by Colorado law, Owner hereby waives and relinquishes any right to have the fair market value of the Real Property determined by a judge or jury in any action on the Obligations secured hereby.**

Notice provided to Owner under this Performance Deed of Trust shall be delivered to the address specified in Section 21 in accordance with the applicable terms and conditions of the Exchange Agreement unless otherwise required by applicable law.

**a.** Exercise of Beneficiary's remedies under this Performance Deed of Trust shall be in compliance with applicable law.

**b.** The power of sale under this Performance Deed of Trust shall not be exhausted by any

one or more sales (or attempts to sell) as to all or any portion of the Property remaining unsold, but shall continue unimpaired until all of the Property has been sold by exercise of the power of sale herein contained and all Obligations of Owner to Beneficiary under the Performance Deed of Trust or other Transaction Documents have been paid in full.

**c.** Any proceeds of any disposition under this Section 7 shall not cure any Event of Default or reinstate any of the obligations secured under this Performance Deed of Trust for the purposes of applicable law or otherwise.

**d.** Beneficiary may exercise its right to foreclose pursuant to the power of sale set forth herein, foreclose by judicial action pursuant to applicable law and/or seek any other remedy available at law or in equity to the maximum extent permitted by applicable law. Any provision of this Performance Deed of Trust which is prohibited or unenforceable in any jurisdiction, will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

8. **Late Performance.** By accepting performance of any obligation after its due date, Beneficiary does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.

9. **Trustee's Powers.** At any time or from time to time, without liability therefor upon written request of Beneficiary and presentation of this Performance Deed of Trust, and without affecting the personal liability of any person for the performance of the Exchange Agreement secured hereby, Trustee may: (a) reconvey any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Performance Deed of Trust.

10. **Substitution of Trustee.** Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Performance Deed of Trust, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instrument must contain the name of the original Owner, Trustee and Beneficiary under this Performance Deed of Trust, the book and page where this Performance Deed of Trust is recorded, and the name and address of the new Trustee(s). This procedure for substitution shall govern to the exclusion of all other provisions for substitution.

11. **Trustee's Compensation.** Owner shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this Trust, including Attorneys' Fees.

12. **Full Reconveyance.** Upon written request of Beneficiary stating that all Obligations

have been performed or paid, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Performance Deed of Trust. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

13. **Reserved.**

14. **Successors.** This Performance Deed of Trust applies to, inures to the benefit of, and binds all parties to this Performance Deed of Trust, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "Beneficiary" shall include any successor or assignee of Beneficiary's rights in the Exchange Agreement and in this Performance Deed of Trust, whether or not named as Beneficiary in this Performance Deed of Trust. In this Performance Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

15. **Joint and Several Liability.** If more than one person signs this Performance Deed of Trust as Owner, the obligations of each signatory shall be joint and several.

16. **Multiple Owners.** If there are multiple Owners of the Property:

**a.** this Performance Deed of Trust must be signed by each such Owner;

**b.** all rights and powers specified for Owner in this Performance Deed of Trust must be approved and exercised unanimously by all such multiple Owners;

**c.** all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Performance Deed of Trust;

**d.** notice required to be given by, or to, Owner will be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 21; and

**e.** Beneficiary may treat any notice received from any one Owner as notice from all Owners.

17. **Revocable Trust.** If any Owner is/are the trustee(s) of a Revocable Trust (as defined herein):

**a.** all trustees of the Revocable Trust and all individuals having the power to revoke the Revocable Trust (referred to herein as "owners of the Revocable Trust") must sign this Performance Deed of Trust in their respective capacities as trustees and/or owners of the Revocable Trust, and each trustee and owner of the Revocable Trust who signs this Performance Deed of Trust hereby represents and warrants that all trustees and owners of the Revocable Trust have been disclosed to Beneficiary;

**b.** any trustee of the Revocable Trust who is also an owner of the Revocable Trust need only sign this Performance Deed of Trust once for it to be binding on such person both as trustee and as

owner of the Revocable Trust;

**c.** all rights and powers specified for, and all actions required of, Owner in this Performance Deed of Trust must be approved and exercised unanimously by all trustees of the Revocable Trust;

**d.** all trustees and all owners of the Revocable Trust shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Performance Deed of Trust;

**e.** all representations and warranties by Owner in this Performance Deed of Trust are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all owners of the Revocable Trust;

**f.** notice required to be given by, or to, any Owner will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in Section 21; and

**g.** Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Owner.

As used herein, "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

18. **Acceptance by Trustee.** Trustee accepts this Trust when this Performance Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

19. **Extent of Lien. The lien granted under this Performance Deed of Trust shall encumber Owner's entire interest in the Property, notwithstanding the fact that the Exchange Agreement relates to only a fractional interest in the Property.**

20. **Miscellaneous.**

**a.** So long as any of the Obligations remain outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Owner in the Property or any part thereof (including the estate of Beneficiary after exercising the Conversion) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

**b.** Owner agrees, to the full extent that it may lawfully do so, that it will not at any time insist upon or plead or in any way take advantage of any appraisement, valuation, stay, marshalling of assets, extension, redemption or moratorium law now or hereafter in force and effect so as to prevent or hinder the enforcement of the provisions of this Performance Deed of Trust or the Obligations secured hereby, or any agreement between Owner and Beneficiary or any rights or remedies of Beneficiary. To the extent permitted by applicable law, Owner waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Property, (ii) all rights of redemption, valuation,

appraisement, stay of execution, notice of election to mature or declare due the whole of the Obligations and marshaling in the event of foreclosure of the lien created by this Performance Deed of Trust, (iii) all rights and remedies which Owner may have or be able to assert by reason of the laws of the State of Colorado pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Performance Deed of Trust or to any action brought to enforce any obligation secured by this Performance Deed of Trust, and (v) any rights, legal or equitable, to require marshaling of assets or to require foreclosure sales in a particular order, including any requirement under applicable law to require Beneficiary to resort to assets in a particular order or resort to certain assets before others. To the extent permitted by applicable law, Beneficiary shall have the right to determine the order in which any or all (i) of the Property shall be subjected to the remedies provided by this Performance Deed of Trust, and (ii) portions of the Obligations are satisfied from the proceeds realized upon the exercise of the remedies provided by this Performance Deed of Trust.

**c.** Notwithstanding Owner's obligations under Section 21.12 (Indemnification) of the Exchange Agreement, Owner agrees it will pay or reimburse Trustee and Beneficiary for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Obligations, this Performance Deed of Trust or the interest created herein, or the Property or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Beneficiary, activities related to protection of Beneficiary's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Owner, and any such amounts paid or incurred by the Trustee or Beneficiary shall be added to the Obligations and shall be secured by this Performance Deed of Trust. The agreements of this clause shall expressly survive in perpetuity satisfaction of this Performance Deed of Trust and repayment of the secured Obligations, any release, reconveyance, discharge or foreclosure of this Performance Deed of Trust, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by Trustee's conveyance of the Property.

**d.** To the extent permitted by law, Owner hereby waives the provisions of any law prohibiting Beneficiary from making an election under any Transaction Document as to the application of proceeds.

**e.** Trustee or Beneficiary may collect a fee not to exceed the maximum amount permitted by applicable law for furnishing the statement of obligation or other report, disclosure, or statement in connection with or pursuant to this Performance Deed of Trust or any other Transaction Document.

**f.** In furtherance of Beneficiary's rights under the Exchange Agreement to inspect the Property, Beneficiary may: (i) obtain a court order to enforce Beneficiary's right to enter and inspect the Property in accordance with applicable law (including as to the costs relating thereto), and (ii) have a receiver appointed to enforce Beneficiary's rights to enter and inspect the Property for Hazardous Substances (as defined herein) in accordance with applicable law.

**g.** References in this Performance Deed of Trust to any statute or statutory

provisions (including, without limitation, the UCC or applicable law) shall be deemed to be a reference to such statute or statutory provisions as amended or recodified from time to time.

**h.** Capitalized terms used in this Performance Deed of Trust shall have the meanings specified herein, or if not defined herein, in the Exchange Agreement. Except as expressly set out in this Performance Deed of Trust, if there is any conflict between the provisions of this Performance Deed of Trust and the provisions of the Exchange Agreement, the provisions of the Exchange Agreement shall control. In this Performance Deed of Trust, references to a Section or a Schedule shall be to a section or schedule of this Performance Deed of Trust unless otherwise stated.

21. **Notices.** All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Exchange Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| **UNLOCK:** | **OWNER:** |
|---|---|
| Unlock Partnership Solutions Inc.<br><br>548 Market St, STE 31036<br>San Francisco, CA 94104<br><br>**Personal or Overnight Delivery**<br>Unlock Partnership Solutions Inc.<br>270 Madison Ave, Suite 702<br>New York, NY 10016<br><br>**Fax:** 844-916-4006<br><br>**Email:** support@unlock.com | Sheila M. Johnsen<br><br>15161 E 116th Drive<br><br>Commerce City, CO 80603 |

22. **Hazardous Substances.** As used in this Section 22: (a) "**Hazardous Substances**" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law (as defined herein) and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "**Environmental Law**" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "**Environmental Cleanup**" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "**Environmental Condition**" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Owner shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous

Substances, or threaten to release any Hazardous Substances, on or in the Property. Owner shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Owner shall promptly give Beneficiary written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Owner has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Owner learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Owner shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Beneficiary for an Environmental Cleanup.

23. **Savings Clause.** This Performance Deed of Trust is subject to the express condition that at no time shall Owner be obliged or required to pay the Settlement Payment if such payment could subject Beneficiary to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate (as defined below). If, by the terms of this Performance Deed of Trust or the other Transaction Documents, Owner is at any time required or obliged to pay the Settlement Payment due hereunder which was calculated pursuant to the Exchange Agreement using amounts in excess of the Maximum Legal Rate, the Settlement Payment shall be deemed to be immediately reduced to be calculated taking into account Maximum Legal Rate. In this Section 23, "**Maximum Legal Rate**" shall mean the maximum non-usurious rate of return, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received in connection with the Settlement Payment and as provided for in the Transaction Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the provisions relating to the Transaction Documents and/or Settlement Payment.

24. **Reinstatement Pursuant to Applicable Law.** Subject to applicable law, if Owner meets certain conditions, Owner shall have the right to have enforcement of this Performance Deed of Trust discontinued at any time before the earliest of: (a) five (5) days before sale of the Property pursuant to any power of sale contained in this Performance Deed of Trust; (b) such other period as applicable law might specify for the termination of Owner's right to reinstate; or (c) entry of a judgment enforcing this Performance Deed of Trust. Those conditions are that Owner: (i) pays Beneficiary all sums which then would be due under the Transaction Documents as if no acceleration had occurred; (ii) cures any default of any other covenants or agreements; (iii) pays all expenses incurred in enforcing this Performance Deed of Trust, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees

incurred for the purpose of protecting Beneficiary's interest in the Property and rights under this Performance Deed of Trust; and (iv) takes such action as Beneficiary may reasonably require to assure that Beneficiary's interest in the Property and rights under this Performance Deed of Trust, and Owner's obligation to pay the sums secured by this Performance Deed of Trust, shall continue unchanged.

25. **Arbitration.**

**a.** In the event of any inconsistencies between the terms and conditions of the Transaction Documents (or any of them) and the terms and conditions of this Section 25, this Section 25 shall control and be binding.

**b.** SUBJECT TO APPLICABLE LAW, OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE, THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT, IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ.

**c.** **Procedure.** OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, AND THAT A SINGLE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW, EXCEPT AS OTHERWISE SET FORTH HEREIN. OWNER UNDERSTANDS THAT UNLOCK WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED. THE ARBITRATION SHALL BE CONDUCTED IN ANY U.S. STATE WHERE THE REAL PROPERTY IS LOCATED.

**d.** **Remedy.** EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD

OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

e. **Availability of Injunctive Relief.** BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF BENEFICIARY ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE UNLOCK SETTLEMENT PAYMENT IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

f. **Small Claims Court.** NOTWITHSTANDING THE ARBITRATION AGREEMENT ABOVE, BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION PROVIDED THE COURT'S REQUIREMENTS ARE SATISFIED.

g. **Class Action Waiver.** ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR UNLOCK MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

h. **Exchange Agreement.** Notwithstanding clause (a) above, if any controversy, claim or dispute with Unlock under or in connection with the Exchange Agreement is subject to arbitration in Colorado, is otherwise subject to the laws of Colorado and/or if any provision of Section 20 (Arbitration) of the Exchange Agreement is not enforceable under the laws of Colorado then Section 20 (Arbitration) of the Exchange Agreement will be deemed to be replaced by this Section 25.

26. **Applicable Law.** This Performance Deed of Trust will be governed by the law of the state in which the Real Property is located.

27. **Provisions Subject to Applicable Law.** All rights, powers and remedies provided in this Performance Deed of Trust may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Performance Deed of Trust invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable laws.

28. **State Specific Provisions.**

**a.** Principles of Construction. In the event of any inconsistencies between the terms and conditions of this Section 28 and the other terms and conditions of this Performance Deed of Trust, the terms and conditions of this Section 28 shall control and be binding.

**b.** Waiver of Homestead. To the fullest extent permitted by applicable law, Owner waives all homestead rights and any exemptions under state or federal law, presently existing or hereinafter enacted, in and to the Property, as against the payment and/or performance of the Obligations.

**c.** Expiration Date. The Expiration Date of the Exchange Agreement secured by this Performance Deed of Trust is October 07, 2033 at 11:59:59PM EDT, subject to any extension right under the Exchange Agreement.

**[Signatures on Following Page]**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS PERFORMANCE DEED OF TRUST, THE EXCHANGE AGREEMENT AND TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFICIARY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, each undersigned Owner has executed this Performance Deed of Trust as of the date set forth above.

**OWNER:**

__________________________

Name: Sheila M. Johnsen

**NON VESTED SPOUSE:**

__________________________

Name: Adam L Johnsen

**ACKNOWLEDGMENT**

State of COLORADO )

County of ____________________ ) SS.

)

The foregoing instrument was acknowledged before me this _____ day of _______, 20__ by ____________________.

WITNESS my hand and official seal.

____________________________________[SEAL]
Notary Public

My commission expires: _______________

**ACKNOWLEDGMENT**

State of COLORADO )

County of ____________________ ) SS.

)

The foregoing instrument was acknowledged before me this _____ day of ______, 20__ by ____________________.

WITNESS my hand and official seal.

____________________________________[SEAL]
Notary Public

My commission expires: ________________

**SCHEDULE A**

**LEGAL DESCRIPTION**

The following described real estate, situated in Adams County, Colorado to-wit:

SUB: BUFFALO RUN SUBD FILING NO 1 BLK:7 LOT:3

Subdivision Plat
BUFFALO RUN SUB FILING NO 1

**Parcel ID / APN:** 0172306115008

[End of legal description]

## SCHEDULE B

**Notice of certain matters agreed in relation to the Real Property in the Exchange Agreement**

1. The initial term of the Exchange Agreement shall commence on the date of the Exchange Agreement and shall expire on **October 07, 2033 at 11:59:59PM EDT**.

2. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Real Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Exchange Agreement and this Schedule to the Performance Deed of Trust ("**Schedule**"), whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Exchange Agreement or this Schedule is contained in the instrument conveying such interest in the Real Property to such person or entity.

3. The Exchange Agreement covenants are deemed to be covenants running with the land, and include, without limitation, requirements that Owner:

   (a) not transfer the Real Property without giving prior written notice to Beneficiary and comply with specific sale procedures set forth in the Exchange Agreement;

   (b) maintain insurance on the Real Property against certain hazards and risks;

   (c) not increase the amount of debt to third parties secured by liens on the Real Property as specified in the Exchange Agreement;

   (d) pay all taxes and assessments accruing on the Real Property;

   (e) occupy the Real Property in accordance with the Exchange Agreement and not use the Real Property for commercial or other non-residential purposes;

   (f) keep the Real Property free of liens not approved by Beneficiary; and

   (g) protect and maintain the Real Property and ensure that use of the Real Property complies with all applicable state, federal and local laws and regulations.

4. The purpose of this Schedule is to give notice of the existence of Beneficiary's rights under the Exchange Agreement. If there is an inconsistency between the terms of this Schedule and the Exchange Agreement, the provisions of the Exchange Agreement shall control.

5. This Schedule shall remain in full force and effect until released by a written termination or quitclaim deed executed and notarized by Beneficiary and recorded in the real property records for the county where the Real Property is located, or until extinguished by operation of law.

6. Capitalized terms used in this Schedule shall have the meaning specified in this Schedule (including the Performance Deed of Trust) or if not defined in this Schedule shall have the meaning specified in the Exchange Agreement.

ClearEdge Title

**Attention Signing agent, including this page the total page count for this attachment you are printing is __95__ pages.**

**If you have received or are printing less than that amount please contact our office immediately at:**

**Toll Free: 877-536-3390**
**Email: scheduling@cetitle.com**

****************** **FULL SCAN BACKS ARE REQUIRED – PLEASE SEND A COPY OF THE SIGNED DOCUMENTS TO SCHEDULING@CETITLE.COM** ****************************

**If possible please drop documents directly at a FedEx location due to an increase of packages being stolen from FedEx drop boxes**

ClearEdge Title

Borrower Name(s): Sheila M Johnsen
Property Address: 15161 E 116th Drive, Commerce City, CO 80603
Loan #: [redacted]0876

Thank you for handling this signing for ClearEdge Title, Inc and Unlock Partnership Solutions Inc.

During business hours of 9AM eastern – 8PM eastern Monday through Friday please contact our office at 877-536-3390 with regards to any issues at the closing. Additionally, should an issue arise outside of normal business hours or you are unable to make contact during normal business hours please reach out to the emergency contact number at 727-271-6212. PLEASE LEAVE A VOICEMAIL IF THAT NUMBER IS NOT PICKED UP.

If funds are due at the closing and a check is not available and the customer has not already made arrangements for a wire transfer please also contact us using the above methods.

Thank you.

ClearEdge Title

2605 Enterprise Rd E, Suite 270 | Clearwater, FL 33759

877.536.3390 Business |

www.cetitle.com

Formerly known as Meridian National Title

ORIGIN ID:CLWA (727) 288-2065

CLEAREDGE TITLE, INC
2605 ENTERPRISE ROAD
SUITE 270
CLEARWATER, FL 33759
UNITED STATES US

SHIP DATE: 06OCT23
ACTWGT: 1.00 LB
CAD: 104469151/WSXI2150

BILL SENDER

TO

**CLEAREDGE TITLE, INC**
**2605 ENTERPRISE ROAD E**
**SUITE 270**
**CLEARWATER FL 33759**

(727) 288-2065 REF: C-CO873159
INV:
PO: DEPT:

583J9/3D0A/9AE3

FedEx Express

E

J233123073101uv

REL# 3785346

MON - 09 OCT 5:00P
STANDARD OVERNIGHT

TRK# 0201 7846 9979 2368

33759
TPA

**34 CLWA**

FL-US

ClearEdge Title

**ClearEdge Title, Inc.**
2605 Enterprise Road E
Suite 270
Clearwater, FL 33759
(877) 536-3390

File Number: **C-CO873159**
Loan Number: [redacted]**876**
Loan Amount: **$65,400.00**
Close Date: **9/22/2023**
Disbursement Date:

## BORROWER(S) CLOSING STATEMENT

Type: **Property Report**
Property: **15161 E 116TH DRIVE**
**COMMERCE CITY, CO 80603 (ADAMS)**
**(0172306115008)**

Borrower(s): **SHEILA JOHNSEN**
**15161 E 116th Drive**
**Commerce City, CO 80603**

Lender: **Unlock Partnership Solutions Inc.**
**548 Market Street, Suite 31036, San Francisco, CA 94104**

| Description | P.O.C. | Debit | Credit |
|---|---|---|---|
| **Payoffs** | | | |
| Payoff to PNC BANK | | $25,252.90 | |
| **Subtotal of Payoffs** | | **$25,252.90** | |
| **New Loans** | | | |
| Loan Amount | | | $65,400.00 |
| Appraisal Fee to Accurate Group | | $715.00 | |
| Unlock Origination Fee (4.9%) to Unlock Partnership Solutions Inc. | | $3,204.60 | |
| **Subtotal of New Loans** | | **$3,919.60** | **$65,400.00** |
| **Title Charges** | | | |
| Title - Lender's Title Insurance to ClearEdge Title, Inc. $65,400.00 | | | |
| Title - Settlement or closing fee to ClearEdge Title, Inc. | | $895.00 | |
| **Subtotal of Title Charges** | | **$895.00** | |
| **Government Recording and Transfer Charges** | | | |
| Recording Fees: Mortgage $133.00 | | $133.00 | |
| **Subtotal of Government Recording and Transfer Charges** | | **$133.00** | |
| **Totals** | | **$30,200.50** | **$65,400.00** |

**Balance Due TO Borrower:** **$35,199.50**

**APPROVED AND ACCEPTED**

**BORROWER(S)**

______________________________
SHEILA JOHNSEN

ClearEdge Title

## ***VERY IMPORTANT TO THIS PARTICULAR CLIENT***

- **Please ensure BOTH pages requiring initials of the owners on the Forward Sale and Exchange Agreement are initialed where indicated. Unlock will have already countersigned where applicable for them.**

Initials of Owner: ______
Initials of Owner: ______
Initials of Unlock: DC

Initials of Owner: ______
Initials of Owner: ______

- **Additionally, please make sure the signature page of the Forward Sale and Exchange Agreement is signed by ALL owners as indicated and the notary acknowledgement(s) are complete.**
- **If any page has a "DRAFT DO NOT SIGN" watermark, please proceed without signing this page.**
- **Please make sure that all signors sign EXACTLY as their printed name appears.**

**Please contact us with any questions or concerns regarding these instructions.**

## ***VERY IMPORTANT TO THIS PARTICULAR CLIENT***

# COMPLIANCE AGREEMENT

Re: Order Number: C-CO873159

In consideration of ClearEdge Title. (hereinafter "title company") closing the transaction under the above order number, the undersigned agree, upon request of the company, to fully cooperate with the company to correct any inaccurate term or provision or mistake in, or omission from any document associated with the closing. He/she/they further agree that, subsequent to closing, he/she/they will execute such documents, or take such action as the company may reasonably deem necessary to properly document the transaction.

The undersigned further agree(s) that in the event an error in charges, costs, or payoff amounts is made, he/she/they will, upon request, immediately remit such sums for which he/she/they had initial responsibility for payment as may be necessary to correct such errors. Nothing herein contained shall be construed to impose liability on the parties for charges incurred as a result of the failure of the company to timely remit payment or take actions which the company has agreed in writing to perform.

The undersigned further authorize the company to correct any clerical errors on his/her/their behalf in order to properly complete the title conveyance and/or provide the lender with insurable documentation.

The undersigned further agree to comply with any such requests outlined above and agree that, in the event he/she/they fail to comply with the request, he/she/they will pay, in addition to any amounts owed above, reasonable costs of the company in enforcing this agreement, including but not limited to, reasonable attorney's fees and costs of litigation.

______________________________________________________________

DATE

Sworn to and subscribed, before me, this _____ day of _________________.

____________________________

Notary Public

**PLEASE TAKE NOTE OF THE FORM IMMEDIATELY FOLLOWING THIS COVER LETTER**

**PLEASE COMPLETE AND EXECUTE THIS FORM IF YOU WISH TO HAVE YOUR PROCEEDS WIRE DIRECTLY INTO A CHECKING OR SAVINGS ACCOUNT**

**ClearEdge Title**

2605 Enterprise Rd E, Suite 270, Clearwater, FL 33759

Phone (866) 374-0646

********* REFUND CONFIRMATION FORM********

**File Number: C-CO873159**

**Property Address: 15161 E 116th Drive**

**Projected Disbursement Date: October 10, 2023**

**Transaction Type: Home Equity Investment**

**PLEASE SELECT HOW YOU WISH TO RECEIVE THE PROCEEDS FROM YOUR TRANSACTION:**

☐ CHECK

Does the check need to be sent to the property address above? ___ Yes ___ No

If No, please provide the address where you want the check sent:

______________________________________________

☐ WIRE

We, the undersigned, have requested that ClearEdge Title deliver the following proceeds or disbursement of funds related to the above property [15161 E 116th Drive, Commerce City, CO 80603] of settlement by wire to the following financial institution:

| | | | |
|---|---|---|---|
| **Receiving Institution Name** | | | |
| **Financial Institution Routing Number** | | | |
| **Financial Institution Checking Account Number** | | | |
| **Name(s) / Payee(s) of Record with Financial Institution** | | **Are you attaching a voided check** | ☐ **Yes** ☐ **No** |

*****BANK ACCOUNT NAME MUST MATCH HOW THE TITLE IS HELD*****

We as the Payee(s) hereby authorize ClearEdge Title to wire the amount listed on the Option Closing Disclosure to the above financial institutions account notwithstanding the differences in the payee names and the names on the receiving account. By acknowledging the below through signature, the payee(s) also hereby hold ClearEdge Title harmless and indemnify them against any and all claims and disputes arising from said delivery of funds to the extent of, but not limited to, actual damages, attorney's fees, penalties and other fees associated with this request.

______________________________ ______________________________

Signature Date Signature Date

**Subscribed and sworn to before me this ____________ day of ____________, 20___.**

______________________________

**(seal)** **Notary Public**

# PAYOFF AFFIDAVIT

File No: C-CO873159

Property: 15161 E 116th Drive, Commerce City, CO 80603

WE, the undersigned, do hereby hold ClearEdge Title and Stewart Title Guaranty Company harmless for any addition monies due from any shortages in the payoff amounts of any and all liens on the aforementioned property described above and listed in the title commitment on file number C-CO873159. We also understand that if for any reason the payoff is incorrect, we are fully responsible for making up the difference and will take care of the said shortages within five (5) days from notification by ClearEdge Title whether by telephone or by mail. Should there be a remaining escrow balance we hereby authorize any shortages to be covered thru the escrow balance.

That this affidavit is being made to include Unlock Partnership Solutions Inc. to grant financing to the homeowner(s) of the above described property, and the said parties rely on the statement(s) made by the affiant(s) herein are aware that ClearEdge Title is insuring the title to the property herein and that affiant(s) warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiant(s) shall be responsible personally and/or as a corporation for any losses, including but not limited to, attorney's fees and court costs.

**Revolving Line of Credit Instructions**

**If this is a revolving credit/equity line of credit account, I/we, the undersigned homeowner (s), hereby authorize you to close this account. We hereby acknowledge that there are no outstanding draws or checks against this line of credit and understand that we will be held responsible for any draws or checks still outstanding as of the date of payoff.**

AFFIANT(S) FURTHER SAYETH NAUGHT.

______________________________

Sheila M Johnsen

| |
|---|
| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document |

STATE OF CO

COUNTY OF Adams

Subscribed and sworn to (or affirmed) before me on 8th day of October, 2023 by, Sheila M Johnsen who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

______________________________

(Notary Signature)

(SEAL)

# Marital Affidavit

File No: C-CO873159

Date: October 6, 2023

The undersigned being first duly sworn, on oath, deposes and say that (they/he/she) are the owners of the real estate situated in the County of Adams, State of CO, commonly known as 15161 E 116th Drive, Commerce City, CO 80603 and more particularly described in that certain mortgage dated in favor of Unlock Partnership Solutions Inc., the lender, under transaction number [redacted]0876.

Affiant makes the following representations in conjunction with the consummation of the pending mortgage of the real estate referenced above (premises).

On October 6, 2023 before me a Notary Public, personally appeared the undersigned

affiant(s), who being duly sworn according to law and intending to be legally bound, depose(s) and say(s):

1. (Y – N ) _______ That I am married to _________ and have been continuously married since _______________
2. (Y – N ) _______ That I am a single person and have never been married
3. (Y – N ) _______ That I am married however currently pending divorce proceedings
4. (Y – N ) _______ That I took title as married and have since been divorced and not remarried
5. (Y – N ) _______ That I took title as married and have since been divorced and remarried, my new spouse's name is ___________

FURTHER AFFIANTS SAYETH NAUGHT.

______________________________________

Sheila M Johnsen

STATE OF CO

COUNTY OF Adams

The foregoing instrument was acknowledged before me October 6, 2023 by: Sheila M Johnsen who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

______________________________________ (SEAL)

(Notary Signature)

# Limited Power of Attorney

File No: C-CO873159

Date: October 8, 2023

On this date, the undersigned borrower(s) for and in consideration of the approval, closing and funding of their above referenced mortgage loan, hereby grant ClearEdge Title, Inc as settlement agent, Limited Power of Attorney to correct and/or execute, date or initial all typographical or clerical errors discovered in any or all of the closing documentation required to be executed by the undersigned at settlement. In the event this Limited Power of Attorney is exercised, the undersigned will be notified and receive a copy of the document executed or initialed on their behalf.

THIS LIMITED POWER OF ATTORNEY MAY NOT BE USED TO INCREASE THE INTEREST RATE THE UNDERSIGNED IS PAYING, INCREASE THE TERM OF THE UNDERSIGNED'S LOAN, INCREASE THE UNDERSIGNED'S OUTSTANDING PRINCIPAL BALANCE, OR INCREASE THE UNDERSIGNED'S MONTHLY PRINCIPAL AND INTEREST PAYMENTS. Any of these specified changes must be executed directly by the undersigned.

This Limited Power of Attorney shall automatically terminate 120 days from the closing date of the undersigned's mortgage loan. IN WITNESS WHEREOF, the undersigned have executed this Limited Power of Attorney as of the date and year first above referenced

____________________________________

Sheila M Johnsen

STATE OF CO

COUNTY OF Adams

The foregoing instrument was acknowledged before me 8th day of October, 2023 by:

Sheila M Johnsen

who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

____________________________________ (SEAL)

(Notary Signature)

## OWNERS AFFIDAVIT

File No: C-CO873159

Date: October 8, 2023

On this day, personally appeared before me, the undersigned authority, authorized to administer oaths and take acknowledgements: Sheila M Johnsen & to me well known upon first duly being sworn, deposes and says:

1. They are the legal owner(s) of the property commonly known as:
2. 15161 E 116th Drive, Commerce City, CO 80603
3. That any and all work, labor, materials and supplies which have been used, applied or furnished upon the said property at any time prior to this date have been paid for and discharged; and that there are no possible liens which may be filed against the said property for work or labor or materials furnished thereon by anyone. No "Notice of Commencement" (if applicable by State) has been executed and/or filed.
4. That there is no person, firm, corporation or governmental authority entitled to any claim or lien against said property.
4. That there are no liens or encumbrances upon the real and/or personal property conveyed with the property herein, unless hereby stated. ______________________.(None, if blank)
5. That no person, firm or corporation adversely claims the property and they are in exclusive possession thereof.
6. That the undersigned has disclosed if there are any maintenance or homeowner's association fees applicable to the property herein, and that they are responsible for any fees outstanding prior to the date herein. They further warrant all fees to be current at the time of conveyance or upon acquiring financing.
7. That there are no matters pending against the Affiant(s) that could rise to a lien that would attach to the property between the disbursing of the funds and the recording of the interest to be insured, and that the Affiant(s) have not and will not execute any instrument that would adversely affect the title or interest to be insured.
8. That Affiant(s) have not caused, permitted or agreed to any unrecorded easements or right-of-ways for users, and any existing leases or contracts for sale, contracts for deed, or other contractual rights affecting the property except as follows:____________________.
9. That Affiant(s) and the property are not subject to any proceedings affecting them or the property under any Federal Bankruptcy Laws.
10. That Affiant(s) are without knowledge of any claims whatsoever of any kind or description against the furniture, fixtures and equipment located in, on or about the improvements thereon, and that personal property that are to be considered as part of the mortgaged property.
11. Affiant(s) further state that they are each familiar with the nature of an oath; and with the penalties as provided by the laws of the State aforesaid for falsely swearing to statements made in an instrument of this nature. Affiant(s) further certify that the have read, or have heard read to them, the full facts of this affidavit, and understand its contents.
12. That this affidavit is being made in order to induce Stewart Title Company, to issue a Policy on the above described property, and the said parties rely on the statements made by the affiants herein and that affiants warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiants shall be responsible personally and/or as a corporation for any losses, including but not limited to attorneys fees and court costs.

AFFIANTS FURTHER SAYETH NAUGHT.

________________________ Social Security #:____________________________

Sheila M Johnsen Circle One:

Never Married Married Divorced Widowed

________________________ Social Security #:____________________________

Circle One:

Never Married Married Divorced Widowed

STATE OF CO

COUNTY OF Adams

The foregoing instrument was acknowledged before me 8th day of October, 2023 by:

Sheila M Johnsen & who is/are personally known to me or who has/have produced a driver's license(s) as identification and who did not take an oath.

____________________________________ (SEAL)

(Notary Signature)